**PIPER HOFFMAN, ESQ., PLLC**
**Piper Hoffman**
**379 Fifth Street, Suite #1**
**Brooklyn, New York 11215**
**Tel: (718) 487-9839**
**phoffman@piperhoffmanesq.com**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISCTRICT OF NEW YORK

| | |
|---|---|
| SAMUEL HOY BLACK and BERNARD BLACK, | : : : **Demand for Trial by Jury** |
| Plaintiffs, | : : |
| v. | : : |
| CHERIE WRIGLEY, ESAUN G. PINTO, SR., and CPI INVESTIGATIONS INC., | : : : |
| Defendants. | : : |

     Samuel Hoy Black and Bernard Black (together, "Plaintiffs"), who are co-trustees of the Supplemental Needs Trust for Joanne Black, make the following allegations against Cherie Wrigley, Esaun G. Pinto, Sr., and CPI Investigations Inc. (together, "Defendants").

### <u>INTRODUCTION</u>

    1.    Joanne Black is an adult woman with severe, lifelong mental illness, including schizoaffective disorder and delusions. She has periodically been homeless and has had multiple psychiatric hospitalizations. Joanne is unable to manage her own finances or to make her own financial decisions.

    2.    Defendant Cherie Wrigley, one of Joanne's first cousins, is engaged in a systematic effort to siphon away as much of Joanne's net worth as she can for herself and her associates. Together, she, Defendant Esaun G. Pinto, Sr. – who has a federal criminal conviction – and Defendant CPI

Investigations Inc. have conspired to engage in multiple violations of civil and criminal law, including fraud, unjust enrichment, conversion, fraudulent concealment, money had and received, constructive fraud, negligent hiring and/or retention, negligent misrepresentation, and aiding and abetting, as part of their overall scheme to obtain and spend Joanne's property.

3.      Joanne's primary assets are currently in the estate of her late mother, Renata Black, and in two trusts: the Supplemental Needs Trust ("SNT") and the Joanne Black 2013 Trust ("2013 Trust"). Defendants have succeeded in obtaining for themselves money that belongs in these trusts for Joanne's care and expenses.

4.      Joanne used to be protected from financial exploitation. Her mother, Renata Black, and her brother, Bernard Black, took care of Joanne's financial needs.

5.      Renata passed away on May 1, 2012, and that was when Cherie Wrigley entered the picture.

6.      Renata left a large amount of money and property to Joanne. She left two-thirds of her estate to Joanne in the SNT, and the remaining one-third in trust to Plaintiff Bernard Black and his issue, including Plaintiff Samuel Black.

7.      Plaintiffs are co-trustees of the SNT. Under the terms of the trust, only members of Bernard Black's family can become successor trustees.

8.      Soon after Joanne's mother died, defendant Wrigley went to work on getting control of Joanne, and wresting Joanne's inheritance away from the Black family so she could spend the wealth on herself, rather than on Joanne.

9.      Since Renata's death, Defendants have been controlling and manipulating Joanne in order to exploit and appropriate her money and other assets. Their scheme includes isolating Joanne from her family and turning Joanne against her immediate family, including her brother Bernard and his wife and children, so that they can control Joanne's finances.

10.     Before Renata's death, Defendant Cherie Wrigley was long estranged from Joanne and the rest of the Black family. This was a result of Wrigley's misappropriation of a house that Renata and Renata's mother owned, and Wrigley's attempt to misappropriate valuable jewelry that belonged to Renata Black.

11.     Renata left the disputed jewelry as part of her estate. Following Renata's wishes, Bernard Black contributed the jewelry to the SNT.

12.     At the time of Renata's death, Joanne was located in Colorado, severely mentally ill, not taking her medications, and all but homeless.

13.     Wrigley, after years with no contact with Joanne, sprang into action to gain control over Joanne. Wrigley put Joanne into the hands and under the control of Defendant Esaun G. Pinto, Sr., a private investigator at Defendant CPI Investigations Inc. ("CPI").

14.     Pinto pled guilty in 2009 to the federal crime of theft of government records.

15.     Pinto was also indicted for wire fraud, aggravated identity theft, solicitation of federal tax information, fraudulent elicitation of the Social Security Administration information, and conspiracy.

16.     Pinto has obtained debit cards for Joanne's bank accounts and used them to steal money from the accounts; diverted her Social Security Disability Insurance ("SSDI") payments to himself; and submitted, and received payment for, exaggerated and false bills for expenses and services related to Joanne.

17.     Pinto has been paid with money from Renata's estate. These funds would otherwise have gone to the SNT.

18.     Pinto has stolen Joanne's SSDI payments, which otherwise would have gone to the 2013 Trust.

19.     Wrigley has paid some of Pinto's bills.  She has been reimbursed for some bills from Renata's estate, with funds that would otherwise have gone to the SNT.

3

20.     Wrigley plans to demand reimbursement for bills that she has paid, and not yet been reimbursed for, from Joanne's income, the estate, the SNT, and the 2013 Trust.

21.     Wrigley is seeking to be appointed as Joanne's guardian, so that she can control Joanne's funds.

22.     Wrigley is also seeking to defund the Black family trusts, so that, as Joanne's guardian, she can have complete control over all of their assets.

23.     This action seeks to recover for Plaintiffs, pursuant to New York common law as detailed below.

24.     This action also seeks an injunction prohibiting Pinto from having any contact with Joanne Black and prohibiting the payment of any funds intended for Joanne's benefit to Pinto or Wrigley.

## JURISDICTION AND VENUE

25.     The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(a)(1), as this dispute is between "citizens of different States."

26.     The Court is empowered to issue a declaratory judgment and "[f]urther necessary or proper relief" pursuant to 28 U.S.C. §§ 2201 and 2202.

27.     Defendants are subject to personal jurisdiction in New York.

28.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because "a substantial part of the events or omissions giving rise to the claims occurred" within this District, or § 1391(b)(3), because Defendant Pinto resides in this District and directed activities relevant to this action at this District.

## PLAINTIFFS

**Plaintiff Samuel Hoy Black**

29.     Samuel Hoy Black is a co-trustee of the Supplemental Needs Trust and the 2013 Trust.

30.     Samuel is a nephew of Joanne Black, grandson of Renata Black, and son of Bernard Black.

31.     Samuel is, and was at all times relevant, a resident of the State of Maryland.

32.     Samuel sues as a co-trustee of the SNT and the 2013 Trust, in which capacity he would have had responsibility for the assets Defendants stole. He has been deprived of the opportunity to act as a fiduciary for those assets in these trusts, and to manage those assets for the benefit of all beneficiaries.

**Plaintiff Bernard Black**

33.     Bernard Black is a co-trustee of the Joanne Black Supplemental Needs Trust and the Joanne Black 2013 Trust, and the Executor of the Estate of Renata Black.

34.     Bernard is Joanne Black's brother, the son of Renata Black, and Samuel Black's father.

35.     Bernard is, and was at all times relevant, a resident of the State of Illinois.

36.     Bernard sues as a co-trustee of the SNT and the 2013 Trust, in which capacity he would have had responsibility for the assets Defendants stole. He has been deprived of the opportunity to act as a fiduciary for those assets in these trusts, and to manage those assets for the benefit of all beneficiaries.

## DEFENDANTS

**Defendant Cherie Wrigley**

37.     Defendant Cherie Wrigley is, and was at all times relevant, a resident of the State of California.

38.     Defendant Wrigley is 64 years old.

39.     Defendant Wrigley is a first cousin of Joanne Black.

40.     Defendant Wrigley visits New York several times a year.

41.     Throughout most of her life, Defendant Wrigley had little contact with Joanne or Bernard Black. Since 1999 Defendant Wrigley had been at odds with the Black family after she misappropriated a real estate investment made by Renata Black and Joanne's grandmother, Felicia Oronowicz. Defendant Wrigley's misappropriation led Oronowicz to disinherit Wrigley and her siblings.

5

42.     Between 2004 and 2007, after Oronowicz died, Defendant Wrigley engaged in a lengthy fight with Renata Black, Joanne and Bernard's mother, over jewelry that Defendant Wrigley wanted but that Oronowicz had left to Renata.

43.     Renata left this jewelry as part of her estate. Renata did not leave anything to Wrigley in her will.

44.     At all times material to this cause of action, Defendant Pinto was an agent and/or employee of Defendant Wrigley, and was at such times, acting within the full course, scope, and authority of his position with Defendant Wrigley. Therefore, Wrigley is liable for his acts and resulting damages under the principle of respondeat superior, the law of agency, and/or the laws of New York applicable to professional associations.

45.     Every Invoice that Pinto and CPI issued in this matter stated that the "Client" was Cherie Wrigley.

46.     Defendant Wrigley has acknowledged under oath that "I did indeed retain his [Pinto's] services."  (Response to Amended Petition in Matter of Black at ¶ 15, Index no. 80253/14 (N.Y. Sup. Ct., Richmond Cty.)

**Defendant Esaun G. Pinto, Sr.**

47.     Defendant Esaun G. Pinto, Sr., is, and was at all times relevant, a resident of the State of New York. Upon information and belief, he resides in Brooklyn.

48.     Pinto is Vice President of Defendant CPI Investigations Inc., which has its principal place of business at 50 West 17th Street, Suite 800 South, New York, NY 10011.

49.     On December 5, 2007, the U.S. District Court for the Western District of Washington at Tacoma indicted Pinto of "knowingly and willfully" participating in a conspiracy and committing "Fraudulent Elici[t]ation of Social Security Administration Information, in violation of [42 U.S.C. § 1307(b)]"; "Solicitation of Federal Tax Information, in violation of [26 U.S.C. § 7213(a)(4)]"; "Aggravated Identity Theft, in violation of [18 U.S.C. § 1028A]"; and wire fraud (case number

6

3:07CR05775RBL-009).

50.     At the time, Pinto was working as a private investigator for a private investigation firm in Brooklyn. His boss was also indicted.

51.     The Indictment accused Pinto of participating in a "scheme and artifice to defraud" to obtain the "confidential employment, financial, tax and medical information of unsuspecting persons through false pretenses, and to obtain a profit by selling such information." According to the Indictment, Pinto's co-conspirators used "the identifying information," with his knowledge, to contact

> state and federal agencies, including various State Unemployment Insurance Departments, the Social Security Administration, the Internal Revenue Service, as well as private financial institutions, banks, pharmacies, and hospitals, and fraudulently posed as the individuals about whom information was sought. This fraudulent practice is widely known in the private investigations industry as 'pretexting.' Through such fraudulent telephone calls, [certain of the defendants] obtained personal wage information, employment histories, Social Security benefits information, federal tax records, and medication and hospitalization records.

52.     According to the Indictment, the defendants "obtained or attempted to obtain confidential information through false pretenses on more than 12,000 individuals."

53.     The Indictment stated that Pinto wrongfully obtained and used confidential information about individuals such as "identification of bank accounts and current account balances."

54.     The Indictment further stated that the conspirators, including Pinto, "did knowingly make and aided and abetted in the making of false representations to the Commissioner of Social Security."

55.     The Indictment also stated that Pinto "knowingly used, and aided and abetted in the use, without lawful authority, a means of identification of other persons during and in relation to a felony."

56.     Pinto pled guilty to Unlawful Conveyance of Government Records in violation of 18 U.S.C. §§ 641-42. This section carries a maximum sentence exceeds of ten years.

57.     Pinto was sentenced to one year of probation on March 31, 2009.

58.     During the period from April 2013 through September 2014, Pinto and his employer, CPI, received over $300,000 in Joanne's funds, from a variety of sources, including:  (i) simple theft of

7

Joanne's funds from her bank accounts; (ii) unauthorized and undisclosed redirection of Joanne's government benefits to himself; (iii) payments by Wrigley, supposedly for expenses and services rendered to Joanne, for which Wrigley demanded reimbursement by Bernard from Joanne's funds; and (iv) payments by Bernard from Joanne's funds, supposedly for expenses and services rendered to Joanne.  Of this total, over $50,000 was directly stolen by Pinto from Joanne's funds.  Much of the rest involved fraudulent and inflated billing by Pinto – who claimed, and was paid or reimbursed for, expenses he did not incur, and visits to Joanne that he did not make, and used his control over Joanne to demand unreasonable compensation for the services he did provide.

59.     On information and belief, during the period from July 2014 through the present, Wrigley has made additional payments to Pinto exceeding $100,000, for which she plans to seek compensation from Joanne's assets.

**Defendant CPI Investigations Inc.**

60.     Defendant CPI Investigations Inc. ("CPI") is a domestic business corporation incorporated in the State of New York. Its principal place of business is 50 West 17th Street, Suite 800 South, New York, NY 10011.

61.     CPI employs, and at all relevant times has employed, Pinto as a private investigator.

62.     At all times material to this cause of action, Defendant Pinto was a principal, vice principal, agent, and/or employee of Defendant CPI, and was at such times, acting within the full course, scope, and authority of his position with Defendant CPI. Therefore, CPI is liable for his acts and resulting damages under the principle of respondeat superior, the law of agency, and/or the laws of New York applicable to professional associations.

63.     The invoices for Defendant Pinto's purported work and expenses related to Joanne are all on CPI letterhead, and payments were made to CPI.

## PLAINTIFFS' FACTUAL ALLEGATIONS

64.    In 2010 Joanne was living in an apartment near her mother's home and spending weekends with her mother.

65.    She ceased taking her prescribed medications at around this time and became increasingly paranoid and delusional.

66.    She ran away from home and hid her location from her family because she feared that her mother would commit her to a psychiatric hospital.

67.    At this time, Joanne had a delusional belief that she was married to a billionaire mobster.

68.    After Renata's death, Joanne, because of her disability, was eligible to receive workers' compensation benefits of about $1,000 per week.  She attempted to prevent Bernard from obtaining these benefits for her because she believed her imaginary husband was rich.

69.    Before she died, Renata Black supported Joanne by sending her money weekly through deposits to her bank account at Chase.

70.    Bernard Black continued this practice after Renata's death.

71.    During the period from 2010 to 2012, Wrigley severed her already minimal ties with Joanne, claiming that she could not handle dealing with Joanne when Joanne was unmedicated – even though Wrigley had experience working with mentally ill individuals.

72.    Renata Black's estate is under the supervision of the Surrogate's Court, Westchester County, State of New York, File #2012-1209. In her will Renata named her son, Bernard Black, as executor of her estate.

**Bernard, His Wife, and His Children Had a Good Relationship with Joanne for Years**

73.    Joanne is 59 years old.  During her adult life she has had one, but only one, multi-year period during which she took her prescribed medication and was capable of having a relationship with anyone.  That period was roughly from 2005-2010.

