# Memorandum

To: Linda Lee Babcock, court-appointed visitor

From Bernard Black

    cc:    Gayle Young, Guardian-ad-litem

            Carl Glatstein, Esq.

Date: Sept 22, 2014

Attachments:

    My CV

    Esaun Pinto billing summary to date

    Cherie Wrigley demand for travel and other reimbursement

Linda: Unfortunately, my petition for guardianship is being contested by my cousin Cherie Wrigley and her brother, and my co-trustee, Anthony Dain. I know what crazy and untrue things Cherie Wrigley has said directly to me, and can only imagine what she has been saying to you. Please understand that their contest of my guardianship petition is part of a larger effort in which they are seeking control over a trust fund for my sister, Joanne Black. I urge you not to believe self-serving representations that the parties make (my own included, of course), unless supported by documents, or by a history of conduct.

Given this background, I thought it could be useful to offer a summary of topics on which I can provide verifiable information to you. Most of this information is in written statements from Cherie and Anthony to me, and I am happy to submit full copies to you. For some, additional information will be available from my wife, Kate Litvak, from my son and co-trustee, Samuel Black, and from my son Benjamin Black.

    **I.**    **Summary**

As you know, I am currently financial conservator for Joanne. Cherie and Anthony (siblings, and Joanne's cousins) are trying to oust me (Joanne's brother and closest living relative), gain control over Joanne's trust fund, and spend that fund extravagantly for Cherie's benefit. Among the expenses they want paid from Joanne's trust are Cherie's expenses for first-class cross-continental travel, hotel stays in Manhattan, large, undocumented per diem, and other direct cash payments. The level of expenses that Cherie and Anthony are demanding are unsustainable, given the size of the fund, Joanne's health and support needs, and the expected expenses Joanne will need over her lifetime. I am a financial expert (finance professor at Kellogg School of Management; my professional CV is attached), and I can speak with authority on this – the level of spending that Cherie and Anthony are pushing is not sustainable, and will deplete Joanne's trust fund in much less than her expected lifespan, which might well be 30 years (she is currently 58, and to my knowledge, apart for schizophrenia, has no major chronic diseases). Cherie and Anthony are completely open about their intent to spend Joanne's trust fund, including on Cherie's first-class travel and to pay Cherie for her services, without assessing Joanne's long-term needs (see excerpts from Anthony's emails below).



PLAINTIFF001949

The current fight for control began when as financial conservator and co-trustee for Joanne's trust, I said no to first-class travel. In part, they are claiming that Colorado is not the right forum for a guardianship petition. They never raised this objection until after I refused to pay Cherie's bills from Joanne's trust. To the contrary, both Cherie and Anthony actively supported seeking guardianship in Colorado, particularly after Cherie persuaded me to include her as a co-guardian in a guardianship petition. As recently as on August 30, 2014, Cherie wrote to me and to Carl Glatstein, my counsel, demanding that he speed up the guardianship application in Colorado:

> "Joanne has given me consent to be her guardian in NY. Has anything been done in Colorado??? It is the end of August and another two months have been wasted. I feel I should just go ahead and let Joanne sign some DIY papers. She is expected to be released in two weeks or less.
>
> Bernie once she has more freedom it will be harder to see the necessity of protection. I just can't believe this process has been so time consuming." (email from Cherie Wrigley to Bernie Black and Carl Glatstein; 08/30/2014)
>
> Followed by an email from Cherie two days later, on Sept. 1, seeking to confirm that Carl Glatstein and I had received the August 30 email.

Neither Cherie nor Anthony has ever questioned whether Joanne needs a guardian. Cherie believes Joanne needs a guardian, as evidenced by her active push to become a co-guardian herself. Anthony, meanwhile, was entirely silent, passive, and uninvolved, as he has been since my mother's death in May 2012. Prior to that my mother was the principal overseer of Joanne's care.

I am asking you to see their objection to my guardianship proceedings through these lenses. Cherie thought Colorado was great so long as she could be paid out of the trust fund. When I said no to unreasonable expenses, the fight and challenge to my authority began.

