UNITED STATES DISTRICT COURT
EASETERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

SAMUEL HOY BLACK and BERNARD BLACK,

                              Plaintiffs,                  16-CV-430 (CBA)(ST)

      -against-

CHERIE WRIGLEY, ESAUN G. PINTO, SR., and
CPI INVESTIGATIONS INC.

                              Defendants.

-----------------------------------------------------------------X

### DEFENDANTS' RULE 56.1
### STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT
### OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, by and through their attorneys, Mancilla & Fantone LLP, respectfully submits the following statements of undisputed material facts pursuant to F.R.C.P. Rule 56, in support of Defendants' Motion for Summary Judgment.

**Background Facts**

1. Plaintiff Bernard Black ("Bernard") resides in Illinois and is a co-trustee of the Joanne Black Supplemental Needs Trust ("SNT") and the Joanne Black 2013 Trust, and the Executor of the Estate of Renata Black (Compl. ¶¶ 33, 35)

2. Bernard is Joanne Black's brother. (Compl. ¶34)

3. Plaintiff Samuel Black is Bernard Black's son. (Compl. ¶30)

4. Plaintiffs Bernard and Samual Black ("Plaintiffs") filed the instant lawsuit as co-trustees of the supplemental needs trust for the benefit of Joanne Black. (Compl. ¶¶ 29, 33)

5. Defendant Cherie Wrigley is, and was at all times relevant, a resident of the State of California. (Compl. ¶ 37)

6. Defendant Wrigley is a first cousin of Joanne Black. (Compl. ¶ 39)

7. Defendant Wrigley visits New York several times a year. (Compl. ¶ 40)

8. Defendant Esaun G. Pinto, Sr., is, and was at all times relevant, a resident of the State of New York. He resides in Brooklyn. (Compl. ¶ 47)

9. Pinto is Vice President of Defendant CPI Investigations Inc., which has its principal place of business at 50 West 17th Street, Suite 800 South, New York, NY 10011. (Compl. ¶ 48)

10. Esaun and Joanne have been friends for approximately 20 years. (Joanne Decl. ¶ 4)

11. In 2010 Joanne was living in an apartment near her mother's home and spending weekends with her mother. (Compl. ¶ 64)

12. She ceased taking her prescribed medications at around this time and became increasingly paranoid and delusional. (Compl. ¶ 65)

13. She ran away from home and hid her location from her family because she feared that her mother would commit her to a psychiatric hospital. (Compl. ¶ 66)

14. At this time, Joanne had a delusional belief that she was married to a billionaire mobster. (Compl. ¶ 67)

15. After Renata's death, Joanne, because of her disability, was eligible to receive workers' compensation benefits of about $1,000 per week. She attempted to prevent Bernard from obtaining these benefits for her because she believed her imaginary husband was rich. (Compl. ¶ 68)

16. Before she died, Renata Black supported Joanne by sending her money weekly through deposits to her bank account at Chase. (Compl. ¶ 69)

17. Bernard Black continued this practice after Renata's death. (Compl. ¶ 70)

**Joanne Is Rescued In Colorado**

18. At the time of Renata's death, Joanne was located in Colorado, severely mentally ill, not taking her medications, and all but homeless. (Compl. ¶12)

19. Wrigley used the information she obtained from Verizon, Wells Fargo, and Chase to locate Joanne based on the location of Joanne's contacts with Verizon, and her cash withdrawals and/or check card purchases using her Wells Fargo and Chase debit cards. (Compl. ¶ 90)

20. Soon after her own trip to Colorado, Wrigley arranged with Pinto for him to travel to Colorado and move Joanne back to the East Coast. (Compl. ¶ 99)

21. Bernard wrote: "Cherie and I arranged in 2013 for her advisor, Esaun Pinto, to attempt a "rescue" which involved bringing her to New Jersey, and closer to Esaun. She was committed to a mental institution involuntarily while in New Jersey, then transferred involuntarily to New York because it was easier for us to arrange for long-term care there" in a letter dated September 22, 2014 from Bernard to Linda Lee Babcock, a court-appointed visitor. (Ex. A to Fantone Decl. at 2)