74.    During this period, Bernard and his wife and children had a good relationship with Joanne.

75.     Bernard's wife, Kate Litwak, and Joanne exchanged letters and gifts. Bernard and Kate saw Joanne several times a year when they visited New York. Bernard's older children saw Joanne regularly for years when they lived in New York. Bernard often talked with Joanne on the telephone.

76.     Even after Joanne stopped taking her medications in or around 2010, she continued to contact Bernard and his family. In late 2011 and early 2012, when Joanne was off her medications and hiding from her mother, she spent several months in Chicago, near Bernard's home. Upon information and belief, Joanne sought at this time to reach and see Bernard and his family, who live just outside Chicago, but she did not use the correct contact information.

77.      It is also possible that Joanne only believes that she sought to contact Bernard, but did not in fact do so, due to her paranoia that if she contacted Bernard, her mother would find out where she was. As a result Bernard and his family did not know that Joanne was in Chicago.

78.     After their mother died, Joanne called Bernard many times, at all times of the day and night. She and Bernard had a number of conversations during this period; when he was not available Joanne left messages.

79.     Joanne's phone calls to Bernard's home ended after Pinto found and took control of her. At that point she also stopped responding to the Blacks' phone calls to her.

**Wrigley Schemes to Take Control of Joanne and Her Assets**

80.     On May 2, 2012, the day after Renata died, Wrigley sent an email to Bernard stating that his mother's jewelry belonged to Wrigley. She wrote, in part: "Bernie, Tony read the will to me. Quite confusing. The one thing I know is that you don't want to make any hasty decisions regarding probating that will….Also, regarding jewelry quite a bit of that was my mom's."

81.     Renata Black left an estate of over $4 million, of which the SNT would receive two-thirds. Her estate included the disputed jewelry.

82.     Bernard informed Wrigley that he would put the jewelry in the SNT, following Renata's will and wishes.

83.     After Renata's death, Wrigley decided to reestablish contact with Joanne. She had to ask Bernard for Joanne's phone number because she had not been in touch with Joanne for so long.

84.     Wrigley wrote to Bernard Black by email on May 2, 2012, the day after Renata Black's death: "I have 3#'s for Joanne.  Could you give me the latest one and I will try to call her?"

85.     During the summer and fall of 2012, Wrigley used various illegal means to locate and monitor Joanne in Colorado.

86.     Wrigley called Verizon and pretended to be Joanne.

87.     Wrigley arranged for Verizon to give her access to Joanne's account information and voicemail.

88.     Wrigley arranged for Verizon to send Joanne's phone bills to Wrigley's home address.

89.     Upon information and belief, Wrigley also impersonated Joanne to Wells Fargo and Chase, and thus succeeded in getting online access to Joanne's Wells Fargo and Chase bank accounts.

90.     Wrigley used the information she obtained from Verizon, Wells Fargo, and Chase to locate Joanne based on the location of Joanne's contacts with Verizon, and her cash withdrawals and/or check card purchases using her Wells Fargo and Chase debit cards.

**Wrigley Hires Pinto and Pressures Bernard to Pay Him**

91.     In March 2013, Bernard Black transferred Renata Black's principal assets from her accounts at Vanguard to an Estate account, and began the process of transferring those assets to the SNT and the Issue Trust.

92.     As soon as these funds were moved into the Estate of Renata Black, and therefore available to be spent, Wrigley and Pinto began to carry out their plan to take control over Joanne and her assets.

93.     Wrigley persuaded Bernard Black to allow her, using funds from the Estate of Renata Black, to travel to Colorado to look for Joanne, and did so in late March, 2013.

94.     Wrigley already knew Joanne's approximate location based on the information she

obtained from Verizon, Wells Fargo, and Chase, by pretending to be Joanne.

95. Wrigley later submitted to Bernard Black and the Estate a fraudulent and inflated bill for this trip. This bill included travel from California to Colorado for both herself and her nephew, Dustin Patenaude.

96. Wrigley told Bernard that Dustin had helped her with Joanne, in some unspecified way.

97. Their travel was first class and therefore more expensive than necessary, but Wrigley failed to disclose this.

98. Bernard Black paid this bill using funds from the Estate of Renata Black, which otherwise would have been contributed to the SNT.

99. Soon after her own trip to Colorado, Wrigley arranged with Pinto for him to travel to Colorado and move Joanne back to the East Coast.

100. According to Wrigley, she hired Pinto "to search for [Joanne] when [she] was missing in Colorado." (Response to Amended Petition in Matter of Black at ¶ 15, Index no. 80253/14 (N.Y. Sup. Ct., Richmond Cty.))

101. Upon information and belief, Wrigley instructed Pinto to travel to Colorado in April 2013, find Joanne, and gain her trust.

102. Upon information and belief, Wrigley instructed Pinto to take Joanne to New Jersey, where she had never lived and had no reason to be, so that he could monitor her conveniently from his Manhattan office and Brooklyn home.

103. Upon information and belief, Pinto also brought Joanne to New Jersey rather than New York City so it would be harder for Joanne to escape from his control, because she had no connections or contacts there.

104. Pinto brought Joanne to New Jersey and kept her under constant guard, initially 24 hours per day, to prevent her from running away. Pinto and Wrigley kept Joanne's location secret from her brother, Bernard, and the rest of the Black family.

105.     Wrigley initially paid Pinto herself and demanded reimbursement from Bernard out of money from the Estate of Renata Black that would otherwise have been contributed to the SNT.

106.     Wrigley later demanded that Bernard pay directly for Pinto's services using money from the Estate of Renata Black that would otherwise have been contributed to the SNT.

107.     Bernard objected to paying Pinto with SNT money, but Wrigley threatened that Joanne was in a dire situation, and her life would be in danger if Bernard Black did not promptly pay Pinto.

108.     Joanne was already under Pinto's physical control when Wrigley began to demand payment for his services. Once Joanne was in New Jersey, Wrigley refused to tell Bernard where his sister was. Out of fear for his sister's life, Bernard Black agreed to pay Pinto and Wrigley.

**Pinto and Wrigley Keep Bernard from Seeing Joanne and Manipulate Her Feelings toward Him**

109.     Upon information and belief, Wrigley and Pinto worked to turn Joanne against Bernard.

110.     Upon information and belief, Wrigley and Pinto manipulated and lied to Joanne to make her fear Bernard and believe that Bernard had stolen her money when in fact, Pinto had done so.

111.     In 2013, after Pinto transported Joanne from Colorado to New Jersey, Bernard proposed to hire a professional to look after Joanne rather than a private investigator, i.e. Pinto and his associates.

112.     Wrigley and Pinto refused. Wrigley needed to keep Pinto in a position where he could control Joanne, and Pinto wanted to keep the position that allowed him to charge huge amounts for watching her, and steal Joanne's money besides.

113.     Bernard made many attempts to talk with and to visit Joanne, but Pinto and Wrigley refused him access to her. Pinto told Bernard that Joanne did not want to speak with him.

114.     Joanne Black was involuntarily hospitalized from June 2013 through October 2014. Her condition gradually improved under medication.

115.     Bernard visited New York City in September 2014.

116.     He insisted on seeing his sister, despite Pinto's efforts to talk him out of this.

117.     On September 18, 2014, Bernard visited Joanne at South Beach Psychiatric Center in

13

Staten Island.

118.    Pinto insisted on being present throughout the visit, which Bernard permitted because Pinto and Wrigley told him that seeing him alone would be too stressful for Joanne.

119.    Joanne seemed afraid of Bernard. She said things that didn't make sense, which to Bernard seemed most likely to have come from Wrigley and Pinto, such as accusing Bernard of stealing the clothes she had left in Renata's house, and accusing Bernard of stealing her SSDI payments.

120.    Bernard had moved Joanne's old clothes from Renata's house to his own house for safekeeping and stored them in his basement. He reassured Joanne that her clothes were safe and she could have them whenever she wanted them.

121.    Bernard also told Joanne that his wife and children wanted to see Joanne, and invited her to visit them in Illinois once she was out of the hospital.

122.    Pinto later lied about this meeting; for instance, he told a Court Visitor appointed by the Colorado court that Bernard refused to give Joanne her clothes.

123.    Pinto became increasingly agitated during Bernard's visit, and abruptly cut it short after approximately one hour.

124.    Upon information and belief, Pinto cut the visit short because Pinto knew that Wrigley was coming to visit Joanne immediately after Bernard's visit, and neither Wrigley nor Pinto wanted Bernard to know this.

125.    On his way out of the facility, Bernard encountered Wrigley coming in.

126.    Bernard had not known that Wrigley was traveling to New York or planning to visit his sister.

127.    Pinto told Bernard that Wrigley would be in New York for several days.

128.    Bernard asked Pinto when he could visit Joanne again.

129.    Bernard also asked Pinto and Wrigley to meet with them in New York, in the hopes of resolving some of the difficulties between them.

14

130.   Pinto refused to arrange another visit for Bernard with Joanne.

131.   Pinto and Wrigley refused to schedule a meeting with Bernard while all three of them were in New York.

132.   Bernard was in the New York City area again in early October 2014.

133.   He tried to arrange a visit to Joanne on October 2, 2014 by emailing Pinto, but Pinto did not respond to his emails.

134.   Bernard also tried to reach Joanne directly and through her psychotherapist to arrange a visit, also without success.

135.   Bernard was in the New York City area again in late October 2014.

136.   He tried to arrange a visit with Joanne for October 30, 2014, but learned that Joanne had recently left South Beach Psychiatric Center.

137.   Bernard tried to reach Joanne directly and through her therapist, again without success.

138.   Upon information and belief, Joanne moved from the South Beach Psychiatric Center in Staten Island to the Center for Independent Living ("CIL") in Brooklyn on or about October 29, 2014.

139.   Neither Pinto nor Wrigley informed Bernard of this move.

140.   After the move, Pinto and Wrigley refused to tell Bernard where Joanne was living.

141.   In an email to Wrigley dated October 31, 2014, Bernard wrote, "where is Joanne now, if I may ask?"

142.   Wrigley sent a responsive email the same day in which she wrote, "NO you can not [sic] ask where Joanne is. She does not wish for you to have that information."

143.   Bernard and Katherine Litwak tried to call Joanne directly on other occasions, including November 14, 15, and 27, 2014, and December 11, 19, and 26, 2014. Joanne did not answer their calls, nor did she return their messages.

144.   For Joanne's birthday on November 14, 2014, the Blacks purchased and sent to Joanne a Kindle with a gift card for her to buy books and accessories for it.

15

145.     Bernard called and spoke to Pinto on November 15, 2014.

146.     During the November 15th call, Bernard asked Pinto to confirm the phone number that Joanne was currently using. Pinto refused to do so.

147.     Also during that call, Bernard asked Pinto to confirm with Joanne that she had received the birthday present he sent her.

148.     Pinto did not get back to Bernard to say whether Joanne had received the present.

149.     In December 2014 Bernard called Joanne to arrange to visit her that month. She did not answer or call back.

150.     On December 30, 2014, Bernard flew to New York City and went to Joanne's apartment at CIL, hoping to find her there and meet with her. She was not there. He left her pastries as a New Year's gift, the new debit card for her Chase account, and a note.

151.     On the same day Bernard called Joanne's social worker, Nelson Reddy, and left him a message. Reddy did not return the call.

152.     On January 4, 2015, Bernard called Joanne and left a message. She called him back three times, but hung up each time he answered. Bernard called Joanne back and left a message with a number she could call if she wanted to leave him a message but not speak with him.

153.     On January 26, 2015, Bernard called Joanne again. She did not answer, and he could not leave a message because her voicemail was full.

154.     On January 27, 2015 her voicemail was still full. Bernard called CIL, which told him that she did not want to speak with him and that she knew her voicemail was full.

155.     On January 31, 2015, Bernard flew to New York City. He called Joanne and left a message on her voicemail. He went to her apartment, hoping to find her and meet with her, but she was not there.

156.     Bernard called Joanne again on February 5, 2015, but did not reach her.

157.     On February 10, 2015, Bernard called Joanne, left a message, and said that he wanted to

visit, and that he needed information from her so he could pay her rent directly, using her funds from the Joanne Black 2013 Trust.

158.    On February 19, 2015, Bernard called Joanne and offered to visit that weekend, and again offered to pay her rent directly.

159.    In an example of Wrigley's manipulation of Joanne's feelings towards her brother, while Wrigley and Bernard were preparing to petition the Colorado court together for joint guardianship of Joanne, Wrigley visited Joanne and told her that she would bring her the jewelry from Renata's estate if Joanne requested Wrigley to be her sole guardian. Wrigley then notified Bernard that she intended to travel to Chicago to pick up the very jewelry she had fought over with his mother for years. She told him that Joanne wanted Cherie to come to Chicago, pick up the jewelry, and bring it to Joanne in New York.

160.    In a second example of Wrigley's manipulation of Joanne's feelings towards her brother, Wrigley told Joanne that she opposed Bernard's plan to sell a house on McKeel Avenue that was part of Renata's estate, which Bernard planned to sell as Executor because it was unsuitable for Joanne to live in, and which Joanne did not wish to sell. Wrigley told Bernard what she had said to Joanne, and that in truth she supported his selling the house, because she understood that it was not suitable for Joanne to live in.  Wrigley wrote to Bernard, regarding the sale of the McKeel house, "I guess at this point Joanne will be upset no matter what, so do whatever you feel you must."

161.    In a third example, Pinto and/or Wrigley, upon information and belief, told Joanne that Bernard was getting and stealing her SSDI checks, when in fact it was Pinto who was receiving and stealing the checks.

162.    Wrigley and Pinto succeeded in making Joanne fear her brother and his family. Before Wrigley took control of Joanne's life, Joanne and Kate Litwak were in the habit of exchanging gifts for birthdays and holidays, including presents for Kate and Bernard's sons. Yet in 2014, after Wrigley and Pinto took control of her, Joanne was too afraid to accept birthday gifts that Kate and the children had

prepared for and sent to her.

163.    The Colorado court-appointed Court Visitor, Linda Babcock, recognized that Joanne was being fed accusations intended to turn her against Bernard. In her report to the court of September 24, 2014, Babcock wrote that Joanne "appears to get caught up in the family turmoil and gets information from family members [a reference to Wrigley] that appears to 'fuel' her suspicions against Mr. Black."

**Pinto Steals from Joanne's Bank Accounts**

164.    Pinto engaged in a pattern of using Joanne's Chase and Wells Fargo debit cards to withdraw money from her accounts. He reported only a portion of his Chase withdrawals as credits on his CPI invoices. He did not reveal to Bernard that he had made additional withdrawals from Chase.