Substantively, there is no reason to move guardianship proceedings from Colorado to New York, and important reasons not to. First, there is no reason to think Joanne is in New York more than temporarily and by accident. Cherie and I arranged in 2013 for her advisor, Esaun Pinto, to attempt a "rescue" which involved bringing her to New Jersey, and closer to Esaun. She was committed to a mental institution involuntarily while in New Jersey, then transferred involuntarily to New York because it was easier for us to arrange for long-term care there. Joanne owns no property in New York, has no job or residence there, has no family there (I am in the Chicago area; she has no other siblings, nor any children), and no friends, other than Esaun Pinto, whom I am paying large amounts of money to be her friend (though I believe he genuinely cares about Joanne as well). There is no reason to think she will choose to live in New York long term. In the past, she has spent substantial periods in Colorado, and also in California, in Illinois, and in Texas. She obviously liked Colorado, which is why she was living there in 2012-2013. Any claims that she should be viewed as a New York resident are based on speculation, not facts.

There will also be real challenges for anyone to establish guardianship in Colorado. New York has a well-entrenched Mental Health Legal Services group, which view it as their duty to zealously oppose any effort by anyone to restrict the autonomy of a mentally ill person in any way. Joanne already has, at her request, New York counsel from this group, Nora Renzolli, who has been particularly obstructive thus far, and has a reputation for being so. One ground she will

PLAINTIFF001950

likely use to oppose guardianship is that the proposed guardian is not a resident of New York – I am advised that New York courts will often reject a guardianship request on this ground alone. Also, Joanne is currently at South Beach Psychiatric Center in Staten Island. While I don't know where she will go once released, she will likely not stay in Staten Island. I am advised that any guardianship proceedings would need to be brought now in Staten Island, and then transferred to wherever she is - -with the potential for repeated transfers if Joanne moves around, and for complete unwillingness of the New York courts to continue to entertain a petition if Joanne leaves New York State – which provides an easy way for Joanne to block guardianship. At best, the process would be long and contested.

**II.   Verifiable facts about the misbehavior of Anthony and Cherie and about their attempts to fleece Joanne's trust fund of money for their own benefit.**

### a. Reimbursement of Cherie's Extravagant Personal Expenses from Joanne's Trust Fund

For the last two years, Cherie has been pushing me to make unreasonable, and unsustainable payments, from Joanne's trust fund, principally to Esaun Pinto, claiming them to be of value to Joanne, and assuring me that these were temporary. I should have resisted earlier, but I trusted Cherie and wanted to stay on cooperative terms with her. In hindsight, this was a mistake. Earlier this year, I, as a financial conservator, submitted those expenses to the Colorado courts for review and received a strong rebuke and a request to justify these expenses. (Of course, I have written documentation for all interactions with the Colorado courts).

My annual report was recently approved, but quite frankly, on a technicality – I had been spending what remained in my mother's estate, rather than spending trust funds directly. But the substance was the same, I was depleting assets that were intended for Joanne, at an unsustainable rate. Quite frankly, the court was right, and I should not have incurred this level of expenses. What I thought would be temporary continued too long, and cost far too much.

In response to the court's concerns, I have cut the monthly payment to Esaun Pinto to $4,000 beginning in September 2014. His biling earlier in 2014 had been twice this -- $8,000 per month, and was even higher in 2013. I had to fight with Esaun and Cherie to get the amount *down* to $8,000. Overall, Esaun's billings to date are $230,000 for April 2013 to the present. [Not counting the $6,800+ that he has billed for shepherding Cherie around during her recent visits to see Joanne, which I have not paid.] In hindsight, I should have fought harder and sooner.

Even the current $4,000/month level is not sustainable for a substantial period of time, but I believe it would be adverse to Joanne to cut Esaun Pinto further in the bear term.

More recently, Cherie has incurring many thousands of dollars in personal expenses **on herself**, without my prior approval, and demanded to be reimbursed from the trust fund. These expenses included Cherie's first class, cost-to-cost air travel to visit Joanne (at $2,500 a pop), and much more. Her written explanation to justify the first-class travel reimbursement was simple: "I do not fly coach" (emphasis in the original). Cherie's reimbursement request is attached.

I advised Cherie orally on September 1 that I would not pay for the first-class travel. Cherie blew up. A excerpt from her response on Sept 2 (emphasis in original):

> As far as my expenses.....how dare you!!!! I have worked my ass off for you and your sister for over two years with little or no compensation. I ONLY FLY BUSINESS

PLAINTIFF001951

> CLASS not 1st due to a hereditary blood clotting factor that makes me much more likely to get a DVT. Even so...too bad. Again how dare you!!! I will stay where I am comfortable and yes you WILL PAY FOR IT!