22. On April 9, 2013 Pinto sent an email to Bernard stating: "Hello Mr. Black. This is investigator Esaun Pinto. I would like to travel to Denver this weekend and attempt to get Joanne help. After opening conversation with her again I seem to have gained her trust. She has provided information about her current condition with the promise of seeing me again. I would like to document her daily activities for a couple of days before meeting her. This will allow me to have someone intelligence which will be necessary to sort through her many stories. Once contact is made it may take a few days to gain her

complete trust but I think ultimately we will be successful in getting her treatment.I will need a client agreement from you detailing my efforts as well as a $5k retainer. I will cover the travel expenses will the retainer and bill you for time and any additional expenses." (Ex. B to Fantone Decl.)

23. On April 10, 2013 Wrigley sent an email to Bernard stating"I have already wired him the money. You authorized 5k." (Ex. C to Fantone Decl.)

24. On April 10, 2013 Bernard wrote to Cherie stating, "Cherie: I don't want to scare Joanne into running somewhere. That's my worry. And he seemed entirely too anxious to get paid, and then do work to justify the pay, which I think will come to nothing. I should just send you a check, say for $10k, and then you can report expenses later; I don't want you to be significantly out of pocket. I will do so. Bernie." (Ex. C to Fantone Decl.)

25. Pinto traveled to Colorado to help Joanne. (Joanne Decl. at ¶7)

26. From April 12, 2013 to June 3, 2013 Pinto and/or his employees were with Joanne working all hours of each day to secure, monitor, and care for Joanne. (Pinto Decl. at ¶ 3; Joanne Decl. at ¶ 7; Ex. D to Fantone Decl.)

27. Esaun and his employees worked tirelessly to rescue Joanne from her perilous circumstances. (Joanne Decl. at ¶7)

28. In an email from Pinto to Wrigley dated April 16, 2013 states: "As of today, at 4pm et. I have a total of 96hrs invested in this case at an hourly rate of $150." (Ex. E to Fantone Decl. at 1)

29. Pinto and his employees successfully brought Joanne to New Jersey (Pinto Dep. 40:17 - 41:10)

30. In an email dated April 25, 2013 Wrigley wrote to Bernard stating "Esaun and his team have worked wonders with Joanne. There are at least 20 things I could list that a psych hospital was unable to do in months that he has accomplished in a week & 1/2 Ex. Take off her many layers of clothing, bathe, bandages off her face, calm her, make her happy and safe." (Ex. F to Fantone Decl. at 2)

31. On April 25, 2013 Wrigley sent Bernard an email stating "I understood that she had about $25,000 a month that was to be distributed to her UNDER SOMEONE'S care. You and Esaun can decide how you want to handle that." (Ex. F to Fantone Decl. at 2)

32. In an email dated April 25, 2013 Bernard wrote to Pinto: "Pinto: I tried to leave my cousin, Cherie Wrigley, in charge of your efforts, but can no longer do so." (Ex. G to Fantone Decl.)

33. On May 14, 2013 Pinto sent Bernard an email stating: "Bernard, I apologize for the delay but hopefully you have received the new invoice which reflects the reduction of hours. We have cut the amount of hours to 12 per day this has drastically lowered the bill. Last weeks invoice is approximately $7000. As I continue to gain Joanne's trust I hope to reduce the amount of hours necessary. [...] The next few invoices should look very similar to last weeks and I estimate that it should be approximately $ 28k to $30k for the next month. Again I will do my best to continue reducing the hours without compromising Joannes safety. [...] (Ex. H to Fantone Decl. at 4)

34. On May 14, 2013, Bernard responded to Pinto stating "The key is bringing down hourly cost, Bernie." (Ex. H to Fantone Decl. at 3)

35. On May 26, 2013 Bernard sent an email to Esaun with a detailed breakdown attached labeled "servicelist.xls" and noting discrepancies between Bernard's review of the chase banks statements and Pinto's invoices. (Ex. I to Fantone Decl. at 3-5)

36. On May 31, 2013 Pinto wrote to Bernard: "I have made withdrawals to cover a lot of things including money that was laid out by me to cover late invoices, gas, tolls, motels, food, damages, clothes and anything else that happen. [...]" (Ex. I to Fantone Decl. at 2)

37. On June 2, 2013 Bernard wrote to Pinto, cc'ing Wrigley, stating: "Esaun: [...] I am also acting as a fiduciary. In that capacity, I simply *cannot* spend funds without adequate documentation [...] Given the current uncertainty, I am not sure it makes sense to pay a month in advance, but will be happy to pay a week in advance when I get back. [...]" (Ex. I to Fantone Decl.)