165.    Pinto never disclosed to Bernard Black, at any time, that he had withdrawn funds from Joanne's Wells Fargo account, and indeed Wrigley and Pinto assured Bernard that Joanne's Wells Fargo account was safe, and that Pinto had the debit card.

166.    Wrigley was aware that Pinto was making withdrawals from Chase and Wells Fargo, and was not reporting them to Bernard Black.

167.    For example, on July 13, 2013, Wrigley wrote an email to Pinto in which she asked "How to bill going forward and continued w/drawals from Chase if that is still happening?? I fear he [Bernard] will blow a fuse. Thinking you might be double-billing."

Chase Withdrawals

168.    The following withdrawal dates and amounts are all derived from Chase Bank statements for Joanne's account. Any bank and ATM charges that resulted from withdrawals and appeared on the statements are included in the total withdrawal figure.

169.    On April 15, 2013, Pinto withdrew $404.50 from the Chase account.

170.    On April 15, 2013, Pinto withdrew $100 from the Chase account.

171.    On April 15, 2013, Pinto made a $94.24 withdrawal or debit from the Chase account.

172.  On April 15, 2013, Pinto withdrew $405 from the Chase account.

173.  On April 15, 2013, Pinto withdrew $404 from the Chase account.

174.  On April 16, 2013, Pinto withdrew $205.50 from the Chase account.

175.  On April 16, 2013, Pinto withdrew $205.50 from the Chase account.

176.  On April 17, 2013, Pinto withdrew $305.95 from the Chase account.

177.  On April 18, 2013, Pinto withdrew $504.50 from the Chase account.

178.  On April 19, 2013, Pinto withdrew $450 from the Chase account

179.  On April 22, 2013, Pinto withdrew $500 from the Chase account.

180.  On April 22, 2013, Pinto withdrew $500 from the Chase account.

181.  On April 25, 2013, Pinto withdrew $500 from the Chase account

182.  On April 26, 2013, Pinto withdrew $500 from the Chase account.

183.  On April 29, 2013, Pinto withdrew $300 from the Chase account.

184.  On April 29, 2013, Pinto withdrew $124 from the Chase account.

185.  On April 30, 2013, Pinto withdrew $450 from the Chase account.

186.  On May 2, 2013, Pinto withdrew $450 from the Chase account.

187.  On May 3, 2013, Pinto withdrew $500 from the Chase account.

188.  On May 6, 2013, Pinto withdrew $500 from the Chase account.

189.  On May 7, 2013, Pinto withdrew $500 from the Chase account.

190.  On May 8, 2013, Pinto withdrew $500 from the Chase account.

191.  On May 9, 2013, Pinto withdrew $500 from the Chase account.

192.  On May 10, 2013, Pinto withdrew $505 from the Chase account.

193.  On May 13, 2013, Pinto withdrew $305 from the Chase account.

194.  On May 13, 2013, Pinto withdrew $500 from the Chase account.

195.  On May 15, 2013, Pinto withdrew $203.75 from the Chase account.

196.  On May 16, 2013, Pinto withdrew $500 from the Chase account.

197.    On May 17, 2013, Pinto withdrew $500 from the Chase account.

198.    On May 20, 2013, Pinto withdrew $500 from the Chase account.

199.    On May 21, 2013, Pinto withdrew $500 from the Chase account.

200.    On May 23, 2013, Pinto withdrew $500 from the Chase account.

201.    On May 24, 2013, Pinto withdrew $500 from the Chase account.

202.    On May 28, 2013, Pinto withdrew $500 from the Chase account.

203.    On May 29, 2013, Pinto withdrew $500 from the Chase account.

204.    On June 5, 2013, Pinto withdrew $500 from the Chase account.

205.    On June 17, 2013, Pinto withdrew $100 from the Chase account.

206.    On June 19, 2013, Pinto withdrew $500 from the Chase account.

207.    On June 20, 2013, Pinto withdrew $500 from the Chase account.

208.    On June 21, 2013, Pinto withdrew $500 from the Chase account.

209.    On June 24, 2013, Pinto withdrew $500 from the Chase account.

210.    On June 25, 2013, Pinto withdrew $500 from the Chase account.

211.    On June 28, 2013, Pinto withdrew $500 from the Chase account.

212.    On July 8, 2013, Pinto withdrew $500 from the Chase account.

213.    On July 10, 2013, Pinto withdrew $500 from the Chase account.

214.    On July 15, 2013, Pinto withdrew $500 from the Chase account.

215.    On July 17, 2013, Pinto withdrew $200 from the Chase account.

216.    On July 18, 2013, Pinto withdrew $500 from the Chase account.

217.    On July 22, 2013, Pinto withdrew $500 from the Chase account.

218.    On August 7, 2013, Pinto withdrew $500 from the Chase account.

219.    On August 9, 2013, Pinto withdrew $500 from the Chase account.

220.    On August 12, 2013, Pinto withdrew $500 from the Chase account.

221.    On August 15, 2013, Pinto withdrew $500 from the Chase account.

222.    On August 19, 2013, Pinto withdrew $203 from a non-Chase ATM, for which Bernard Black later arranged a $3 credit, for a total withdrawal of $200 from the Chase account.

223.    On August 19, 2013, Pinto withdrew $60 from the Chase account.

224.    On August 19, 2013, Pinto withdrew $500 from the Chase account.

225.    On August 29, 2013, Pinto withdrew $500 from the Chase account.

226.    On August 30, 2013, Pinto withdrew $500 from the Chase account.

227.    On September 9, 2013, Pinto withdrew $301.50 from a non-Chase ATM, with a $1.50 credit, for a total withdrawal of $300 from the Chase account.

228.    On September 9, 2013, Pinto withdrew $202.95 from a non-Chase ATM, with a $2.95 credit, for a total withdrawal of $200 from the Chase account.

229.    On September 12, 2013, Pinto withdrew $500 from the Chase account.

230.    On September 13, 2013, Pinto withdrew $500 from the Chase account.

231.    On September 16, 2013, Pinto withdrew $100 from the Chase account.

232.    On September 23, 2013, Pinto withdrew $500 from the Chase account.

233.    On September 25, 2013, Pinto withdrew $100 from the Chase account.

234.    On September 26, 2013, Pinto withdrew $200.99 from a non-Chase ATM, with a $.99 credit, for a total withdrawal of $200 from the Chase account.

235.    On September 30, 2013, Pinto withdrew $122 from the Chase account.

236.    On September 30, 2013, Pinto withdrew $101.99 from a non-Chase ATM, with a $1.99 credit, for a total withdrawal of $100 from the Chase account.

237.    On September 30, 2013, Pinto withdrew $100.99 from a non-Chase ATM, with a $.99 credit, for a total withdrawal of $100 from the Chase account.

238.    On October 15, 2013, Pinto withdrew $300 from the Chase account.

239.    On October 18, 2013, Pinto withdrew $403 from a non-Chase ATM, with a $3 credit, for a total withdrawal of $400 from the Chase account.

240.    On October 18, 2013, Pinto withdrew $60 from the Chase account.

241.    On October 24, 2013, Pinto withdrew $500 from the Chase account.

242.    On October 28, 2013, Pinto withdrew $402 from a non-Chase ATM, with a $2 credit, for a total withdrawal of $400 from the Chase account.

243.    On November 12, 2013, Pinto withdrew $500 from the Chase account.

244.    On November 14, 2013, Pinto withdrew $500 from the Chase account.

245.    On November 26, 2013, Pinto withdrew $500 from the Chase account.

246.    On December 2, 2013, Pinto withdrew $400 from the Chase account.

247.    On December 6, 2013, Pinto withdrew $500 from the Chase account.

248.    On December 9, 2013, Pinto withdrew $500 from the Chase account.

249.    On December 12, 2013, Pinto withdrew $500 from the Chase account.

250.    On December 16, 2013, Pinto withdrew $200 from the Chase account.

251.    On December 16, 2013, Pinto withdrew $101.75 from a non-Chase ATM, with a $1.75 credit, for a total withdrawal of $100 from the Chase account.

252.    On December 24, 2013, Pinto withdrew $102.25 from a non-Chase ATM, with a $2.25 credit, for a total withdrawal of $100 from the Chase account.

253.    On December 24, 2013, Pinto withdrew $102.25 from a non-Chase ATM, with a $2.25 credit, for a total withdrawal of $100 from the Chase account.

254.    On December 27, 2013, Pinto withdrew $300 from the Chase account.

255.    On December 30, 2013, Pinto withdrew $200 from the Chase account.

256.    On December 31, 2013, Pinto withdrew $500 from the Chase account.

257.    On January 2, 2014, Pinto withdrew $203 from a non-Chase ATM, with a $3 credit, for a total withdrawal of $200 from the Chase account.

258.    On January 2, 2014, Pinto withdrew $203 from a non-Chase ATM, with a $3 credit, for a total withdrawal of $200 from the Chase account.

259.     On January 29, 2014, Pinto withdrew $503 from a non-Chase ATM, with a $3 credit, for a total withdrawal of $500 from the Chase account.

260.     On February 18, 2014, Pinto withdrew $450 from the Chase account.

261.     On February 21, 2014, Pinto withdrew $400 from the Chase account.

262.     On February 21, 2014, Pinto withdrew $101.50 from a non-Chase ATM, with a $1.50 credit, for a total withdrawal of $100 from the Chase account.

263.     On February 25, 2014, Pinto withdrew $500 from the Chase account.

264.     On February 28, 2014, Pinto withdrew $303 from a non-Chase ATM, with a $3 credit, for a total withdrawal of $300 from the Chase account.

265.     On March 17, 2014, Pinto withdrew $101.75 from a non-Chase ATM, with a $1.75 credit, for a total withdrawal of $100 from the Chase account.

266.     On March 17, 2014, Pinto withdrew $203 from a non-Chase ATM, with a $3 credit, for a total withdrawal of $200 from the Chase account.

267.     On March 18, 2014, Pinto withdrew $500 from the Chase account.

268.     On March 19, 2014, Pinto withdrew $503 from a non-Chase ATM, with a $3 credit, for a total withdrawal of $500 from the Chase account.

269.     On April 10, 2014, Pinto withdrew $500 from the Chase account.

270.     On April 21, 2014, Pinto withdrew $101.50 from a non-Chase ATM, with a $1.50 credit, for a total withdrawal of $100 from the Chase account.

271.     On April 21, 2014, Pinto withdrew $201.75 from a non-Chase ATM, with a $1.75 credit, for a total withdrawal of $200 from the Chase account.

272.     On April 28, 2014, Pinto withdrew $201.75 from a non-Chase ATM, with a $1.75 credit, for a total withdrawal of $200 from the Chase account.

273.     On May 5, 2014, Pinto withdrew $500 from the Chase account.

274.     On May 6, 2014, Pinto withdrew $450 from the Chase account.

275.    On May 12, 2014, Pinto withdrew $400 from the Chase account.

276.    On May 12, 2014, Pinto withdrew $101.75 from a non-Chase ATM, with a $1.75 credit, for a total withdrawal of $100 from the Chase account.

277.    On May 13, 2014, Pinto withdrew $500 from the Chase account.

278.    On May 15, 2014, Pinto withdrew $203 from a non-Chase ATM, with a $3 credit, for a total withdrawal of $200 from the Chase account.

279.    On May 16, 2014, Pinto withdrew $500 from the Chase account.

280.    On May 19, 2014, Pinto withdrew $450 from the Chase account.

281.    On May 21, 2014, Pinto withdrew $101.75 from a non-Chase ATM, with a $1.75 credit, for a total withdrawal of $100 from the Chase account.

282.    On May 21, 2014, Pinto withdrew $303 from a non-Chase ATM, with a $3 credit, for a total withdrawal of $300 from the Chase account.

283.    On May 23, 2014, Pinto withdrew $300 from the Chase account.

284.    On May 27, 2014, Pinto withdrew $500 from the Chase account.

285.    On May 30, 2014, Pinto withdrew $500 from the Chase account.

286.    On June 2, 2014, Pinto withdrew $500 from the Chase account.

287.    On June 5, 2014, Pinto withdrew $202 from a non-Chase ATM, with a $2 credit, for a total withdrawal of $200 from the Chase account.

288.    On June 12, 2014, Pinto withdrew $102.50 from a non-Chase ATM, with a $2.50 credit, for a total withdrawal of $100 from the Chase account.

289.    On June 18, 2014, Pinto withdrew $500 from the Chase account.

290.    On June 19, 2014, Pinto withdrew $500 from the Chase account.

291.    On June 20, 2014, Pinto withdrew $500 from the Chase account.

292.    On June 23, 2014, Pinto withdrew $6 from the Chase account.

293.    On June 24, 2014, Pinto withdrew $200 from the Chase account.

294.     On June 27, 2014, Pinto withdrew $200 from the Chase account.

295.     On June 30, 2014, Pinto withdrew $101.75 from a non-Chase ATM, with a $1.75 credit, for a total withdrawal of $100 from the Chase account.

296.     On July 2, 2014, Pinto withdrew $101.75 from a non-Chase ATM, with a $1.75 credit, for a total withdrawal of $100 from the Chase account.

297.     On July 3, 2014, Pinto withdrew $300 from the Chase account.

298.     On July 7, 2014, Pinto withdrew $203 from a non-Chase ATM, with a $3 credit, for a total withdrawal of $200 from the Chase account.

299.     On July 10, 2014, Pinto withdrew $122.50 from a non-Chase ATM, with $2.50 credit, for a total withdrawal of $120 from the Chase account.

300.     On July 7, 2014, Pinto withdrew $200 from the Chase account.

301.     On July 22, 2014, Pinto withdrew $500 from the Chase account.

302.     On August 4, 2014, Pinto withdrew $102.50 from a non-Chase ATM, with a $2.50 credit, for a total withdrawal of $100 from the Chase account.

303.     On August 11, 2014, Pinto withdrew $200 from the Chase account.

304.     On August 12, 2014, Pinto withdrew $100 from the Chase account.

305.     On August 15, 2014, Pinto withdrew $503 from a non-Chase ATM, with a $3 credit, for a total withdrawal of $500 from the Chase account.

306.     On August 18, 2014, Pinto withdrew $400 from the Chase account.

307.     On August 18, 2014, Pinto withdrew $101.75 from a non-Chase ATM, with a $1.75 credit, for a total withdrawal of $100 from the Chase account.

308.     On August 18, 2014, Pinto withdrew $60.99 from a non-Chase ATM, with a $.99 credit, for a total withdrawal of $60 from the Chase account.

309.     On September 2, 2014, Pinto withdrew $101.75 from a non-Chase ATM, with a $1.75 credit, for a total withdrawal of $100 from the Chase account.