Cherie then ran to her brother Anthony Dain, my co-trustee. Anthony wrote to me the next day (Sept. 3, 2014), saying the following:

> "With respect to reimbursing Cherie for business class travel, I believe this is eminently appropriate. First, at our age, flying cramped in coach can be dangerous. Second, Cherie is not doing this for the luxury of travel, nor as some employee of the Trusts, but for Joanne's and our good. She should fly business and stay at a comfortable hotel. She should also be compensated at a reasonable rate for her work. That is only fair. Last on this point, for all the reasons stated above, I believe her upcoming visit to Joanne is appropriate, and authorize it." (Anthony Dain's email to Black from 9/3/2014).

Notice that Anthony authorizes Joanne's trust to reimburse Cherie (his sister) for multi-thousand dollar expenses for items that few if any employers would reimburse their employees – certainly mine would not. Cherie's bill included, beyond first-class airfare, the cost of boarding for Cherie's pet, all itemized expenses like hotels and transportation, plus $200/day in non-itemized per diem). Anthony also purports to authorize future expenses on such trips, plus "reasonable compensation" to Cherie.

Since receiving this email, I have repeatedly sought to discuss Cherie's expenses with Anthony. He has refused to speak to me by phone.

### b. Why Cherie and Anthony Are Objecting to Keeping Guardianship Proceedings in Colorado

In response to my saying that the Colorado court had refused to approve the trust's expenses on Esaun Pinto, Anthony wrote that we should get out of the sight of that judge and move our proceedings to a less inquisitive judge in another state:

> I am not sure why there should be any difficulty in the Colorado Court approving bills from either Cherie or Mr. Pinto in light of the broad powers discretionary powers of the Joanne Black Trust... Additionally, although this may reveal ignorance on my part with respect to trusts and estate law, given the broad discretionary powers under the special needs trust, why does the Colorado Court have any say in how we take care of Joanne's needs? And, on this point, why are we continuing a conservatorship in Colorado, if Joanne resides in New York/New Jersey? (Dain's email to Black from 9/3/2014).

And from a followup email (emphasis added):

> Again, please explain why there is a need to continue the conservatorship in Colorado (in my view an unreasonable expense to the Trusts) and *why we would want to be in a position of having a Colorado court dictate what we can reasonably expend for the benefit of Joanne.* " (Dain's email to Black from 9/12/2014). [emphasis mine – Bernard Black]

That is, our choice to keep all proceedings in Colorado was fine for Anthony and Cherie until the Colorado courts told me to reduce spending and until I refused to pay Cherie's exorbitant expenses from Joanne's trust fund. Only then did Anthony and Cherie decided to question the authority of the Colorado courts to oversee spending.

Prior to that, Cherie fully supported proceeding with guardianship in Colorado, discussed doing so with Gayle Young, Joanne's guardian ad litem, and cooperated with me in preparing a co-

PLAINTIFF001952

guardianship application in Colorado. Any forum concerns are self-interested and unrelated to Joanne's best interests. (I did not file the co-guardianship petition because I was uncomfortable with Cherie as co-guardian. In hindsight, that concern was clearly correct.)

### c. Anthony's and Cherie's Unsustainable Overspending of Trust Money

Anthony has repeatedly written to me that he is not at all concerned with the depletion of Joanne's trust's assets, and that he will authorize spending without analyzing whether the expenditure rates are sustainable. He has never asked questions like "What is Joanne's life expectancy?", "How many years should we expect Joanne may need to spend in a nursing home?", "How much does a quality nursing home care cost for someone with Joanne's special needs?" Instead, Anthony simply claims that our role as trustees is to spend down the trust as quickly as Joanne would prefer. Here is some flavor of his views:

> "The Trusts' directives are not focused on conserving assets, nor on restricting expenditures to only what a trustee believes is the minimum necessary to provide health care for Joanne. Your mom admonished me so many times that the purpose of the Trusts is to meet Joanne's needs and reasonable desires. She wanted Joanne to live the most fulfilling life possible, even if that meant exhausting the Trusts' assets by the end of Joanne's life. In fact, she often expressed that she wanted most of the assets to be spent during Joanne's life...