**Joanne Is Committed To A Mental Healthcare Facility**

38. On June 3, 2013, Joanne was involuntarily committed to Jersey City Medical Center in New Jersey. (Compl. ¶ 511)

39. On July 2, 2013 Bernard wrote to Pinto: "Esaun: [...] At this point I do not understand the basis for your most recent bill to cover a period prior to June 3, a period for which you have already billed. Cherie told me repeatedly during this period that you were billing for the time of others, but not for your own time. As you know, I was very concerned about weekly cash burn. Over time, we reached an agreement on a burn rate of $5,000 per week. I took that to be a total, not an amount to which you would later add $2 -3,000 per week for your own time. [...] I will pay your latest bill from June 3 forward, adjusted for any under- or overpayment prior to that. I continue to be frustrated by the lack of an integrated bill showing all expenses and payments. The attached spreadsheet is my best

effort, after substantial effort, to build such a bill, relying on your statements for specific weeks and your most recent statement. [...] Cherie advises me that you will be able to document some additional expenses during that period, and I'm willing to consider that, if you provide me with details. Otherwise, I consider the period from inception through June 24 to be closed." (Ex. J to Fantone Decl. at 2)

40. In an email dated July 17, 2013, Bernard instructed Pinto: "Esaun, [...] To confirm, you should make all future billing agreements with me., and only me." (Ex. K to Fantone Decl. at 1)

41. Joanne remained committed to mental healthcare facilities until October 2014. (Compl. ¶114)

42. During Joanne's commitment to mental healthcare facilities in 2013 and 2014 Joanne called Pinto at least 3 times a day and talked to him for hours each day. (Joanne Decl. at ¶8)

43. During Joanne's commitment to mental healthcare facilities in 2013 and 2014 Pinto performed several tasks for Joanne including meeting with healthcare professionals regarding her condition and care plan, going to the bank, going shopping for her, and taking care of other tasks if anything else came up. (Joanne Decl. at ¶8)

44. During the time that Joanne was committed to mental healthcare facilities in 2013 Pinto visited her regularly, on average at least 3 times per week. (Joanne Decl. at ¶8)

45. On November 17, 2013 Bernard sent an email to Pinto stating, "Esaun: [...] Cherie and I think that once Joanne is moved, your visits can be cut back in frequency, initially to twice per week. I understand from Cherie that you agree with this plan." (Ex. L to Fantone Decl. at 11)

46. In 2014 Joanne's condition began to improve and Pinto visited Joanne less frequently. (Joanne Decl. at ¶8)

47. On February 19, 2014 Pinto sent an email to Bernard stating: "I have reduced my visits to twice a week on most weeks however sometimes things come up and I am needed.[..] A monthly rate to be paid at the start of the month." (Ex. M to Fantone Decl. at 2)

48. Between January 2014 through September 2014, Pinto's invoices that he sent to Bernard do not contain any representations as to the number and duration of his visits to Joanne. (Ex. D to Fantone Decl. at 23-31)

49. Pinto billed, and Bernard paid, a flat rate payment of $8,000 per month from January 2014 until August 2014. (Ex. D to Fantone Decl. at 23-31; Compl. at ¶459)

50. In an email dated September 4, 2014 Bernard wrote to Pinto "you are working for me, in my capacity as financial conservator for Joanne, as trustee of trusts of which Joanne is the principal beneficiary, and as executor of the Estate of Renata Black."(Ex. N to Fantone Decl. at 1)

51. In Bernard's letter to Linda Babcock dated September 22, 2014 Bernard wrote "Esaun Pinto (private investigator on our payroll)" (Exhibit A to Fantone Decl. at 6)