310.    On September 3, 2014, Pinto withdrew $103 from a non-Chase ATM, with a $3 credit, for a total withdrawal of $100 from the Chase account.

311.    On September 4, 2014, Pinto withdrew $101.75 from a non-Chase ATM, with a $1.75 credit, for a total withdrawal of $100 from the Chase account.

312.    On September 5, 2014, Pinto withdrew $200 from the Chase account.

313.    On September 8, 2014, Pinto withdrew $101.75 from the Chase account.

314.    On September 8, 2014, Pinto withdrew $101.50 from a non-Chase ATM, with a $1.50 credit, for a total withdrawal of $100 from the Chase account.

315.    On September 8, 2014, Pinto withdrew $101.50 from a non-Chase ATM, with a $1.50 credit, for a total withdrawal of $100 from the Chase account.

316.    On September 15, 2014, Pinto withdrew $101.75 from the Chase account.

317.    On September 16, 2014, Pinto withdrew $303 from the Chase account.

318.    On September 19, 2014, Pinto withdrew $101.75 from the Chase account.

319.    On September 22, 2014, Pinto withdrew $500 from the Chase account.

320.    On September 25, 2014, Pinto withdrew $500 from the Chase account.

321.    On September 29, 2014, Pinto withdrew $100 from the Chase account.

322.    On September 29, 2014, Pinto withdrew $400 from the Chase account.

323.    On September 30, 2014, to prevent further withdrawals, Bernard Black cancelled Joanne's Chase debit card.

324.    In total, from April 15, 2013 through September 29, 2014, Pinto withdrew $52,003.19 from Joanne's Chase bank account.

Wells Fargo Withdrawals

325.    Joanne's monthly SSDI checks were deposited automatically into her Wells Fargo checking account.

326.    Pinto engaged in a pattern of using Joanne's Wells Fargo debit card to withdraw money

from her account. He reported none of these withdrawals on his statements to Cherie Wrigley.

327.    The following withdrawal dates and amounts are all derived from Wells Fargo statements for Joanne's account. Any bank and ATM charges that resulted from withdrawals and appeared on the statements are included in the total withdrawal figure.

328.    On May 2, 2013, Pinto withdrew $950.00 from the Wells Fargo account.

329.    On May 3, 2013, Joanne received a payment from the Social Security Administration for $1,192.00.  The same day, Pinto incurred a $2.00 charge for a non-ATM balance inquiry.

330.    On May 3, 2013, Pinto withdrew $205.50 from the Wells Fargo account, and also incurred a $2.50 non-ATM withdrawal charge.

331.    On June 3, 2013, Pinto withdrew $104.50 from the Wells Fargo account.

332.    On June 3, 2013, Pinto withdrew $204.50 from the Wells Fargo account.

333.    On July 9, 2013, Pinto made a $19.08 Check Card Purchase, paying out of the Wells Fargo account.

334.    On July 10, 2013, Pinto made a $22.06 Check Card Purchase, paying out of the Wells Fargo account.

335.    On July 10, 2013, Pinto made a $23.55 Check Card Purchase, paying out of the Wells Fargo account.

336.    On July 10, 2013, Pinto made a $16.09 Check Card Purchase, paying out of the Wells Fargo account.

337.    On July 10, 2013, Pinto made a $19.07 Check Card Purchase, paying out of the Wells Fargo account.

338.    On July 10, 2013, Pinto made a $5.75 Check Card Purchase, paying out of the Wells Fargo account.

339.    On July 10, 2013, Pinto made a $22.06 Check Card Purchase, paying out of the Wells Fargo account.

340.    On August 5, 2013, Pinto withdrew $204 from the Wells Fargo account.

341.    On August 7, 2013, Pinto made a $61 Check Card Purchase, paying out of the Wells Fargo account.

342.    On August 12, 2013, Pinto withdrew $305.50 from the Wells Fargo account.

343.    On August 15, 2013, Pinto withdrew $204 from the Wells Fargo account.

344.    On August 19, 2013, Pinto withdrew $124.50 from the Wells Fargo account.

345.    On August 19, 2013, Pinto withdrew $84.50 from the Wells Fargo account.

346.    On August 19, 2013, Pinto withdrew $205.50 from the Wells Fargo account.

347.    On August 26, 2013, Pinto made a $500 POS Purchase, incurring $12.50 in overdraft transfer fees, for a total debit of $512.50 from the Wells Fargo account.

348.    On August 27, 2013, Pinto withdrew $96.50, which included an overdraft transfer fee, from the Wells Fargo account.

349.    On August 28, 2013, Pinto withdrew $220, which included an overdraft transfer fee from the Wells Fargo account.

350.    On August 29, 2013, Pinto withdrew $318, including an overdraft transfer fee, from the Wells Fargo account.

351.    On August 30, 2013, Pinto incurred a $2 fee for a non-Wells Fargo ATM balance inquiry.

352.    On September 3, 2013, Pinto withdrew $204 from the Wells Fargo account.

353.    On September 3, 2013, Pinto withdrew $305.50 from the Wells Fargo account.

354.    On September 4, 2013, Pinto withdrew $104.50 from the Wells Fargo account.

355.    On September 5, 2013, Pinto withdrew $305.50 from the Wells Fargo account.

356.    On September 6, 2013, Pinto withdrew $206.50 from the Wells Fargo account.

357.    On September 9, 2013, Pinto withdrew $138, including an overdraft transfer fee, from the Wells Fargo account.

358.    On September 10, 2013, Pinto withdrew $216.50, from the Wells Fargo account.

359.    On September 11, 2013, Pinto withdrew $116.50, including an overdraft transfer fee, from the Wells Fargo account.

360.    On September 13, 2013, Pinto withdrew $137.50, including an overdraft transfer fee, from the Wells Fargo account.

361.    On September 16, 2013, Pinto withdrew $220, from the Wells Fargo account.

362.    On October 2, 2013, Pinto incurred a $2 fee for a non-Wells Fargo ATM balance inquiry.

363.    On October 3, 2013, Pinto withdrew $205.45 from the Wells Fargo account.

364.    On October 4, 2013, Pinto withdrew $305.50 from the Wells Fargo account.

365.    On October 7, 2013, Pinto withdrew $207.75 from the Wells Fargo account.

366.    On October 8, 2013, Pinto made a $336.62 POS Purchase, paying out of the Wells Fargo account.

367.    On October 10, 2013, Pinto made a $190.79 POS Purchase, incurring $35 in overdraft protection fees, for a total debit of $225.79 from the Wells Fargo account.

368.    On October 11, 2013, Pinto made a $145.07 POS Purchase, paying out of the Wells Fargo account.

369.    On October 28, 2013, Pinto incurred a $2 fee for a non-Wells Fargo ATM balance inquiry.

370.    On November 4, 2013, Pinto withdrew $104.25 from the Wells Fargo account.

371.    On November 4, 2013, Pinto made a $94.97 POS Purchase, paying out of the Wells Fargo account.

372.    On November 4, 2013, Pinto withdrew $104.25 from the Wells Fargo account.

373.    On November 4, 2013, Pinto withdrew $204 from the Wells Fargo account.

374.    On November 5, 2013, Pinto withdrew $104 from the Wells Fargo account.

375.    On November 7, 2013, Pinto withdrew $106.50 from the Wells Fargo account.

376.    On November 12, 2013, Pinto made a $124.87 POS Purchase, paying out of the Wells

Fargo account.

377.    On November 14, 2013, Pinto made an $83.10 POS Purchase, paying out of the Wells Fargo account.

378.    On November 19, 2013, Pinto withdrew $139.25 from the Wells Fargo account.

379.    On November 25, 2013, Pinto incurred a $2 fee for a non-Wells Fargo ATM balance inquiry.

380.    On December 4, 2013, Pinto withdrew $103.49 from the Wells Fargo account.

381.    On December 6, 2013, Pinto withdrew $104 from the Wells Fargo account.

382.    On December 6, 2013, Pinto withdrew $300 from the Wells Fargo account.

383.    On December 9, 2013, Pinto made a $123.96 POS Purchase, paying out of the Wells Fargo account.

384.    On December 9, 2013, Pinto withdrew $104 from the Wells Fargo account.

385.    On December 10, 2013, Pinto withdrew $305.50 from the Wells Fargo account.

386.    On December 11, 2013, Pinto withdrew $240.50, including an overdraft fee, from the Wells Fargo account.

387.    On December 12, 2013, Pinto withdrew $140.50 from the Wells Fargo account.

388.    On January 21, 2014, Pinto withdrew $307.50 from the Wells Fargo account.

389.    On January 28, 2014, Pinto withdrew $104 from the Wells Fargo account.

390.    On January 29, 2014, Pinto withdrew $307.50 from the Wells Fargo account.

391.    On February 7, 2014, Pinto withdrew $105.50 from the Wells Fargo account.

392.    On February 10, 2014, Pinto withdrew $305.50 from the Wells Fargo account.

393.    On February 12, 2014, Pinto withdrew $307.50 from the Wells Fargo account.

394.    On February 18, 2014, Pinto withdrew $104 from the Wells Fargo account.

395.    On February 18, 2014, Pinto withdrew $124 from the Wells Fargo account.

396.    On February 18, 2014, Pinto withdrew $105.50 from the Wells Fargo account.

397.   On February 18, 2014, Pinto withdrew $204.25 from the Wells Fargo account.

398.   On February 19, 2014, Pinto withdrew $239, including an overdraft fee, from the Wells Fargo account.

399.   On February 20, 2014, Pinto made a $52.50 Check Card Purchase, incurring $35 in overdraft fees, for a total debit of $87.50 from the Wells Fargo account.

400.   On February 20, 2014, Pinto withdrew $139, including an overdraft fee, from the Wells Fargo account.

401.   On March 11, 2014, Pinto withdrew $204 from the Wells Fargo account.

402.   On March 12, 2014, Pinto withdrew $205 from the Wells Fargo account.

403.   On March 13, 2014, Pinto withdrew $205 from the Wells Fargo account.

404.   On March 17, 2014, Pinto withdrew $206 from the Wells Fargo account.

405.   On March 17, 2014, Pinto withdrew $241.45 from the Wells Fargo account.

406.   On March 17, 2014, Pinto withdrew $100.25, including an overdraft fee, from the Wells Fargo account.

407.   On April 7, 2014, Pinto withdrew $104 from the Wells Fargo account.

408.   On April 10, 2014, Pinto withdrew $305.50 from the Wells Fargo account.

409.   On April 11, 2014, Pinto withdrew $305.50 from the Wells Fargo account.

410.   On April 14, 2014, Pinto withdrew $204 from the Wells Fargo account.

411.   On May 5, 2014, Pinto withdrew $46.25 from the Wells Fargo account.

412.   The total of Pinto's withdrawals from Joanne's Wells Fargo account from May 2, 2013 to May 5, 2014 is $14,373.68.

<u>Credits for Bank Withdrawals on CPI Investigations Invoices</u>

413.   For the same periods, Pinto credited only $15,100 in withdrawals from Chase against the balances on the CPI Investigations invoices, as follows:

414.   Invoice # 41213 (for the period ending April 23, 2013) credited $2,000 in Chase

withdrawals.

415.    Invoice # 42913 (for the period ending April 29, 2013) credited $2,500 in Chase withdrawals.

416.    Invoice # 50713 (for the period ending May 7, 2013) credited $2,000 in Chase withdrawals.

417.    Invoice # 52013 (for the period ending May 20, 2013) credited $1,000 in Chase withdrawals.

418.    Invoice # 61913 (for the period ending June 24, 2013) credited $1,100 in withdrawals from "J. Black account", which Bernard understood to be Joanne's Chase account.

419.    Invoice # 80613-2 (for the period ending August 5, 2013) credited $2,000 in Chase withdrawals.

420.    Invoice # 82613 (for the period ending September 2, 2013) credited $2,000 in Chase withdrawals.

421.    Invoice # 10114 for January 2014 credited and charged "approximately $2,000" withdrawn from Joanne's Chase account to cover an apparently equal amount of Joanne's expenses for "storage, winter clothing etc."

422.    Invoice #40114 for April 2014 credited $2,000 in withdrawals from an unspecified account.

423.    Invoice #50114 for May 2014 credited $3,500 in Chase withdrawals.

424.    Invoice #80114 for August 2014 credited $2,500 in Chase withdrawals.

425.    Subtracting the $22,600 in withdrawals that CPI Investigations credited to Cherie Wrigley's account from the $52,003.19 that Pinto withdrew from Chase and the $14,373.68 that he withdrew from Wells Fargo leaves $43,776.87 of Joanne's money that Pinto did not report he had taken and did not credit on invoices.

426.    Pinto did not return any of these funds to Joanne. He billed Wrigley separately for all out-

of-pocket expenses for Joanne, including buying items for Joanne and providing her with spending money.

**Pinto Took Joanne's Social Security Disability Insurance Benefits**

427.     Joanne received Social Security Disability Insurance benefits from the Social Security Administration during the period from January 2013 and continuing through the present.

428.     The SSA direct-deposited these benefits into Joanne's Wells Fargo bank account.

429.     During the period when Joanne was hospitalized, Bernard believed that these monthly benefit payments were accumulating untouched.

430.     On November 19, 2013, Bernard sent an email with the subject line "Joanne's SSDI checks" to Pinto and Wrigley that read:

Esaun or Cherie: What do you know about where these are going. When she gets out of hospital, I think it would be not a good idea for her to have what might be by then $10-15k sitting in a bank account.

431.     Wrigley responded by email, stating in part:

Esaun should have Joanne's Wells Fargo card. That is the bank acct. where the check is auto deposited into. The first couple of months I think she used some money for calls…but Esaun talks to her about that.

432.     Bernard understood from this message that, other than a small amount that Joanne might have used for phone calls, her SSDI benefits were accumulating in her Wells Fargo account.

433.     Wrigley had online access to Joanne's Wells Fargo account.  Wrigley knew that Pinto had been withdrawing Joanne's SSDI payments and was not reporting these withdrawals to Bernard.

434.     Thus, Wrigley knew that Pinto's "double billing," as she called it, was continuing. Wrigley also knew that the "double billing" included both the Chase and Wells Fargo accounts.

435.     Until he received this email message from Wrigley, Bernard did not know that Pinto had Joanne's Wells Fargo debit card.

436.     In the spring of 2014 Bernard again asked about the SSDI money, which by then should have amounted to around $13,000, and proposed to transfer it to the Chase account.

437.   Pinto and Wrigley claimed at that time that Joanne had lost her Wells Fargo debit card.

438.   In fact, Pinto had been taking the SSDI money out of Joanne's Wells Fargo account for his own use, and there was almost no money left.