> "And as trustees we must follow the Trusts' directives not our own. And if that means, as I understand is the case, hospital staff accepts Cherie and/or Mr. Pinto to help Joanne cope with her current treatment, and to accompany her on day trips, and dental or other medical treatments, and to assist her in obtaining housing and outside treatment, these expenses should be accommodated. There should be no arbitrary restrictions on this (such as unilaterally instructing Mr. Pinto to cut his time in half).[1] If you believe that any time spent by Mr. Pinto or Cherie is objectively unreasonable or counterproductive to Joanne's wellbeing or mental health treatment, explain it to me and I will not authorize it. Otherwise I currently authorize it, and do not agree to any unilateral restrictions by you. " (Email from Anthony Dain to Bernard Black, 9/12/20014)

For me, the starting point in considering spending is what Joanne's income and assets can sustain, for her expected lifetime. Fortunately, Joanne has sufficient income and sufficient assets to both sustain a comfortable middle-class life style today, and leave enough in reserve to cover nursing home costs when she is old enough to need this level of care. The problem is that Cherie and Anthony want to spend without considering what a reasonable budget might be.

Yet the first issue for a prudent trustee is not whether "time spent (by a paid third party, especially a trustee's own sister) with Joanne is counterproductive to Joanne's wellbeing", but instead whether the rate of spending is sustainable. The amounts they want to spend are not close to sustainable.

Following my deciding not to reimburse first-class travel and other extravagant spending out of Joanne's fund, Cherie has decided to push to be a full guardian in New York, and to oust me from any role, including as financial conservator. As best I can tell, Cherie wants to evict me from control so that Cherie can spend Joanne's money at will. We are, to my great sadness, in a full fledged war for control of Joanne's assets.

---

[1] This refers to my insisting that Esaun Pinto reduce his monthly billing to $4,000 per month, from $8,000, as of September 2014.

PLAINTIFF001953

### d. A Summary of Cherie's Expenses on Trips to See Joanne:

**July 2014:** 3 days in New York. Bill submitted to me = $6,900, including first-class air travel, $200/day in undocumented per diem, $2,300 to Esaun Pinto (private investigator on our payroll) to shepherd Cherie around [on top of the $8,000 I already paid him for July], boarding for Cherie's cat, and lodging in Manhattan (expensive) instead of Staten Island (where Joanne is), which is less than half the price for hotels.

**Early September 2014:** Roughly 8 days. I do not know all details, because Cherie has not provided them to me, but, if her expenses are consistent with her first trip, I estimate them to be around $12,000, including first-class travel, $4,000 extra for Esaun Pinto (already submitted to me), per diem, and so on.

**Mid-September 2014:** 4-day trip, not disclosed to me in advance. I was visiting Joanne at the same time, which Cherie knew. She chose to arrive at Joanne's hospital just as I was leaving, surely to try to get Joanne on her side instead of mine. Estimated cost = $8,000, based on what she spent earlier for a 3-day trip.

**Summary:** 3 trips in 2 months, for total estimated cost of $27,000. In contrast, I traveled coach to visit Joanne, and further limited expenses by arranging to visit Joanne at the beginning of a trip to New York I was already taking, and stayed in a hotel in Staten Island rather than Manhattan. Cost was under $1,000.

Recall that Anthony Dain's view, this is not enough, and the trust should **also** pay Cherie for her time spent on Joanne.

### e. Anthony Dain's Refusals to Talk to Me, Discuss Trust Matters or Guardianship Proceedings – After My Refusal to Pay Cherie's Expenses

After the issue of Cherie's expenses arose, I set up a phone call with Anthony to discuss the situation (emails from Black to Dain from 9/3/2014). Anthony agreed:

> "I'm tied up this afternoon except for short breaks. Is tomorrow around noon my time okay?... Sure, I can call. You need to tell me what number you prefer... Will do [call at the number provided by me], Thanks." (Multiple short emails from Anthony Dain to Bernard Black from 9/3/2014).