52. Plaintiffs voluntarily provided Pinto the advance pursuant to an agreement that Pinto would provide services in September 2014. (Compl. ¶543-44)

53. Plaintiffs initially paid Pinto $8,000 in exchange for services for September 2014. (Compl. ¶543-44)

54. On September 2, 2014 Bernard wrote to Pinto stating "[w]e are also at the start of a new month, September. For September and going forward, please reduce your billing to half

of the prior level ($4k/month), and document all visits to Joanne - record your Hours." (Ex. O to Fantone Decl at 1)

55. Pinto never agreed to reduce his fee for September 2014. (Pinto Dep. at 130:7-19)

56. Bernard visited New York City in September 2014. (Compl. ¶ 115)

57. On September 30, 2014, Bernard emailed Pinto writing: "Esaun: I am sorry, but if you cannot communicate with me, and do so regularly (not after many attempts and a long delay) I cannot justify continuing to pay you. I am acting on advice of my Colorado counsel, Carl Glatstein (who is cc'd). Mr. Glatstein has advised me that, in my fiduciary capacities as financial conservator for Joanne, executor of the estate of Renata Black, and co- trustee of her trust accounts, I cannot in good conscience continue to pay for your services when you refuse to communicate openly with me. Please consider your services to me as financial conservator for Joanne, executor of the estate of Renata Black, and co-trustee of her trust accounts, terminated, effective as of today, September 30, 2014. Please refund the advance payment I made to you of $4,000 for October 2014. The check should be payable to "Bernard Black, executor ", and mailed to me at 2829 Sheridan Place, Evanston IL 60201. Please also refund any amounts you withdrew from Joanne's checking account for payment, beyond those listed as deductions in your bill for August 2014 (attached). I will write separately with a list of withdrawals from Joanne's checking account, that I will need you to document and justify. Bernie." (Ex. P to Fantone Decl. at 2)

58. On September 18, 2014, Bernard visited Joanne at South Beach Psychiatric Center in Staten Island. (Compl. ¶ 117)

59. Joanne moved from the South Beach Psychiatric Center in Staten Island to the Center for Independent Living ("CIL") in Brooklyn on or about October 29, 2014. (Compl. ¶ 138)

60. During the time period that Bernard paid Pinto for services provided to Joanne, Bernard was a fiduciary as Joanne's conservator and a trustee of the SNT. (Ex. I to Fantone Decl; Compl. ¶33; Ex. N to Fantone Decl.; Ex. P to Fantone Decl. at 2)

**Wrigley and Pinto Have Successfully Helped Joanne**

61. With the help of Cherie and Esaun, Joanne has been in complete remission and living on her own since 2014. (Joanne Decl. at ¶6)

62. Cherie found Lois Orlin, a professional psychiatric social worker that has been assisting Joanne since 2014. (Joanne Decl. at ¶6)

63. With the help of Cherie, Esaun, and Lois (Joanne's support team) Joanne was able to move into my home at Concerned Living in Brooklyn, New York, where I have been living since October 2014. (Joanne Decl. at ¶6)

64. Their support has also helped Joanne maintain compliance with her medications, which is something she struggled with in the past. (Joanne Decl. at ¶6)

65. As a result of their help, Joanne has been able to recognize and overcome her mental illness over the past six years. (Joanne Decl. at ¶6)

66. Joanne has now been able to achieve stability in her life. (Joanne Decl. at ¶3)

**Plaintiffs Allegations Against Pinto**

67. Plaintiffs' allegations that Pinto's invoices contain inflated representations related to his visits to see Joanne are false. Pinto performed the services he billed for and Pinto's invoices are accurate. (Joanne Decl. at ¶9; Pinto Decl. at ¶2)

68. Pinto's representations regarding the number and duration of his visits are accurate. (Joanne Decl. at ¶9; Pinto Decl. at ¶3)

69. There were several times that Esaun visited Joanne when he didn't sign in. This includes occasions when Joanne saw Esaun's new motorcycle, times she visited with his family, and times he came outside of visiting hours. (Joanne Decl. at ¶9)

70. Pinto was not required to sign in each time he visited Joanne at South Beach hospital. (Pinto Dep. at 252:10 - 253:2)