439.   The Wells Fargo bank statements were mailed by Wells Fargo to Joanne's address. Bernard did not have access to her statements, so he did not know that Pinto had been withdrawing funds from Joanne's Wells Fargo account.

440.   Wrigley, however, had online access to Joanne's Wells Fargo accounts, knew that Pinto was continuing to withdraw money from Wells Fargo, and concealed this from Bernard.

441.   In September 2014, when relations between the Black family on the one hand, and Wrigley, Pinto, and Wrigley's brother, Anthony Dain, on the other, began to worsen, Bernard determined to find out for himself whether Joanne's SSDI money was sitting safely in her Wells Fargo account.

442.   Once Bernard got access to Joanne's Wells Fargo account statements he discovered that the account was essentially empty and that SSDI payments had stopped coming into it, with the last SSDI payment received in April 2014.

443.   Joanne Black was correct that her SSDI had been stolen, but the thief was Pinto, with Wrigley's knowledge and consent, not Bernard.

444.   Bernard investigated the cessation of SSDI payments, and determined that Pinto had applied to the Social Security Administration ("SSA") and made himself the Representative Payee for Joanne's SSDI benefits.

445.   Upon information and belief, he did this in response to Bernard's inquiries in the spring of 2014 about the Wells Fargo account, so that he could continue to take Joanne's SSDI payments for his own use without Bernard's knowledge.

446.   As Representative Payee, Pinto received Joanne's money directly from the SSA. It no longer went into the Wells Fargo account.

447.     Upon information and belief, Pinto used most if not all of Joanne's SSDI money for his own purposes and did not save it for or spend it on her.

448.     Upon information and belief, Wrigley knew that Pinto had become Joanne's representative payee.

449.     Wrigley knew that Bernard was Joanne's conservator in Colorado, was responsible for her financial affairs, and was specifically authorized by the Colorado court to become Joanne's representative payee.

450.     Wrigley did not inform Bernard that Pinto had become Joanne's representative payee.

451.     Pinto remained Representative Payee of Joanne's SSDI benefits until January 29, 2015.

452.     The SSDI payments he received for May 2014 through January 2015 remain unaccounted for.

453.     These payments total $10,975.00:  $1,217 per month for 8 months in 2014; plus $1,239 for January 2015.

454.     As of January 29, 2015, Bernard became the Representative Payee. He received one check from SSDI for Joanne.

455.     Pinto and Wrigley persuaded Joanne to tell SSA to stop sending him money.  SSA then decided to stop sending anyone money. Joanne's money began to pile up at SSA, unclaimed.

456.     Bernard did exactly what he should have with the one SSDI check he received for Joanne: he deposited it into the 2013 Trust, where the money still sits.

**Pinto Charges for Services He Did Not Provide**

<u>Pinto Charges for Visits to Joanne that He Didn't Make</u>

457.     During Joanne's hospitalization in 2013 and 2014, Pinto claimed that he visited her at least three times a week for five hours per visit.  During 2013, he charged $150 per hour, plus mileage, gas, and tolls, for a total of $796.33 per visit.

458.     Bernard believed that this was an exorbitant per-visit charge, but paid it because Pinto

had physical control over his sister, Joanne, and had made himself Bernard's only contact with Joanne.

459.    Beginning in January 2014, Bernard succeeded in negotiating with Pinto for a lower monthly flat rate of $8,000 per month, for the same minimum visit frequency of three times per week.

460.    Wrigley was responsible for supervising Pinto and ensuring that he actually made the minimum three visits per week.

461.    Wrigley was also responsible for ensuring that Pinto actually spent the five hours per visit to Joanne (including travel time) that he was charging for.

462.    Hospital records prove that Pinto did not fulfill his minimum responsibility, though he still charged, and was paid, as if he was visiting three times per week.

463.    Wrigley knew that Pinto was supposed to visit Joanne three times per week, was sometimes not doing so, yet billed as if he had done so.  For example, on June 24, 2013, Pinto wrote to Wrigley by email, and explained "When I return to NY [Joanne] expects me to visit 3 times per week."

464.    This message indicates that Pinto did not visit Joanne during the period when he was absent from New York.

465.    Wrigley did not inform Bernard that Pinto was failing to visit Joanne a minimum of three times per week.

466.    The visitor logs of the South Beach Psychiatric Center ("SBPC") in Staten Island, where Joanne was hospitalized from November 17, 2013 through October 29, 2014, demonstrate that Pinto visited Joanne an average of only 1.2 times per week from May 22, 2014 through August 31, 2014, not the three times per week that he was paid for. (The visitor logs do not cover the period prior to May 22, 2014. SBPC maintains that earlier records are not available.)

467.    Between May 22, 2014, and August 31, 2014[1], a period of approximately 15 weeks, Pinto visited Joanne only 18 times by himself.

---

[1] We end this analysis at August 31, 2014. After that, Bernard reduced Pinto's compensation to $4,000 per month.

468.    Pinto visited Joanne four additional times during July 2014 together with Wrigley.

469.    For the visits he made together with Wrigley, Pinto demanded and received a separate payment of $2,300 from Wrigley.

470.    Wrigley then demanded that Bernard reimburse her, from Estate funds that would otherwise go to the SNT, for this additional payment to Pinto.

471.    Pinto's 18 visits over 15 weeks average out to 1.2 visits per week.

472.    This means that he was paid for $1.8^2$ visits to Joanne per week that he did not make.

473.    Upon information and belief, this visit frequency can be extrapolated throughout the approximately 56 weeks during which Joanne was hospitalized (first at Meadowview Psychiatric Hospital in New Jersey from June 2013 to November 2013, then at South Beach) and Pinto was paid to visit her three times a week, i.e. from July 2013 through August 2014.

474.    The 8-month period during which Pinto was billing a flat rate of $8,000/month (January through August 2014) includes 243 days, or approximately 35 weeks.  Thus, Pinto was being paid approximately $610/visit = [$8,000 * 8 months]/[35 weeks * 3 visits/week].

475.    During this period Pinto therefore overcharged for 1.8 visits/week * $610/visit * 35 weeks = $38,400.  This amount was paid from the Estate of Renata Black, with funds that would otherwise have been contributed to the SNT.

476.    Pinto also overcharged for visits during the period from June 3-December 31, 2013.  This is a period of 209 days, or approximately 30 weeks.  Pinto overcharged for an estimated 1.8 visits/week * $796.33/visit * 30 weeks = $43,000.  This amount was paid from the Estate of Renata Black, with funds that would otherwise have been contributed to the SNT.

477.    Pinto also overcharged based on the duration of the visits. He charged for five hours per visit, but according to SBPC's records of his visits, when he did visit, he was in the facility for an average of only 56 minutes per visit.

---

[2] 3 invoiced visits per week - 1.2 actual visits per week = 1.8 visits invoiced but not made per week.

478.    Even allowing for travel time, it is implausible that each visit consumed five hours.

479.    The total estimated overcharge by Pinto and CPI for visits to Joanne that he did not make during 2013 and 2014 is $43,000 + $38,400 = $81,400.

480.    If we assume one hour travel each way per visit, then Pinto overcharged for the visits he did make.  Assume that one credits him with making 1.2 visits per week for the periods specified above (a total of 65 weeks), and spending an average of one hour with Joanne plus one travel hour each way.  That leaves two hours unaccounted for but charged (and paid) for. He overcharged in 2013 for 36 visits [30 weeks * 1.2 visits per week] * (2 hours per visit claimed but not spent) * $150/hour = $10,800.

481.    Pinto also overcharged for 42 visits [35 weeks * 1.2 visits/week] in 2014 for which he charged $610/visit, or an effective rate of $122/hour for a five-hour visit.  He therefore overcharged by 42 visits * 2 hours per visit claimed but not spent * $122/hour = $10,248.

482.    The combined overcharge for time claimed but not spent is therefore $10,800 + $10,249 = $21,048.

483.    The specific bills from Pinto and CPI are listed below.

Pinto Double-Bills, Working With Wrigley to Charge Joanne Twice

484.    Wrigley has a history of seeking reimbursement from Joanne's funds for purported expenses, as discussed above.

485.    In July 2014, Pinto charged Wrigley $2,300 for four visits he made to Joanne together with Wrigley.  Wrigley paid Pinto, and then demanded reimbursement from the SNT and 2013 Trust.  Pinto was already paid by Bernard Black for his services during July 2014 from Estate assets, which otherwise would have gone to the SNT, so this was unjustified double billing.  Bernard Black therefore refused to pay Pinto's additional July 2014 bill.

486.    In September 2014, Pinto charged Wrigley $3,950 for visiting Joanne together and chauffeuring Wrigley around New York.  Wrigley paid Pinto, and is expected to seek reimbursement

from the SNT and 2013 Trust. Pinto was already paid by Bernard Black for his services during September 2014 from Estate assets, which otherwise would have gone to the SNT, so this was unjustified double billing.  Bernard Black therefore refused to pay Pinto's additional September 2014 bill.

487.    Pinto charged Wrigley additional amounts for services to Joanne Black, which, upon information and belief, total at least $8,000 for October 2014 and $6,000 per month for November 2014 through January 2016, plus additional charges for Wrigley's visits to New York.  The total of these additional charges is at least $96,000 for this 16-month period.

488.    Thus, the total amount Wrigley has transferred to Pinto to date that has not yet been reimbursed from Joanne's funds is at least $102,250.

Pinto Bills for 24 Hours in a Day

489.    Pinto billed Joanne for his own services for 24 hours per day, at $150/hour, for April 12, 2013, through April 19, 2013, for a total of 153 consecutive hours at $22,950. It is not credible that he actually worked these hours.

490.    Pinto also billed Joanne $50/hour for a driver working 33 consecutive hours during this period, and a bodyguard working 55 consecutive hours. These charges are also not credible.

**Pinto Charges for Expenses He Did Not Legitimately or Reasonably Incur**

491.    In many of his bills, Pinto claimed that he had incurred expenses on Joanne's behalf.  He provided no receipts for any of his expenses and reported all of them in round numbers, meaning that at best they were estimates.  Upon information and belief Pinto inflated his reported expenses.

492.    For example, on Pinto's first bill, for April 12-22, 2013, he claims to have spent $2,200 for a rental car and $800 for gasoline in just ten days.  Pinto sought reimbursement for Joanne's housing, food, and clothing, plus another $500 in cash he claimed to have given to Joanne. With all her necessities paid for, it is hard to imagine why he would reasonably give her $500 in cash.

493.    As another example of Pinto's inflated and fraudulent billing for expenses, in his bill for the period ended April 29, 2013, he claimed $500 for a rental car return penalty because the car he used to drive Joanne to New Jersey was returned in Atlanta, Georgia, plus $260 for "driver - vehicle transport."  When Bernard Black questioned this expense, Pinto falsely stated that Atlanta was the nearest drop-off location for the car rental agency he had used. In fact, the car could have been returned to Newark Airport in New Jersey, close to where he brought Joanne.

494.    On information and belief, Pinto returned the rental car to Atlanta, Georgia for his own personal convenience: he is from Atlanta, and travels there frequently.

**Pinto and CPI Bills**

495.    Pinto and CPI billed Wrigley $35,425 for the 10-day period from April 12-22, 2013. This included:

    a.  $15,600 for Pinto's time, charged at $150 per hour, for 153 consecutive hours;

    b.  $1,650 for driver, charged at $50 per hour for 33 consecutive hours;

    c.  $4,125 for a bodyguard, charged at $75 per hour for 55 consecutive hours;

    d.  $800 for a one-way flight from New York City to Denver;

    e.  $1,000 for a hotel in Denver from April 12 through April 16;

    f.  $1,000 for a rental car from April 12 through April 16;

    g.  Another $1,200 for a rental car from April 16 through April 22;

    h.  $300 for gas from April 12 through April 16;

    i.  Another $500 for gas from April 16 through April 22;

    j.  $600 for a motel room for Joanne Black from April 12 through April 16;

    k.  $400 for clothing for Joanne Black from April 12 through April 16;

    l.  $400 for food for Joanne Black from April 12 through April 16;

    m.  Another $300 for food from April 16 through April 22; and

    n.  $500 for cash for Joanne Black.

496.    No receipts were provided for any expenses, either on this or other bills.

497.    All expenses were stated in round numbers, on this and other bills.

498.    Some of the claimed expenses are manifestly absurd, including $2,200 for car rental, and $300 for gas for four days for local driving in Denver, Colorado.

499.    Wrigley nevertheless paid $20,000 toward this bill.

500.    Wrigley asked no questions about Pinto's claimed expenses, either on this or later bills.

501.    If one assumes as 12-hour workday for Pinto and the driver, then half of the $17,250 combined bill for them, or $8,625, is fraudulent.

502.    Wrigley demanded that Bernard reimburse her and pay the balance of the bill from Estate funds that would otherwise have gone to the SNT.

503.    Bernard agreed to make these payments because: (i) Joanne was under Pinto's physical control, and Bernard feared for her safety if he refused; (ii) Pinto and Wrigley falsely promised that the spending rate would soon drop; and (iii) Pinto and Wrigley falsely promised that Pinto would not charge for his own time going forward.

504.    Given the strong evidence that Pinto inflated his expenses, all claimed expenses should be recoverable as damages, except to the extent that Pinto can prove he actually incurred them.

505.    Pinto and CPI billed Wrigley $14,160 for the one-week period from April 22-29, 2013. This included:

a.    $12,600 for a bodyguard, for 24 hours per day, at $75 per hour for 168 hours;

b.    $500 for "rental car return penalty"; Pinto claimed that "vehicle was returned to EZCar rental in Atlanta, Ga";

c.    $260 for "driver-vehicle transport";

d.    $200 for "Motel Denver," allegedly for storage of Joanne's belongings; and

e.    $600 for "Motel New York," although Joanne was actually at a motel in New Jersey.

     f.   Consistent with Pinto's and Wrigley's promise that Pinto would not bill for his own time, this bill included no amount for Pinto's own time.

506.   Pinto and CPI billed Wrigley $13,400 for the one-week period from April 29-May 7, 2013.  This included:

     a.   $12,600 for a bodyguard, for 24 hours per day, at $75 per hour for 168 hours;

     b.   $200 for "Denver Motel," allegedly for storage of Joanne's belongings; and

     c.   $600 for "New York Motel," although Joanne was actually at a motel in New Jersey.

     d.   Consistent with Pinto's and Wrigley's promise that Pinto would not bill for his own time, this bill included no amount for Pinto's own time.