Anthony soon changed his attitude, presumably after speaking to Cherie. He did not call me when he had agreed to, and has since refused to talk to me. I have made repeated attempts to discuss the situation with Anthony, requested phone calls, and suggested other ways of finding a solution (emails from Bernard Black to Anthony Dain from 9/3/2014, 9/4/2014, 9/11/2014, 9/16/2014). Anthony's characteristic responses:

> "I have no intention of spending time on the phone listening to you vent." (email from Anthony Dain to Bernard Black from 9/4/2014)

> "I want all communications to be documented and transparent. I do not want to have separate phone calls with you" (email from Anthony Dain to Bernard Black from 9/12/2014)

> "There is nothing you need to say to me that you can't provide in writing." (email from Anthony Dain to Bernard Black from 9/16/2014)

### III. A List of Topics on Which I Can Provide Additional Verifiable Information (Mostly Written Documents, Emails, and Such)

A. **General background information:**
1. Bernie's relationship with Joanne (phone calls and visits for many years, when Joanne was reachable).
2. Kate's relationship with Joanne (visits and multiple exchanges of gifts).
3. Bernie's relationship with his mother (weekly or nearly-weekly phone calls, multiple visits each year, full control of estate in the will and co-trustee of Joanne's main trust, full expectation of care for Joanne after mother's death).
4. Bernie's extensive work to obtain workers' compensation benefits for Joanne (despite opposition from Joanne), which are now a central source of support for Joanne.
5. Kate's relationship with her Joanne's mother, and her mother-in-law (nearly-weekly phone calls and multiple visits each year).
6. Cherie's relationship with Joanne and Bernie's mother -- periods of grudging (on my mother's part) coexistence, but also many years of open estrangement with no communication, and always great suspicion by my mother of Cherie's motives (which, sadly, now seem to be justified)
7. Tony's relationship with Joanne and Bernie's mother (limited).

B. **Details of financial planning and trust management**
1. Bernie's detailed financial estimates of the state of Joanne's two trusts, the current and expected cost of relevant care, the rates of expected expenditures for the rest of Joanne's life, the need for and amount of a reserve for likely future nursing home care, and a sustainable rate of spending.

C. **Specific (mostly written) documentation of Cherie's attempts to spend Joanne's trust money on Cherie, demands for more spending on Cherie from Joanne's trust, and Anthony's approvals of that spending.**
1. Cherie's written demands to spend Joanne's trust fund money on Cherie (including first-class travel, undocumented per diem, etc.).
2. Cherie's written demands for future first class travel to see Joanne, at Cherie's discretion.
3. Tony's repeated written approvals (as a trustee) of spending of Joanne's trust fund money on Cherie, without any effort to limit amount or verify what level of spending the trusts can sustain.
4. Tony's written claims that it is reasonable for Joanne's trust fund to spend thousands on Cherie's first-class travel plus hundreds per day on extra non-itemized expenses, in addition to all itemized expenses.
5. Tony's written demand to continue spending of Joanne's trust fund money on Cherie in the future.
6. Tony's written admissions that he has no information about the state of the main trust fund, has had no involvement in the trust management, has no knowledge of what

PLAINTIFF001955

expenditures the trust documents allow (immediately next to his written approval of expenditures on his sister's first-class travel).

7. Cherie's written demands to come to Bernie's house and remove his mother's jewelry and car.

8. Tony's written statements that he will not authorize the use of Joanne's trust money on guardianship proceedings, whether or not beneficial to Joanne, if this would involve taking a legal position against Cherie.

9. Cherie's statements to Bernie claiming that she does not wish to be a guardian and has never wanted to be a guardian for Joanne, while she was actively preparing to file for full guardianship in New York.

D. **The unwillingness of Tony and Cherie to engage in discussions with Bernie to resolve disagreements; the overtly litigious nature of all their interactions with Bernie.**

1. Tony's repeated written refusals to speak with Bernie on the phone, discuss disagreements, resolve problems.

2. Tony's explicit written insistence on keeping a paper trail of all interactions with Bernie.

3. Cherie's refusal to speak to Bernie when they met in New York several days ago (at Joanne's hospital); Cherie's refusal to meet with Bernie to discuss Joanne's health and future prospects.

E. **Information about what Bernie's and Joanne's mother wanted to accomplish in her trusts for Joanne:**

1. Bernie's mother's reasons to include Tony as a trustee, despite limited contact with Tony (tax management).

2. Bernie's mother's specific decision to exclude Cherie from all roles in the estate and to exclude Cherie from the care of Joanne (as evidenced by estate documents).