71. Pinto would visit with staff members, doctors, social workers, and attorneys on Joanne's behalf. (Pinto Dep. at 252:4-9)

72. Pinto personally incurred expenses on behalf of Joanne that he was never reimbursed for. (Pinto Dep. at 217:23- 218:2)

73. Pinto incurred each and every expense listed in his invoices, and more that he did not list on the invoices. (Pinto Decl. at ¶2)

74. Pinto also spent the disputed amounts on out of pocket expenses. (Ex. D to Fantone Decl.; Pinto Dep. at 217:23 - 218:2)

75. Pinto also spent significant time helping Joanne with things that were not documented in the invoices. (Joanne Decl. at ¶9)

76. Pinto did not steal from Joanne or the Supplemental Needs Trust. (Pinto Decl. at ¶4)

77. The allegation that Pinto stole $43,776.87 from Joanne's Chase and Wells Fargo bank accounts is false. With respect to each of the disputed transactions, Pinto utilized the funds for Joanne's benefit by either providing the funds directly to her, placing the funds in a safe location that she was aware of, or spending the funds at her direction for items or services that she needed. (Joanne Decl. at ¶11)

78. Pinto also used some of the withdrawals to reimburse himself for out-of-pocket expenses that he had previously incurred for Joanne's benefit, but was not reimbursed for. (Joanne Decl. at ¶11)

79. Pinto never took or otherwise used any of the $43,776.87 for his own benefit. (Joanne Decl. at ¶11)

80. Esaun also spent at least $12,000.00 on Joanne for, among other things, motels, clothing, food, storage of belongings, and shopping, for which Bernard reimbursed him. (Joanne Decl. at ¶12)

81. Plaintiffs' accusation that Pinto stole several months of Joanne's Social Security Disability Insurance Benefits totaling $10,975.00 is also false. (Joanne Decl. at ¶13)

82. After Bernard took control of Joanne's finances she became afraid that he was going to steal her SSDI money. (Joanne Decl. at ¶13)

83. Joanne's social worker at the time advised her that she could have the monthly payments sent directly to Pinto, who she trusted, and Joanne's social worker helped Joanne arrange for that to happen. (Joanne Decl. at ¶13)

84. Each month when the SSDI checks were deposited into Joanne's account Pinto withdrew the SSDI funds and Joanne either spent the money, directed him to spend the money for things that she needed, or directed him to place the money in a specific location that she knew was safe. (Joanne Decl. at ¶14)

85. At some point Joanne had to pay some of the SSDI money to one of the hospitals. (Joanne Decl. at ¶14)

86. Pinto never took or otherwise used any of the disputed SSDI payments for his own benefit. (Joanne Decl. at ¶14)

87. Pinto did not retain for his personal benefit any funds from Joanne's Social Security Disability benefits, or from her bank accounts at Chase or Wells Fargo. (Pinto Decl. at ¶4)

88. Pinto sought payment by Bernard, from Estate funds, of $3,950 for visiting Joanne with Wrigley during Wrigley's first visit in September 2014.  Bernard did not pay this amount, as he had already paid Pinto and CPI for the full month of September.  (Compl. ¶546)

89. When Plaintiffs made the payment of $2,300 to Wrigley, they were aware that Wrigley was requesting reimbursement of payment she had provided to Pinto over and above his monthly flat rate fee. (Compl. ¶¶485, 569)

90. Plaintiffs refused to reimburse Wrigley with respect to the reimbursement requested for September 2014. (Compl. ¶486)

91. Plaintiffs did not ask Joanne why Pinto became her SSDI Representative Payee, or what happened with the $10,975.00 in unaccounted payments.  When asked why he never inquired into Pinto's involvement with the SSDI payments, Bernard answered: "I don't know that I asked the question why.  I simply did not."  (Bernard Sept. 8 Dep. at 50:2-8)

Dated: New York, New York
December 7, 2020

**Mancilla & Fantone, LLP**

By: /s/ Robert M. Fantone
Robert M. Fantone

By: /s/ Andrew Mancilla
Andrew Mancilla

*Attorneys for Defendants*