507.   Pinto and CPI billed Wrigley $7,700 for the one-week period from May 7-13, 2013.  This included:

     a.   $6,300 for a bodyguard, for 12 hours per day, at $75 per hour for 84 hours;

     b.   $200 for Western Inn in Colorado, allegedly for storage of Joanne's belongings;

     c.   $600 for Rodeway Motel; and

     d.   $600 for Skyway Motor Inn for May 11-18.

     e.   Consistent with Pinto's and Wrigley's promise that Pinto would not bill for his own time, this bill included no amount for Pinto's own time.

508.   Pinto and CPI billed Wrigley $7,300 for the one-week period from May 13-20, 2013.  This included:

     a.   $6,300 for a bodyguard, for 12 hours per day, at $75 per hour for 84 hours

     b.   $200 for Denver Motel, allegedly for storage of Joanne's belongings; and

     c.   $800 for "New York Motel," even though the prior bill had indicated that the Skyway Motor Inn had been paid for through May 18 and, upon information and belief, Joanne was in New Jersey at the time.

    d. Consistent with Pinto's and Wrigley's promise that Pinto would not bill for his own time, this bill included no amount for Pinto's own time.

509. Pinto and CPI billed Wrigley $5,800 for the one-week period from May 20-27, 2013. This included:

    a. $5,000 for a bodyguard, for 12 hours per day, at a "discount . . . flat rate" of $5,000 for 84 hours;

    b. $200 for Denver Motel, allegedly for storage of Joanne's belongings; and

    c. $600 for New York Motel.

    d. Consistent with Pinto's and Wrigley's promise that Pinto would not bill for his own time, this bill included no amount for Pinto's own time.

510. Pinto and CPI billed Wrigley $5,800 for the one-week period from May 27-June 3, 2013. This included:

    a. $5,000 for a bodyguard, for 12 hours per day, at a "discount . . . flat rate" of $5,000 for 84 hours;

    b. $200 for Denver Motel, allegedly for storage of Joanne's belongings; and

    c. $600 for New York Motel.

    d. Consistent with Pinto's and Wrigley's promise that Pinto would not bill for his own time, this bill included no amount for Pinto's own time.

511. On June 3, 2013, Joanne was involuntarily committed to Jersey City Medical Center in New Jersey.

512. On June 12, 2013, Joanne was transferred to the acute ward of Meadowview Psychiatric Hospital in New Jersey.

513. Pinto's bills during the period were either paid by Wrigley, who then demanded reimbursement by Bernard, or paid directly by Bernard. In either case the money came from Estate funds that would otherwise have gone to the SNT.

514.     Pinto and CPI submitted no bills for the weeks ended June 10 and June 17.  This was consistent with Pinto's and Wrigley's promise that Pinto would not bill for his own time.

515.     Upon information and belief, Pinto was not satisfied with the loss of this income stream, and he and Wrigley developed a plan for Pinto to bill for his own time for the period from April 19 on, notwithstanding his prior promise not to.

516.     On or about June 24, 2013, Pinto and CPI submitted a bill to Wrigley for $18,073, for the period from April 29-June 24, 2013, consisting of:

    a.  For April 29-May 6: $150 per hour for 15 hours for three trips to see Joanne at five hours per trip, plus $39 in tolls = $2,289;

    b.  For May 6-May 13, $150 per hour for 15 hours for three trips to see Joanne at five hours per trip, plus $39 in tolls = $2,289;

    c.  For May 13-May 20, $150 per hour for 13 hours for two trips to see Joanne at 6.5 hours per trip, plus $26 in tolls = $1,976;

    d.  For May 20-27, $150 per hour for 18 hours for three trips to see Joanne at six hours per trip, plus $39 in tolls = $2,739;

    e.  For May 27-June 3, $150 per hour for 15 hours for three trips to see Joanne at five hours per trip, plus $39 in tolls = $2,289;

    f.  For June 3-June 10, $150 per hour for 22 hours for four trips to see Joanne at 5.5 hours per trip, plus $52 in tolls = $3,352;

    g.  For June 10-June 17, $150 per hour for six hours for one trip to see Joanne, plus $13 in tolls = $913;

    h.  For June 17-24, $150 per hour for 10 hours for two trips to see Joanne at five hours per trip, plus $26 in tolls = $1,526; and

    i.  $700 in gas.

517.     When Bernard protested this bill, Wrigley paid $25,000 to CPI.  Wrigley then demanded that Bernard reimburse her from Estate funds, which would otherwise have gone to the SNT.

518.     Pinto and Wrigley falsely claimed to Bernard that Pinto had never agreed not to bill for his time, but had only agreed to hold his bills and bill at a later date.

519.     Pinto and CPI billed Wrigley $4,978 for the two-week period from July 1-15, 2013.  This included:

   a.   $150 per hour for 30 hours for six trips to see Joanne at five hours per trip, plus $78 in tolls and $200 in gas = $4,778;

   b.   $100 for Denver motel, for storage of Joanne's belongings for two weeks; and

   c.   $100 for "JB [Joanne Black] shopping."

520.     Pinto and CPI billed Wrigley $4,978 for the two-week period from July 15-29, 2013. This included:

   a.   $150 per hour for 30 hours for six trips to see Joanne at five hours per trip, plus $78 in tolls and $200 in gas = $4,778;

   b.   $100 for Denver motel, for storage of Joanne's belongings for two weeks; and

   c.   $100 for JB shopping.

521.     Pinto and CPI billed Wrigley $2,489 for the one-week period from July 29-August 5, 2013.  This included:

   a.   $150 per hour for 15 hours for three trips to see Joanne at five hours per trip, plus $39 in tolls and $100 in gas = $2,389;

   b.   $50 for Denver motel, for storage of Joanne's belongings; and

   c.   $50 for JB shopping.

522.     Pinto and CPI billed Wrigley $4,978 for the two-week period from August 5-19, 2013. This included:

   a. $150 per hour for 30 hours for six trips to see Joanne at five hours per trip, plus $78 in tolls and $200 in gas = $4,778;

   b. $100 for Denver motel, for storage of Joanne's belongings for two weeks; and

   c. $100 for JB shopping.

523.    Pinto and CPI billed Wrigley $4,878 for the two-week period from August 19-September 2, 2013.  This included:

   a. $150 per hour for 30 hours for six trips to see Joanne at five hours per trip, plus $78 in tolls and $200 in gas = $4,778; and

   b. $100 for JB shopping.

524.    Pinto and CPI billed Wrigley $4,878 for the two-week period from September 2-16, 2013.  This included:

   a. $150 per hour for 30 hours for six trips to see Joanne at five hours per trip, plus $78 in tolls and $200 in gas = $4,778; and

   b. $100 for JB shopping.

525.    Pinto and CPI billed Wrigley $2,489 for the one-week period from September 16-23, 2013.  This included:

   a. $150 per hour for 15 hours for three trips to see Joanne at five hours per trip, plus $39 in tolls and $100 in gas = $2,389; and

   b. $50 for JB shopping.

526.    Pinto and CPI billed Wrigley $4,878 for the two-week period from September 23-October 7, 2013.  This included:

   a. $150 per hour for 30 hours for six trips to see Joanne at five hours per trip, plus $78 in tolls and $200 in gas = $4,778; and

   b. $100 for JB shopping.

527.    Pinto and CPI billed Wrigley $4,878 for the two-week period from October 7-21, 2013. This included:

    a.  $150 per hour for 30 hours for six trips to see Joanne at five hours per trip, plus $78 in tolls and $200 in gas = $4,778; and

    b.  $100 for JB shopping.

528.    Pinto and CPI billed Wrigley $4,878 for the two-week period from October 21-November 4, 2013.  This included:

    a.  $150 per hour for 30 hours for six trips to see Joanne at five hours per trip, plus $78 in tolls and $200 in gas = $4,778; and

    b.  $100 for JB shopping.

529.    Pinto and CPI billed Wrigley $4,878 for the two-week period from November 4-18, 2013.  This included:

    a.  $150 per hour for 30 hours for six trips to see Joanne at five hours per trip, plus $78 in tolls and $200 in gas = $4,778; and

    b.  $100 for JB shopping.

530.    Pinto and CPI billed Wrigley $4,878 for the two-week period from November 18-December 1, 2013.  This included:

    a.  $150 per hour for 30 hours for six trips to see Joanne at five hours per trip, plus $78 in tolls and $200 in gas = $4,778; and

    b.  $100 for JB shopping.

531.    Pinto and CPI billed Wrigley $4,878 for the two-week period from December 2-16, 2013. This included:

    a.  $150 per hour for 30 hours for six trips to see Joanne at five hours per trip, plus $78 in tolls and $200 in gas = $4,778; and

    b.  $100 for JB shopping.

532. Pinto and CPI billed Wrigley $4,878 for the two-week period from December 16-30, 2013. This included:

  a. $150 per hour for 30 hours for six trips to see Joanne at five hours per trip, plus $78 in tolls and $200 in gas = $4,778; and

  b. $100 for JB shopping.

533. Effective in January 2014, Pinto agreed with Bernard that he would charge a reduced flat rate of $8,000 per month. This amount covered all of his prior weekly or biweekly billing, including trips to see Joanne, tolls, mileage, and any incidental "JB shopping."

534. Pinto and CPI billed Wrigley $10,000 for January 2014. This included:

  a. three trips per week to see Joanne, including gas and tolls;

  b. JB shopping; and

  c. "approximately" $2,000 "to cover JB's storage, winter clothing, etc."

535. Pinto and CPI billed Wrigley $8,000 for February 2014. This included:

  a. three trips per week to see Joanne, including gas and tolls; and

  b. JB shopping

536. Pinto and CPI billed Wrigley $8,000 for March 2014. This included:

  a. three trips per week to see Joanne, including gas and tolls; and

  b. JB shopping.

537. Pinto and CPI billed Wrigley $8,000 for April 2014. This included:

  a. three trips per week to see Joanne, including gas and tolls; and

  b. JB shopping.

538. Pinto and CPI billed Wrigley $9,100 for May 2014. This included:

  a. three trips per week to see Joanne, including gas and tolls;

  b. $600 for JB storage;

  c. $400 for JB clothing; and

    d.   $100 for JB toiletries and cosmetics

539.    Pinto and CPI billed Wrigley $8,000 for June 2014.  This included:

    a.   three trips per week to see Joanne, including gas and tolls; and

    b.   JB shopping.

540.    Pinto and CPI billed Wrigley $8,000 for July 2014.  This included:

    a.   three trips per week to see Joanne, including gas and tolls; and

    b.   JB shopping.

541.    Neither Pinto nor Wrigley disclosed to Bernard at this time that Pinto had billed Wrigley for an additional $2,300 for visits to Joanne during Wrigley's July 2014 visit to New York.

542.    Pinto and CPI billed Wrigley $8,000 for August 2014.  This included:

    a.   three trips per week to see Joanne, including gas and tolls; and

    b.   JB shopping.

543.    Effective September 1, 2014, Bernard informed Pinto that he would pay, from Estate funds, only $4,000 per month for his services, and that Pinto could reduce his visit frequency accordingly.

544.    Bernard informed Pinto that his advance payment of $8,000 should cover both September and October 2014.

545.    Pinto and CPI billed Wrigley $8,000 for September 2014.

546.    Pinto sought payment by Bernard, from Estate funds, of $3,950 for visiting Joanne with Wrigley during Wrigley's first visit in September 2014.  Bernard did not pay this amount, as he had already paid Pinto and CPI for the full month of September.

547.    Bernard informed Pinto and Wrigley at the end of September 2014 that he would no longer pay for Pinto's services from Estate funds, and demanded return of the $4,000 advance payment for October.

548.    Pinto and CPI did not return this advance.

549.    Pinto and CPI billed Wrigley an additional $8,000 for October 2014.

550.    Bernard has not received copies of CPI bills for periods after October 2014.

551.    Upon information and belief, Pinto and CPI have charged at least $6,000 per month for Pinto's services for November 2014 through the present, plus additional charges for Wrigley's visits.

552.    Bernard sought at various times to reduce the charges by Pinto and CPI for Pinto's time and the time of other CPI employees.  However, at no time did Bernard refuse to pay, or seek to reduce, any of the amounts indicated in the Pinto and CPI bills as being spent directly for Joanne,

553.    The total charges by Pinto and CPI to Wrigley for April 2013 through September 2014, listed above, are $244,783.  They can be divided into categories as follows:

a. Pinto's services, including payments during the flat rate billing period of January-September 2014:  $169,200;

b. Bodyguard:  $51,925;

c. Driver, including payment for "driver-vehicle transport":  $1,910; and

d. Other expenses, totaling $21,748, divided into:

    i.   Gasoline:  $4,000;

    ii.  Tolls:  $1,248;

    iii. Airfare:  $800;

    iv.  Pinto hotel:  $1,000;

    v.   Car rental:  $2,700; and

    vi.  Amounts claimed to be spent on Joanne, including motel, clothing, food, storage of belongings, and JB shopping:  $12,000.

**Payments to Pinto and CPI**

554.    In addition to Pinto's disclosed and undisclosed withdrawals from Joanne's Chase account, his undisclosed withdrawals from Joanne's Wells Fargo account, and his undisclosed taking of Joanne's SSDI payments, Pinto and CPI received the following payments from the Estate of Renata Black.

555.    All payments referred to in this section were from the Estate of Renata Black, from funds that would otherwise have gone to the SNT.

a.  Bernard reimbursed Wrigley for $10,000 on April 13, 2013 for her payment to Pinto and CPI.

b.  $25,000 to CPI Investigations on April 27, 2013.

c.  $10,000 to Wrigley on April 27, 2013 for her payment to Pinto and CPI.

d.  $18,000 to CPI Investigations on May 16, 2013.

e.  $25,000 to Wrigley on July 3, 2013 for her payment to Pinto and CPI.

f.  $15,000 to CPI Investigations on July 17, 2013.

g.  $5,690 to CPI Investigations on August 10, 2013.

h.  $12,634 to CPI Investigations on September 23, 2013.

i.  $12,634 to CPI Investigations on September 30, 2013.

j.  $5,213 to CPI Investigations on November 17, 2013.

k.  $11,713 to CPI Investigations on December 14, 2013.

l.  $10,934 to CPI Investigations on December 27, 2013.

m.  $12,000 to CPI Investigations on February 21, 2014.

n.  $10,000 to CPI Investigations on April 3, 2014.

o.  $17,600 to CPI Investigations on June 2, 2014.

p.  $18,166 to CPI Investigations on July 21, 2014.

**Pinto Retains an Advance from Joanne's Money Even after Bernard Terminates His Services**

556.   At the end of September 2014, Bernard Black informed Pinto that his services for Joanne were being terminated, and demanded return of an advance payment of **$4,000** for October 2014.  Pinto never returned that unearned advance.

**Pinto and Wrigley Misrepresent the Amount Pinto Will Charge Joanne**

557.   As another example of Pinto's fraudulent billing, when Bernard Black complained about the level of Pinto's bills during the period when Joanne was under Pinto's control in New Jersey, Pinto

and Wrigley defended his bills by stating falsely that Pinto was charging only for the services of his employees, and not for his own time.

558.     After Pinto and Wrigley had pretended for two months that Pinto was not billing for his own time, Pinto submitted a separate bill for **$18,073** for his own time for the entire period from April 29, 2013 through June 24, 2013.  Pinto and Wrigley offered the thin excuse that they had only advised Bernard Black that he was not going to bill for his own time *now*, and had never promised that he would not bill at a later date.  Bernard Black felt coerced into paying this bill because Pinto was the only contact he had with Joanne.  This bill was improper.

**Wrigley Charges for Expenses She Did Not Legitimately or Reasonably Incur**

559.     In March 2013 Wrigley went to Colorado to visit Joanne for three days. She charged over $3,500 for the trip, which Bernard paid from Estate funds that would otherwise have been contributed to the SNT.

560.     She brought her nephew Dustin Patenaude with her and billed for his travel as well. Wrigley told Bernard about this only after the trip.  She claimed that her nephew was devoting his spring break "to help me find Joanne."

561.     After the visit she told Bernard that she expected to be reimbursed for her expenses from Joanne's money. She claimed over $3,500 in expenses, including two roundtrip plane tickets from Los Angeles to Denver that cost over $700 each.

562.     On information and belief, these were first class tickets.  Wrigley did not disclose this to Bernard when she demanded reimbursement.

563.     There is no evidence that Wrigley's nephew, who used one of those plane tickets during his spring break, actually helped at all with locating Joanne.

564.     Other expenses Wrigley charged for include $150 for one car service trip and $145 for another.  Wrigley even charged for two movies she watched in her hotel.

565.    After Wrigley went to New York in July 2014 she sent a bill for $4,607.80 for her own expenses.

566.    Wrigley's expenses included $2,618 just for her flight. She wrote beneath this entry on her bill, "I <u>don't</u> fly Coach!" (Emphasis in original.)

567.    Wrigley also demanded a $200 per day "per diem" payment for her time, totaling $800.

568.    Wrigley also demanded $120 for care for her pet cat.

569.    Wrigley also demanded $2,300 in compensation she paid to Pinto, even though Pinto had already been paid $8,000 for July, and his services during Wrigley's trip were included in that prior payment.

570.    Including the payment to Pinto, Wrigley demanded to be reimbursed for $6,907.80 for a four-day, three-night trip to visit Joanne in New York.

571.    Wrigley has made clear to the New York State Supreme Court of Richmond County that she intends to seek reimbursement from Joanne's funds for all amounts she paid to Pinto.  In her September 22, 2015 sworn response to the Amended Petition for Guardianship, Wrigley stated: "Significantly, I paid for all disbursements related to [Pinto's] retention, all at my own expense…. [S]ince September of 2014, I have not been reimbursed whatsoever." See ¶ 15.

**Wrigley Covers Up for Pinto**

572.    Upon information and belief, Wrigley participated in blocking an investigation into Pinto's handling of Joanne's funds by a forensic accountant appointed by the Colorado court.  Wrigley persuaded the forensic accountant to investigate Bernard's handling of Joanne's funds as Conservator (which the court had ordered her to review), but to ignore and not investigate Pinto's conduct (which the court had also ordered her to review).

573.    Wrigley lied to the New York Supreme Court for Richmond County to cover up Pinto's criminal history. In her September 22, 2015 response to the amended petition, she denied that Pinto had ever been charged with any improper conduct in his work for her, stating under oath that, "[n]otably,

there is no assertion that Mr. Pinto has done anything improper in connection with [Joanne] whatsoever." See ¶ 16.

574.    This is false. Bernard had submitted documents to the Colorado court in January 2015, as part of his conservator report for 2014, detailing Pinto's theft of tens of thousands of dollars of Joanne's money. On April 2, 2015, the Colorado court had ordered an investigation into Pinto's conduct (which, upon information and belief, Wrigley later worked to obstruct). All of this occurred before Wrigley lied under oath that there were no assertions that Pinto had acted improperly with respect to Joanne.

575.    In her sworn Answer to Amended Petition, dated September 22, 2015, Wrigley attested, "the felony charge against Mr. Pinto, to which Petitioner refers, was dropped and he has never been convicted of a felony." See ¶ 16.

576.    This statement creates an impression that Pinto has no federal criminal convictions.

577.    This is false. Pinto pleaded guilty to 18 U.S.C. §§ 641 and 2. A guilty plea, once accepted by a court (which this one was), constitutes a conviction. A conviction under 18 U.S.C. § 641 carries either a felony or misdemeanor sentence, depending on the amount stolen. The maximum sentence for a violation of 18 U.S.C. § 641 is imprisonment for ten years, making it a felony section.

578.    Wrigley further swore, "these events [related to the supposedly dropped felony charge] transpired twenty (20) years ago." See ¶ 16.

579.    This is false. The indictment is dated December 5, 2007 (eight years ago); the specific conduct to which Pinto pleaded guilty occurred in 2007 (eight to nine years ago); and Pinto's guilty plea is dated March 31, 2009 (less than seven years ago).

580.    As part of the cover-up, Pinto committed multiple perjuries in the New York guardianship proceedings, lying, under oath, about the extent of his involvement in the massive criminal conspiracy.

581.    In his sworn testimony, Pinto claimed that "I was charged with possession of the document." (Hearing transcript p.56.)

582.     This is false. Pinto was charged with the following counts: conspiracy, wire fraud, fraudulent solicitation of Social Security Administration information, solicitation of federal tax information, and aggravated identity theft.

583.     Also in his sworn testimony, Pinto falsely claimed that "I was charged with possession of the document. I got a misdemeanor." (Hearing transcript p. 56.)

584.     This implies that he was convicted of the "possession of the document." This is false. Pinto was convicted of theft of government records. The section under which Pinto was convicted carries a maximum sentence of up to 10 years, making it a felony section.

585.     Also in his sworn testimony, Pinto falsely claimed that all he did was to receive one document via fax from an unscrupulous source. "When [the government] investigated our office, they found a fax from that information broker. We got tied into the conspiracy... I was charged with possession of the document."

586.     This is false. Per Pinto's Government Sentencing Memorandum, Pinto admitted to knowing that he was buying illegally obtained government records; paying for the receipt of illegally obtained records; knowingly using illegally obtained information for the benefit of his clients, and receiving compensation in return.

587.     Further, contrary to his testimony, Pinto did not merely obtain a single document. Per his Government Sentencing Memorandum, "Mr. Pinto engaged BNT Investigations to obtain a variety of financial information, not simply tax information, on approximately 53 individuals."

588.     Also in his sworn testimony, Pinto claimed that "I got a misdemeanor. All the other investigators involved were convicted of a felony."

589.     This is false. There were 11 defendants.  The charges against two defendants were dismissed altogether. Three defendants received misdemeanors (one of them was Pinto). Further, only four of the eleven defendants received any prison time at all, and the longest time was six months in prison. Pinto's conviction type and sentence was average for the group, not exceptionally low, as he

falsely stated.

590.     Further, Pinto stated that his participation in the scheme was so small that he did not even have to pay a fine.

591.     This is false. Pinto did not pay a fine or restitution because he was found indigent. Pinto's guilty plea states that "The court finds that the defendant is financially unable and is unlikely to become able to pay a fine and, accordingly, the imposition of a fine is waived."

592.     Also in his sworn testimony, Pinto falsely claimed that "The private investigator I worked under just lost his son. I ran the office. He gave me some information about a information broker in Seattle. I requested some information unaware that the information broker was under investigation. They found the request in his office. Our office was investigated."

593.     This is false. Pinto's boss, Patrick A. Bombino, lost his son, Patrick P. Bombino, suddenly on May 9, 2007. Pinto's ordering and receipt of stolen records occurred between September 2006 and April 2007. Pinto's criminal activities happened before, not after, the death of his boss's son, and cannot be attributed to the mere fact that Pinto was responsible for the office.

### FIRST CAUSE OF ACTION
**Fraud (Invoices)**
**(Against Defendants Pinto, CPI, and Wrigley)**

594.     Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

595.     Defendants Pinto and CPI made the following false representations of material fact, as detailed above:

a.     claiming $21,748 in fraudulent and inflated expenses on their invoices to Cherie Wrigley;

b.     claiming $81,400 in unperformed services on their invoices to Cherie Wrigley, by falsely claiming that Pinto was visiting Joanne three times per week;

c.     claiming $8,625 in unperformed services by billing for 24 hours per day for Pinto and a driver during the period from April 12-19, 2013; and

57

      d.     claiming $21,048 in unperformed services by billing for five hours for each visit to

Joanne, when a reasonable estimate of actual time, including travel time, is three hours.

596.    Defendants Pinto and CPI knew these statements of expenses and/or services were false

when they created and submitted the invoices. They created these invoices with the intent of overbilling

and thus stealing money from the SNT.

597.    In the alternative, Defendants Pinto and CPI made these statements recklessly, without

regard to their truth.

598.    Defendants Pinto and CPI submitted these statements of claims for expenses and services

to deceive Bernard Black and to induce him to rely and act upon them by paying money to Defendants

that would otherwise have gone to the SNT.

599.    Defendants Pinto and CPI's statements of claims caused injury to Plaintiffs by reducing

the assets that would otherwise have been contributed to the SNT.

600.    Defendants Pinto and CPI's fraud was part of a complex scheme that occurred over a

long period of time and involved numerous occurrences.

601.    Defendants Pinto and CPI's acts constituted a gross, wanton or willful fraud or other

morally culpable conduct.

602.    Defendants Wrigley and CPI are liable for Defendant Pinto's acts under the doctrine of

respondeat superior and the common law of principal/agent liability.

603.    Due to Defendants Pinto and CPI's fraudulent acts, Plaintiffs are entitled to recover from

Defendants the money paid to Defendants out of the Estate of Renata Black for the fraudulent claims of

expenses and services described above; pre-judgment and post-judgment interest; and punitive damages.

**<u>SECOND CAUSE OF ACTION</u>**
**Fraud by Omission (Bank Accounts)**
**(Against Defendants Pinto, CPI, and Wrigley)**

604.    Plaintiffs re-allege and incorporate by reference all allegations in the preceding

paragraphs.

605.     Defendants Pinto and CPI knowingly made material omissions of facts when they failed to disclose on invoices or otherwise reveal to Bernard Black that Defendant Pinto stole money from Joanne Black's Chase and Wells Fargo bank accounts on multiple occasions, as detailed above.

606.     Defendants Pinto and CPI knew that omitting the bank withdrawals from their invoices rendered them false, because they overstated the amount that was owed to Defendants.

607.     Defendants Pinto and CPI omitted the bank withdrawals for the purpose of inducing Bernard Black to rely upon these incomplete, false invoices.

608.     In the alternative, Defendant CPI acted with reckless disregard as to their truth or falsity in issuing the invoices that omitted the Chase and Wells Fargo withdrawals.

609.     Defendants Pinto and CPI intended for Bernard Black to rely on the invoices that they issued to Defendant Wrigley.

610.     Bernard Black justifiably relied on Defendants Pinto and CPI to report accurately any withdrawals from Joanne Black's Chase bank account. As a result, he paid more to Defendants Pinto and CPI than they were due, reducing the assets available to the SNT.

611.     Bernard Black justifiably relied on Defendants Pinto, CPI, and Wrigley when they advised him that Joanne's SSDI payments were safe and were accumulating in her Wells Fargo account. As a result, he paid more to Defendants Pinto and CPI than they were due, reducing the assets available to the SNT.

612.     Under the common law of agency, Defendant Pinto had a duty to disclose all funds that he took from Joanne Black's Chase and Wells Fargo accounts, in connection with his bills.  See Restatement (Third) of Agency §§ 8.01 (duty of loyalty); 8.11 (duty of disclosure).

613.     Defendants Pinto and Wrigley knew that the bills submitted by Defendant CPI to Defendant Wrigley would ultimately be paid by Bernard Black from funds that would otherwise go to the SNT.  Defendants Pinto and Wrigley therefore had a duty of disclosure toward Bernard Black.

614.     Defendant Pinto's failure to disclose all bank withdrawals made his bills materially false

and misleading.

615.     Defendant Pinto was entrusted with Joanne Black's Chase and Wells Fargo bank cards for the purpose of taking care of Joanne and paying her expenses.

616.     Defendants Wrigley and CPI are liable for Defendant Pinto's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

617.     Due to Defendants Pinto and CPI's fraudulent omissions, Plaintiffs are entitled to recover from Defendants the money paid to Defendants out of the Estate of Renata Black for amounts that Defendants had already removed from Joanne Black's Chase or Wells Fargo accounts; pre-judgment and post-judgment interest; and punitive damages.

### THIRD CAUSE OF ACTION
**Fraudulent Misrepresentation (Invoices and Bank Accounts)**
**(Against Defendants Pinto, CPI, and Wrigley)**

618.     Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

619.     Defendants Pinto and CPI fraudulently misrepresented the amounts owed to them on their invoices by knowingly overstating the amounts due for expenses and for their services, and knowingly understating or failing to account for the amounts already withdrawn from Joanne Black's bank accounts, as detailed above.

620.     Defendants Pinto and CPI misrepresented the amounts due on their invoices for the purpose of inducing Bernard Black to rely on their misrepresentations.

621.     Bernard Black justifiably relied on the misrepresentations on the invoices.

622.     Bernard Black paid Defendants Pinto and CPI the amounts listed on their invoices as due out of the Estate of Renata Black, reducing the amount available to the SNT.

623.     Defendants Wrigley and CPI are liable for Defendant Pinto's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

624.     Due to Defendants Pinto and CPI's fraudulent misrepresentations, Plaintiffs are entitled to recover from Defendants the money paid to Defendants out of the Estate of Renata Black for expenses that were not in fact incurred and services that were not provided, as well as amounts due that were offset by funds that Defendant Pinto had already removed from Joanne Black's Chase or Wells Fargo accounts; pre-judgment and post-judgment interest; and punitive damages.

### FOURTH CAUSE OF ACTION
### Unjust Enrichment (Invoices)
### (Against Defendants Pinto, CPI, and Wrigley)

625.     Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

626.     Defendants Pinto and CPI were enriched at Plaintiffs' expense by submitting invoices and accepting payment for expenses they did not incur and services they did not perform, as described above.

627.     Defendants Pinto and CPI were further enriched at Plaintiffs' expense by being paid twice for services, once by Wrigley or from the Estate of Renata Black, and again through (i) Pinto's undisclosed withdrawals of funds from Joanne's Chase and Wells Fargo checking accounts; and (ii) Pinto billing a flat rate for his services for July and September 2014, and separately billing Wrigley for his services during these time periods.

628.     Defendant Wrigley was aware of this double billing and did not report it to Bernard Black, except to demand reimbursement after she paid Pinto's double bills for July 2014, and to instruct Pinto to demand that Bernard Black pay his double bill for September 2014.

629.     It is against equity and good conscience to permit Defendants Pinto and CPI to retain the money they received from the Estate of Renata Black as a result of their false invoices. Had Defendants not billed for expenses they did not incur and services they did not perform, the money they unjustly received as a result would have been paid to the SNT.

630.     It is against equity and good conscience to permit Defendants Pinto and CPI to retain the money they received through being paid twice for the same services. Had Defendants not been paid twice for the same services, the money they unjustly received as a result would have been paid to the SNT.

631.     Defendants Pinto, CPI, and Wrigley had relationships with Plaintiff Bernard Black and Plaintiff Samuel Black that induced the Plaintiffs to pay or to rely on the false invoices.

632.     Defendants Pinto, CPI, and Wrigley had relationships with Plaintiff Bernard Black and Plaintiff Samuel Black that could have induced the Plaintiffs to pay invoices that represented double payment for the same services.

633.     Defendants Pinto, CPI, and Wrigley have a relationship, connection, and/or equitable obligation to the Plaintiffs.

634.     Defendants Wrigley and CPI are liable for Defendant Pinto's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

635.     Due to Defendants Pinto and CPI's unjust enrichment, Plaintiffs are entitled to recover from Defendants the money paid to Defendants out of the Estate of Renata Black for expenses that were not in fact incurred, services that were not provided, and services for which they were paid twice; and pre-judgment and post-judgment interest.

### FIFTH CAUSE OF ACTION
### Unjust Enrichment (SSDI Benefits)
### (Against Defendants Pinto and Wrigley)

636.     Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

637.     Defendant Pinto became Joanne's representative payee in April 2014.  In this capacity he received Joanne's SSDI benefits during the period from May 2014 through and including January 2015, and was obligated to disburse those benefits on behalf of Joanne.

638.    Pinto instead secretly kept the SSDI payments for himself.  Had he disclosed his receipt of these payments, then during the period through and including September 2014, he would have been obligated to treat them as offsets to his bills, in the same way that his withdrawals from Chase and Wells Fargo should have been offsets.  Instead, his bills were paid by the Estate of Renata Black, from funds that would otherwise have gone to the SNT.  Thus, Pinto was enriched at the expense of the SNT by receiving and keeping Joanne's SSDI benefit payments.

639.    It is against equity and good conscience to permit Defendant Pinto to retain these benefits.

640.    Bernard Black had a relationship with Defendants Pinto and Wrigley that was sufficiently close to cause reliance on Pinto reporting honestly to him any amounts he obtained directly from Joanne's funds.

641.    The circumstances here create an equitable obligation running from Defendant Pinto to the Plaintiffs.

642.    Defendant Wrigley is liable for Defendant Pinto's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

643.     Due to Defendant Pinto's unjust enrichment, Plaintiffs are entitled to recover from him for the SNT the benefits that he received from SSDI and retained, plus pre-judgment and post-judgment interest.

## SIXTH CAUSE OF ACTION
### Money Had and Received (Invoices)
### (Against Defendants Pinto, CPI, and Wrigley)

644.    Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

645.    Defendants Pinto and CPI received money, in the form of payments on CPI invoices, for expenses that were not in fact incurred and services that were not provided.  These funds by right belonged to and would otherwise have been paid to the SNT.

646.    Defendants Pinto and CPI benefitted from the receipt of these payments.  Under principles of equity and good conscience, Defendants Pinto and CPI should not be permitted to keep these payments.  Defendants Wrigley and CPI are liable for Defendant Pinto's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

647.    Due to Defendants Pinto and CPI's inequitable receipt of these payments, Plaintiffs are entitled to recover from them the money paid to Defendants out of the Estate of Renata Black, which should have and otherwise would have gone to the SNT, for expenses that were not in fact incurred and services that were not provided plus pre-judgment and post-judgment interest.

**SEVENTH CAUSE OF ACTION**
**Money Had and Received (Bank Accounts)**
**(Against Defendants Pinto, CPI, and Wrigley)**

648.    Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

649.    Defendants Pinto and CPI were enriched at Plaintiffs' expense by taking and keeping money from Joanne Black's Chase and Wells Fargo bank accounts, as described above, which resulted in double payment of Pinto and CPI because they invoiced Cherie Wrigley for services and expenses that had already been compensated for by the undisclosed withdrawals.

650.    Had it not been for this double-billing, the money that was inequitably paid to Defendants Pinto and CPI would have remained in the Estate of Renata Black and then been paid to the SNT.

651.    Defendants Pinto and CPI benefitted from the receipt of the duplicative payments.

652.    Under principles of equity and good conscience, Defendants Pinto and CPI should not be permitted to keep that money.

653.    Defendants Wrigley and CPI are liable for Defendant Pinto's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

654.    Due to Defendants Pinto and CPI's inequitable receipt of duplicative payments, Plaintiffs are entitled to recover from them the amounts they were paid out of the Estate of Renata Black that

duplicated money that Defendants Pinto and CPI took from Joanne Black's Chase and Wells Fargo bank accounts, without disclosure to Bernard Black, plus pre-judgment and post-judgment interest.

### EIGHTH CAUSE OF ACTION
**Money Had and Received (SSDI Benefits)**
**(Against Defendants Pinto and Wrigley)**

655.    Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

656.    Defendant Pinto received money, in the form of Joanne Black's SSDI benefit payments, which resulted in double payment of Pinto and CPI for the period of May through September 2014, from funds that should have and otherwise would have been contributed to the SNT.

657.    Defendants Pinto and CPI benefitted from the receipt of the money.

658.    Under principles of equity and good conscience, Defendants Pinto and CPI should not be permitted to keep the money.

659.    Defendant Wrigley is liable for Defendants Pinto and CPI's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

660.    Due to Defendants Pinto and CPI's unjust enrichment, Plaintiffs are entitled to recover from them for the SNT the benefits that he received from SSDI and retained, plus pre-judgment and post-judgment interest.

### NINTH CAUSE OF ACTION
**Money Had and Received (Advance for October 2014)**
**(Against Defendants Pinto, CPI, and Wrigley)**

661.    Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

662.    Defendants Pinto and CPI received a $4,000 advance from the Estate of Renata Black for October 2014. Because their services were terminated at the end of September 2014, they were not entitled to that money.

663.    The unearned $4,000 should have been returned to the Estate of Renata Black, from

which it would have been contributed to the SNT.

664.    Defendants Pinto and CPI benefitted from the receipt of the advance.

665.    Under principles of equity and good conscience, Defendants Pinto and CPI should not be permitted to keep the money.

666.    Defendants Wrigley and CPI are liable for Defendant Pinto's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

667.    Because Defendants Pinto and CPI unfairly kept the advance, Plaintiffs are entitled to recover from them for the SNT the unearned advance for October 2014, plus pre-judgment and post-judgment interest.

### TENTH CAUSE OF ACTION
**Money Had and Received (Payments for July and September 2014)**
**(Against Defendants Pinto, CPI, and Wrigley)**

668.    Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

669.    Defendants Pinto and CPI received an $8,000 payment from the Estate of Renata Black for July 2014, and a $4,000 payment for September 2014. Defendant Wrigley also paid Defendant Pinto separately for the same services for which Defendants Pinto and CPI had already been paid for those months.

670.    The amount that Defendant Wrigley paid for those months should have been returned to the Estate of Renata Black, from which it would have been contributed to the SNT.

671.    Defendants Pinto and CPI benefitted from the receipt of double payments for these two months.

672.    Under principles of equity and good conscience, Defendants Pinto and CPI should not be permitted to keep the money.

673.    Defendants Wrigley and CPI are liable for Defendant Pinto's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

674.    Because Defendants Pinto and CPI unfairly kept the double payments, Plaintiffs are entitled to recover from them for the SNT the double payments for July and September 2014, plus pre-judgment and post-judgment interest.

**ELEVENTH CAUSE OF ACTION**
**Conversion (Invoices)**
**(Against Defendants Pinto, CPI, and Wrigley)**

675.    Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

676.    Before he paid Defendants Pinto and CPI's false and inflated invoices, Plaintiff Bernard Black had possession or control of the money he transferred to Defendants Pinto and CPI from the Estate of Renata Black.

677.    Plaintiff Bernard Black, as Executor of the Estate of Renata Black, had an immediate superior right of possession to the money relative to Defendants Pinto and CPI.

678.    This money would have been paid to the SNT, had it not been paid to Defendants Pinto and CPI.

679.    Defendants Pinto and CPI exercised an unauthorized dominion over that money, to the exclusion of the rights of Plaintiffs and the SNT, by taking and keeping it under false pretenses.

680.    Defendants Wrigley and CPI are liable for Defendant Pinto's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

681.    Due to Defendants Pinto and CPI's conversion of this money, Plaintiffs are entitled to recover from them the amount paid for expenses they did not incur and services they did not perform, plus pre-judgment and post-judgment interest and punitive damages.

**TWELFTH CAUSE OF ACTION**
**Conversion (Advance for October 2014)**
**(Against Defendants Pinto, CPI, and Wrigley)**

682.    Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

683.    Before he paid Defendants Pinto and CPI an advance for October 2014, Plaintiff Bernard Black had possession or control of the money he transferred to Defendants Pinto and CPI from the Estate of Renata Black.

684.    Plaintiff Bernard Black, as Executor of the Estate of Renata Black, had an immediate superior right of possession to that money relative to Defendants Pinto and CPI.

685.    This money would have been paid to the SNT, had it not been paid to Defendants Pinto and CPI.

686.    Defendants Pinto and CPI exercised an unauthorized dominion over that money, to the exclusion of the rights of Plaintiffs and the SNT, by taking and keeping it under false pretenses.

687.    Defendants Wrigley and CPI are liable for Defendant Pinto's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

688.    Due to Defendants Pinto and CPI's conversion, Plaintiffs are entitled to recover from them the amount paid for the October 2014 Advance, plus pre-judgment and post-judgment interest and punitive damages.

## THIRTEENTH CAUSE OF ACTION
### Constructive Fraud (Invoices)
### (Against Defendants Pinto, CPI, and Wrigley)

689.    Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

690.    Defendants Pinto and CPI made false representations of material fact, as detailed above, by and in the course of demanding payment of inflated and fraudulent expenses and for unperformed services on their invoices, as specified in earlier causes of action.

691.    Defendants Pinto and CPI had a fiduciary or confidential relationship with Plaintiffs at all relevant times, including when they created and submitted the invoices.

692.    Defendants Pinto and CPI's invoices caused injury to Plaintiffs by reducing the assets in the Estate of Renata Black that would otherwise have been paid to the SNT.

693.    Defendants Pinto and CPI's fraud was part of a complex scheme that occurred over a long period of time and involved numerous occurrences.

694.    Defendants Pinto and CPI's acts constituted a gross, wanton, or willful fraud or other morally culpable conduct.

695.    Defendants Wrigley and CPI are liable for Defendant Pinto's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

696.    Due to Defendants Pinto and CPI's fraudulent acts, Plaintiffs are entitled to recover from Defendants the money paid to Defendants out of the Estate of Renata Black for their fraudulent claims of expenses and services; pre-judgment and post-judgment interest; and punitive damages.

### FOURTEENTH CAUSE OF ACTION
**Negligent Misrepresentation**
**(Against Defendants Pinto, CPI, and Wrigley)**

697.    Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

698.    Defendants Pinto, CPI, and Wrigley each had a special or privity-like relationship that imposed a duty on them to impart correct information to Plaintiff Bernard Black.

699.    Defendants imparted materially false, incorrect, and misleading information to Plaintiff Bernard Black.

700.    Plaintiff Bernard Black reasonably relied on this information.

701.    Defendants Wrigley and CPI are liable for Defendant Pinto's acts under the doctrine of respondeat superior and the common law of principal/agent liability.

702.    Due to Defendants Pinto and CPI's fraudulent acts, Plaintiffs are entitled to recover from Defendants the money paid to Defendants out of the Estate of Renata Black, which would otherwise have been paid to the SNT, for fraudulent and inflated claims of expenses, claims for services not provided, double billing through Pinto's undisclosed withdrawals from Joanne's Chase and Wells Fargo

accounts, and undisclosed taking of Joanne's SSDI benefits, all as described above; pre-judgment and post-judgment interest; and punitive damages.

### FIFTEENTH CAUSE OF ACTION
**Aiding and Abetting**
**(Against Defendant Wrigley)**

703.     Plaintiffs re-allege and incorporate by reference all allegations in the preceding paragraphs.

704.      Defendant Wrigley aided and abetted Defendants Pinto and CPI in every previously alleged cause of action.

705.     Defendant Wrigley knew about each of these violations, as described above.

706.     Defendant Wrigley substantially assisted the primary wrongdoer to advance the commission of the tort in each instance.

707.     Due to Defendant Wrigley's aiding and abetting, Plaintiffs are entitled to recover from her the money paid to all Defendants from the Estate of Renata Black, all of which would otherwise have gone to the SNT; pre-judgment and post-judgment interest; and punitive damages.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs seek the following relief:

A.     Damages in the amount of the false or inflated invoice amounts that were paid to Defendants Pinto and CPI;

B.     Damages in the amount of the Chase and Wells Fargo bank withdrawals that were not credited on invoices;

C.     Damages in the amount of the stolen SSDI benefits payments;

D.     Damages in the amount of invoices by Pinto to Wrigley for July and September 2014, that Wrigley paid to Pinto, but which were not deducted from amounts charged to and paid by the Estate of Renata Black to Defendants Pinto and CPI;

E.     Damages in the amount of $4,000 for the October 2014 advance;

F.     Pre-judgment interest and post-judgment interest;

G.     Reasonable attorneys' fees and costs of the action; and

H.     Such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by this Complaint.

Dated: ___1/26___, 2016
Brooklyn, New York

Respectfully submitted,

By:_____
Piper Hoffman

**PIPER HOFFMAN, ESQ., PLLC**
379 Fifth Street, Suite #1
Brooklyn, NY 11215
Tel: (718) 487-9839
phoffman@piperhoffmanesq.com

*Attorney for the Plaintiffs*