UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

SAMUEL HOY BLACK and BERNARD BLACK, as trustees
      Plaintiffs,

                 16-CV-430 (CBA) (ST)

  -against-

CHERIE WRIGLEY, ESAUN G. PINTO, SR., and
CPI INVESTIGATIONS INC.
  Defendants.
-------------------------------------------------------------------X

**PLAINTIFFS' RULE 56.1 RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiffs Samuel Black and Bernard Black, as trustees of the Supplemental Needs Trust for the Benefit of Joanne Black (SNT) submit the following Response to Defendants' Statement of Material Facts, pursuant to F.R.C.P. 56 and Local Rule 56.1. Numbers in the first column correspond to numbers in Defendants' Statement of Material Facts. Plaintiffs request leave of court, for more readable presentation of material in table form, to file the remainder of this statement using landscape format and 10 point font.

1

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| 1 | Plaintiff Bernard Black ("Bernard") resides in Illinois and is a co-trustee of the Joanne Black Supplemental Needs Trust ("SNT") and the Joanne Black 2013 Trust, and the Executor of the Estate of Renata Black. | Compl. ¶¶ 33, 35 | Admitted | |
| 2 | Bernard is Joanne Black's brother. | Compl. ¶34 | Admitted | |
| 3 | Plaintiff Samuel Black is Bernard Black's son. | Compl. ¶30 | Admitted | |
| 4 | Plaintiffs Bernard and Samuel Black ("Plaintiffs") filed the instant lawsuit as co-trustees of the supplemental needs trust for the benefit of Joanne Black. | Compl. ¶¶ 29, 33 | Admitted | |
| 5 | Defendant Cherie Wrigley is, and was at all times relevant, a resident of the State of California. | Compl. ¶ 37 | Admitted | |
| 6 | Defendant Wrigley is a first cousin of Joanne Black. | Compl. ¶ 39. | Admitted | |
| 7 | Defendant Wrigley visits New York several times a year. | Compl. ¶ 40 | Admitted in part as a statement about Wrigley's practices during Renata Black's lifetime (2012 and prior). Wrigley's current travel practices are unknown. | |
| 8 | Defendant Esaun G. Pinto, Sr., is, and was at all times relevant, a resident of the State of New York. He resides in Brooklyn. | Compl. ¶ 47 | Admitted | |
| 9 | Pinto is Vice President of Defendant CPI Investigations Inc., which has its principal place of business at 50 West 17th Street, Suite 800 South, New York, NY 10011. | Compl. ¶ 48 | Admitted in part as a statement during relevant times. Pinto's current employment and the current address of CPI Investigations Inc. (CPI) are unknown. | |
| 10 | Esaun and Joanne have been friends for approximately 20 years. | Joanne Decl. ¶ 4 | Denied. Pinto is a con man who has stolen hundreds of thousands of dollars from the SNT and Joanne, while pretending to be her friend. | |
| 11 | In 2010 Joanne was living in an apartment near her mother's home and spending weekends with her mother. | Compl. ¶ 64 | Admitted | |
| 12 | She ceased taking her prescribed medications at around this time and became increasingly paranoid and delusional. | Compl. ¶ 65 | Admitted | |
| 13 | She ran away from home and hid her location from her family because she feared that her mother would commit her to a psychiatric hospital. | Compl. ¶ 66 | Admitted in part. On information and belief, Renata Black was aware of Joanne's general whereabouts, but not her precise location, which in any event changed frequently as Joanne moved from motel to motel. | |
| 14 | At this time, Joanne had a delusional belief that she was married to a billionaire mobster. | Compl. ¶ 67 | Admitted | |
| 15 | After Renata's death, Joanne, because of her disability, was eligible to receive workers' compensation benefits of about $1,000 per week. She attempted to prevent Bernard from obtaining these benefits for her because she believed her imaginary husband was rich. | Compl. ¶ 68 | Admitted in part. Joanne was theoretically eligible to have her mother's workers compensation benefits transferred to her. Bernard worked to achieve that transfer, and Joanne attempted to block the transfer. | |

2

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| 16 | Before she died, Renata Black supported Joanne by sending her money weekly through deposits to her bank account at Chase. | Compl. ¶ 69 | Admitted.  Joanne's support also included monthly payments of Social Security Disability Insurance, which were sent directly, to a separate bank account of Joanne's at Wells Fargo Bank. | |
| 17 | Bernard Black continued this practice after Renata's death. | Compl. ¶ 70 | Admitted | |
| 18 | At the time of Renata's death, Joanne was located in Colorado, severely mentally ill, not taking her medications, and all but homeless. | Compl. ¶12 | Admitted | |
| 19 | Wrigley used the information she obtained from Verizon, Wells Fargo, and Chase to locate Joanne based on the location of Joanne's contacts with Verizon, and her cash withdrawals and/or check card purchases using her Wells Fargo and Chase debit cards. | Compl. ¶ 90 | Admit that Wrigley obtained information about Joanne's location from these sources, but otherwise denied as misleading and incomplete.  Wrigley used illegal means to obtain this information.  Wrigley called Verizon, pretended to be Joanne, obtained Joanne's account information and access to Joanne's voicemail, and changed the billing address to Wrigley's home address.  Wrigley also impersonated Joanne at Wells Fargo and Chase and obtained online access to Joanne's Wells Fargo and Chase bank accounts. | Compl. ¶¶ 85-89. |
| 20 | Soon after her own trip to Colorado, Wrigley arranged with Pinto for him to travel to Colorado and move Joanne back to the East Coast. | Compl. ¶ 99 | Admitted in part, but otherwise denied as misleading and incomplete. | |
| 21 | Bernard wrote: "Cherie and I arranged in 2013 for her advisor, Esaun Pinto, to attempt a "rescue" which involved bringing her to New Jersey, and closer to Esaun. She was committed to a mental institution involuntarily while in New Jersey, then transferred involuntarily to New York because it was easier for us to arrange for long-term care there" in a letter dated September 22, 2014 from Bernard to Linda Lee Babcock, a court-appointed visitor. | Fantone Decl. Exh. A | Admitted. | |
| 22 | On April 9, 2013 Pinto sent an email to Bernard stating: "Hello Mr. Black. This is investigator Esaun Pinto. I would like to travel to Denver this weekend and attempt to get Joanne help. After opening conversation with her again I seem to have gained her trust. She has provided information about her current condition with the promise of seeing me again. I would like to document her daily activities for a couple of days before meeting her. This will allow me  to have someone intelligence which will be necessary to sort through her many stories. Once contact is made it may take a few days to gain her complete | Fantone Decl. Exh. B | Admitted in part but denied in part as incomplete and misleading.  Pinto sent this email.  Bernard replied the same day that "We should talk first."  Pinto and Wrigley were not prepared to wait.  By the next day, Wrigley had hired Pinto, wired $5,000 to Pinto, and demanded reimbursement from Bernard | Additional emails included in Fantone Decl. Exh. B. CPI bills included in Fantone Decl. Exh. D (CPI bills listing Cherie Wrigley as the "client") |

3

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| | trust but I think ultimately we will be successful in getting her treatment. I will need a client agreement from you detailing my efforts as well as a $5k retainer. I will cover the travel expenses will the retainer and bill you for time and any additional expenses." | | | |
| 23 | On April 10, 2013 Wrigley sent an email to Bernard stating "I have already wired him the money. You authorized 5k." | Fantone Del. Exh. C | Admitted in part, but also denied as incomplete and misleading. Bernard did not authorize this expense, and instead advised Pinto that "We should talk first." | Fantone Decl. Exhs. B, C. |
| 24 | On April 10, 2013 Bernard wrote to Cherie stating, "Cherie: I don't want to scare Joanne into running somewhere. That's my worry. And he seemed entirely too anxious to get paid, and then do work to justify the pay, which I think will come to nothing. I should just send you a check, say for $10k, and then you can report expenses later; I don't want you to be significantly out of pocket. I will do so. Bernie." | Fantone Del. Exh. C | Admitted. | |
| 25 | Pinto traveled to Colorado to help Joanne. | Joanne Del. ¶ 7. | Denied as incomplete and misleading. Pinto was paid lavish amounts for his trip to Colorado. | Fantone Decl. Exh. D (Pinto bills) |
| 26 | From April 12, 2013 to June 3, 2013 Pinto and/or his employees were with Joanne working all hours of each day to secure, monitor, and care for Joanne. | Fantone Decl. Exh. D; Pinto Decl. ¶ 3; Joanne Decl. ¶ 7. | Denied. Pinto left Joanne in a highway-side motel in New Jersey and effectively imprisoned her there. Pinto asserted in his bills that he and his employees maintained a 24-hour watch over the motel, apparently to prevent her from leaving the motel grounds. Pinto billed outrageous amounts for this activity. | Fantone Decl. Exh. D (Pinto bills) |
| 27 | Esaun and his employees worked tirelessly to rescue Joanne from her perilous circumstances. | Joanne Decl. at ¶7 | Denied. Joanne's recollection, 7 years later, is not a substitute for evidence on specific hours worked by Pinto and his employees. Pinto has not provided this evidence. | |
| 28 | In an email from Pinto to Wrigley dated April 16, 2013 states: "As of today, at 4pm et. I have a total of 96hrs invested in this case at an hourly rate of $150." | Fantone Decl. Exh. E | Admit the content of the email but deny that Pinto in fact worked 153 consecutive hours, without sleeping, over April 12-19, 2013, as he claimed in his bills. | |
| 29 | Pinto and his employees successfully brought Joanne to New Jersey | Pinto Dep. 40:17 41:10 | Deny that Pinto's actions in April 2013 were in any sense a "success." Admit that Pinto and his employees used force and deception to bring Joanne from Colorado to a highway motel in New Jersey, where they kept her captive and under 24-hour guard for another 6 weeks. | |
| 30 | In an email dated April 25, 2013 Wrigley wrote to Bernard stating "Esaun and his team have worked wonders with Joanne. There are at least 20 things I could list that a psych hospital was unable to do in months that he has accomplished in a week & 1/2 Ex. Take off her many layers of clothing, | Fantone Decl. Exh. F. | Admit the content of the email, but deny that Pinto achieved meaningful success with regard to Joanne's mental condition in April and May 2013, or that it was ever plausible that he would be able to do so. | |

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| | bathe, bandages off her face, calm her, make her happy and safe." | | | |
| 31 | On April 25, 2013 Wrigley sent Bernard an email stating "I understood that she had about $25,000 a month that was to be distributed to her UNDER SOMEONE'S care. You and Esaun can decide how you want to handle that." | Fantone Decl. Exh. F. | Admit the content of the email chain but deny that the substance of the email is correct. A spending rate of $25,000 per month was not sustainable, even if Pinto had the expertise to take care of Joanne, which he did not, and even if all of Pinto's expenses had there were properly documented, which they were not. As Bernard wrote in a reply email on April 25, 2013, "You are also wrong about their being $25k/mont available for Joanne, even if the need wee properly documented, and the spending were properly approved. That far exceeds a prudent spending rate." | Fantone Decl. Exh. F |
| 32 | In an email dated April 25, 2013 Bernard wrote to Pinto: "Pinto: I tried to leave my cousin, Cherie Wrigley, in charge of your efforts, but can no longer do so." | Fantone Decl. Exh. G | Admit the content of the email chain, but deny that this short excerpt is representative of the exchange. The email was sent to Pinto with copy to Anthony Dain, co-trustee of the SNT. It continued:<br>Every cost estimate [Wrigley] has provided to me has been immediately exceeded, by a large amount.<br>I was told $5k<br>Then told, a few thousand more.<br>Then another $10k.<br>Now I have your bill for a total of $30k, with ongoing daily cost far above what my mother's estate can sustain in more than the very short term. | Fantone Decl. Exh. G |
| 33 | On May 14, 2013 Pinto sent Bernard an email stating: "Bernard, I apologize for the delay but hopefully you have received the new invoice which reflects the reduction of hours. We have cut the amount of hours to 12 per day this has drastically lowered the bill. Last weeks invoice is approximately $7000. As I continue to gain Joanne's trust I hope to reduce the amount of hours necessary. [...] The next few invoices should look very similar to last weeks and I estimate that it should be approximately $ 28k to $30k for the next month. Again I will do my best to continue reducing the hours without compromising Joannes safety. [...] | Fantone Decl. Exh. H | Admit the content of the email chain but deny that this excerpt is representative of the exchange. Later in the chain, Pinto agreed to reduce his weekly charges to $5,000, and to seek to provide further reductions, but in fact did not do so, until Joanne was hospitalized in early June 2013.. | Fantone Decl. Exh. H; Pinto bills included in Fantone Decl. Exh. D |
| 34 | On May 14, 2013, Bernard responded to Pinto stating "The key is bringing down hourly cost, Bernie." | Fantone Decl. Exh. H | Admit the content of the email chain, but deny that this excerpt is representative. Later in the email chain, Pinto resisted reducing the hourly cost for persons to simply want | Fantone Decl. Exh. H |

5

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| | | | Joanne's motel to prevent her from leaving from $75 to a more reasonable level that better reflected the nature of the services being provided. | |
| 35 | On May 26, 2013 Bernard sent an email to Esaun with a detailed breakdown attached labeled "servicelist.xls" and noting discrepancies between Bernard's review of the chase banks statements and Pinto's invoices. | Fantone Decl. Exh. I | Admit the content of the email chain. Deny any implication that Bernard caught all of the instances n which Pinto made withdrawals from Joanne's Chase account without disclosing these on his bills or treating these withdrawals as partial payment for his fees and expenses. | Black Decl. ¶¶ 22-24, 62 and Exh. I |
| 36 | On May 31, 2013 Pinto wrote to Bernard: "I have made withdrawals to cover a lot of things including money that was laid out by me to cover late invoices, gas, tolls, motels, food, damages, clothes and anything else that happen. [...]" | Fantone Decl. Exh. I | Admit the content of the email chain. This was one instance, which later on turned out not to be the only one, in which Pinto wrongfully withdrew funds from Joanne's Chase account without documenting this on his bills or treating these withdrawals as partial payment for his fees and expenses. Deny that Pinto in fact incurred the expenses he claimed to have incurred on his bills, for which he has never provided documentation. Deny any implication that Pinto incurred expenses that he did not list on his invoices. | Black Decl. ¶¶ 22-24, 62 and Exh. I |
| 37 | On June 2, 2013 Bernard wrote to Pinto, cc'ing Wrigley, stating: "Esaun: [...] I am also acting as a fiduciary. In that capacity, I simply *cannot* spend funds without adequate documentation [...] Given the current uncertainty, I am not sure it makes sense to pay a month in advance, but will be happy to pay a week in advance when I get back. [...]" | Fantone Decl. Exh. I | Admit the content of the email chain. The chain involves one instance which later on turned out not to be the only one, in which Pinto wrongfully withdrew funds from Joanne's Chase account without documenting this on his bills or treating these withdrawals as partial payment for his fees and expenses. | Black Decl. . ¶¶ 22-24, 62 and Exh. I |
| 38 | On June 3, 2013, Joanne was involuntarily committed to Jersey City Medical Center in New Jersey. | Compl. ¶ 511 | Admitted. | |
| 39 | On July 2, 2013 Bernard wrote to Pinto: "Esaun: [...] At this point I do not understand the basis for your most recent bill to cover a period prior to June 3, a period for which you have already billed. Cherie told me repeatedly during this period that you were billing for the time of others, but not for your own time. As you know, I was very concerned about weekly cash burn. Over time, we reached an agreement on a burn rate of $5,000 per week. I took that to be a total, not an amount to which you would later add $2 -3,000 per week for your own time. [...] I will pay your latest bill from June 3 forward, adjusted for any under- or overpayment prior to that. I continue to be frustrated by the lack of an integrated bill showing all expenses and payments. The attached spreadsheet is my best effort, after substantial effort, to build such a bill, relying on | Fantone Decl. Exh. J | Admit the contents of the email chain. | |

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
|  | your statements for specific weeks and your most recent statement. [...] Cherie advises me that you will be able to document some additional expenses during that period, and I'm willing to consider that, if you provide me with details. Otherwise, I consider the period from inception through June 24 to be closed." |  |  |  |
| 40 | In an email dated July 17, 2013, Bernard instructed Pinto: "Esaun, [...] To confirm, you should make all future billing agreements with me., and only me." | Fantone Decl. Exh. K | Admit the contents of the email chain, but state that on numerous occasions, both before and after this email, Pinto billed Wrigley directly, Wrigley paid Pinto's invoices and then sought reimbursement from Joanne's trust funds |  |
| 41 | Joanne remained committed to mental healthcare facilities until October 2014. | Compl. ¶114 | Admit, more precisely, that Joanne was a psychiatric inpatient from June 3, 2013 through late October 2014. |  |
| 42 | During Joanne's commitment to mental healthcare facilities in 2013 and 2014 Joanne called Pinto at least 3 times a day and talked to him for hours each day. | Joanne Decl. ¶ 8 | How often Joanne typically called Pinto is not known to plaintiffs. That she spoke to Pinto for multiple hours a day is denied as implausible and not supported by phone records. |  |
| 43 | During Joanne's commitment to mental healthcare facilities in 2013 and 2014 Pinto performed several tasks for Joanne including meeting with healthcare professionals regarding her condition and care plan, going to the bank, going shopping for her, and taking care of other tasks if anything else came up. | Joanne Decl. ¶ 8 | Denied. Whether and how often Pinto met with healthcare professionals at Joanne's hospitals is not known to plaintiffs. Joanne's declaration of events that occurred some years ago, while she was a psychiatric inpatient and often delusional, is not supported by either Pinto's own declaration or hospital records of these meetings, and needs to be tested through cross-examination.<br><br>For visits to banks, Joanne has no basis for personal knowledge of Pinto's activities outside the hospital, and she minimal expenses while in the hospital, so Pinto would have had minimal reason to stop at an ATM machine to withdraw cash for her use. Joanne does not state that Pinto provided cash to Joanne, or how much, out of the over $55,000 he withdrew from Chase bank accounts.<br><br>For shopping, Pinto billed regularly for expenses for "JB shopping," typically $100 every two weeks, with no details and no receipts. The extent of Pinto's actual purchases, what specific items he bought, and their cost is unknown to plaintiffs, and should be left to Pinto to prove and for Joanne to assert with specificity in testimony at trial, subject to cross-examination. |  |

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| 44 | During the time that Joanne was committed to mental healthcare facilities in 2013 Pinto visited her regularly, on average at least 3 times per week. | Joanne Decl. ¶ 8 | Denied. Joanne's memory: (i) is unreliable, and needs to be tested through cross-examination; (ii) is inconsistent with hospital records, for the period from May 22 through October 23, 2014, for which they are available; and (iii) contradicts the assertion in Defendants' Memorandum of Law (Def. MoL) at 8 that Pinto reduced visit frequency in 2014 and that "Bernard agreed to Pinto's reduction in visits"; and (iv) contradicts asserted fact 46. | Black Decl. ¶¶ 10-12 and Exh. B; Def. MOL at 8. |
| 45 | On November 17, 2013 Bernard sent an email to Pinto stating, "Esaun: [...] Cherie and I think that once Joanne is moved, your visits can be cut back in frequency, initially to twice per week. I understand from Cherie that you agree with this plan." | Fantone Decl. Exh. L at 11 | Admit the content of the email string but deny that Pinto agreed to reduce visit frequency in return for reduced pay. Instead, Pinto insisted, and Bernard reluctantly agreed, to continue the visit rate of 3 times weekly, as reflected in his bills for the remainder of 2013, and in the reduced flat fee rate that Bernard negotiated with Pinto beginning January 2014. | Black Decl. ¶ 13; Fantone Del. Exh. D (Pinto bills) |
| 46 | In 2014 Joanne's condition began to improve and Pinto visited Joanne less frequently. | Joanne Decl. ¶ 8 | Admit that Pinto visited Joanne less than 3 times per week in 2014. How many times he actually visited is unknown for the period prior to May 22, 2014. From May 22, 2014 on, Pinto's actual visits are available from records of the South Beach Psychiatric Center. | Black Decl. ¶¶ 10-12 and Exh. B |
| 47 | On February 19, 2014 Pinto sent an email to Bernard stating: "I have reduced my visits to twice a week on most weeks however sometimes things come up and I am needed.[..] A monthly rate to be paid at the start of the month." | Fantone Del. Exh. M | Admit the content of the email string, but deny that Bernard agreed to pay Pinto $8,000 per month for two weekly visits. Instead, Bernard objected, called Pinto, and proposed that Pinto reduce his monthly fee to correspond to any reduction in visits. Pinto refused to reduce his fee and agreed instead to continue to visit Joanne three times per week. | Black Decl. ¶¶ 14-19 |
| 48 | Between January 2014 through September 2014, Pinto's invoices that he sent to Bernard do not contain any representations as to the number and duration of his visits to Joanne. | Fantone Decl. Exh. D | Admit the content of the bills, but deny that Bernard agreed to a reduction in visit frequency. Bernard negotiated the flat monthly rate that began January 2014 as a reduction in Pinto's per-visit charge, not an increase. Bernard preferred a lower visit frequency in return for lower pay to Pinto, but Pinto refused to agree to this. | Black Decl. ¶¶ 14-19 |
| 49 | Pinto billed, and Bernard paid, a flat rate payment of $8,000 per month from January 2014 until August 2014. | Fantone Decl. Exh. D; Compl ¶ 459 | Admit that Bernard paid Pinto $8,000 per month during this period, but state that this was for an agreed-on three visits per week. | Black Decl. ¶¶ 14-19 |
| 50 | In an email dated September 4, 2014 Bernard wrote to Pinto "you are working for me, in my capacity as financial conservator for Joanne, as trustee of trusts of which Joanne is | Fantone Decl. Exh. N | Admit the content of the email, but deny that Pinto was in fact working for Bernard, rather than for Wrigley, as Pinto made abundantly clear through his conduct and emails after Bernard sent this email. | Black Decl. ¶¶ 47-57; Fantone Decl. Exh. P (email chain from Sept. 2014) |

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| | the principal beneficiary, and as executor of the Estate of Renata Black." | | | |
| 51 | In Bernard's letter to Linda Babcock dated September 22, 2014 Bernard wrote "Esaun Pinto (private investigator on our payroll)" | Fantone Decl. Exh. A at 6 | Admit the content of Bernard's letter to Ms. Babcock and admit that Bernard was paying Pinto's bills at the time of this letter, but deny that Pinto was working for Bernard rather than for Wrigley, , as Pinto made clear through his conduct and emails around and after the time of this letter. | Black Decl. ¶¶ 47-57; Fantone Decl. Exh. P (email chain from Sept. 2014) |
| 52 | Plaintiffs voluntarily provided Pinto the advance pursuant to an agreement that Pinto would provide services in September 2014. | Compl. ¶543-44 | Denied as ambiguous as to what advance is being referred to or what agreement is being referred to. If the reference is is to September 2014, admit that Bernard paid Pinto $8,000 in advance for this month, which was intended to cover 3 visits per month for September 2014. | |
| 53 | Plaintiffs initially paid Pinto $8,000 in exchange for services for September 2014. | Compl. ¶543-44 | Admit that Bernard paid Pinto $8,000 in advance for September 2014, which was intended to cover 3 visits per month for September 2014. | |
| 54 | On September 2, 2014 Bernard wrote to Pinto stating "[w]e are also at the start of a new month, September. For September and going forward, please reduce your billing to half of the prior level ($4k/month), and document all visits to Joanne - record your Hours." | Fantone Decl. Exh. O | Admitted. | |
| 55 | Pinto never agreed to reduce his fee for September 2014. | Pinto Dep. at 130:7-19 | Denied. Pinto responded to Bernard's email, excerpted in item 54, and agreed to reduce his billing rate to $4,000 per month. Pinto replied "Got it." | Fantone Decl. Exh. O (Pinto rely email to Bernard, Sept. 2, 2014. |
| 56 | Bernard visited New York City in September 2014. | Compl. ¶ 115 | Admitted | |
| 57 | On September 30, 2014, Bernard emailed Pinto writing: "Esaun: I am sorry, but if you cannot communicate with me, and do so regularly (not after many attempts and a long delay) I cannot justify continuing to pay you. I am acting on advice of my Colorado counsel, Carl Glatstein (who is cc'd). Mr. Glatstein has advised me that, in my fiduciary capacities as financial conservator for Joanne, executor of the estate of Renata Black, and co- trustee of her trust accounts, I cannot in good conscience continue to pay for your services when you refuse to communicate openly with me. Please consider your services to me as financial conservator for Joanne, executor of the estate of Renata Black, and co- trustee of her trust accounts, terminated, effective as of today, September 30, 2014. Please refund the advance payment I made to you of | Fantone Decl. Exh. P | Admitted, but deny that Pinto was in fact working for Bernard, rather than for Wrigley, as Pinto made clear through his conduct during September 2014 preceding this email. | Black Decl. ¶¶ 47-57; |

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| | $4,000 for October 2014. The check should be payable to "Bernard Black, executor ", and mailed to me at 2829 Sheridan Place, Evanston IL 60201. Please also refund any amounts you withdrew from Joanne's checking account for payment, beyond those listed as deductions in your bill for August 2014 (attached). I will write separately with a list of withdrawals from Joanne's checking account, that I will need you to document and justify. Bernie." | | | |
| 58 | On September 18, 2014, Bernard visited Joanne at South Beach Psychiatric Center in Staten Island. | Compl. ¶ 117 | Admitted. | |
| 59 | Joanne moved from the South Beach Psychiatric Center in Staten Island to the Center for Independent Living ("CIL") in Brooklyn on or about October 29, 2014. | Compl. ¶ 138 | Admitted. | |
| 60 | During the time period that Bernard paid Pinto for services provided to Joanne, Bernard was a fiduciary as Joanne's conservator and a trustee of the SNT. | Fantone Decl. Exh. I; Exh. N; Exh. P | Admitted | |
| 61 | With the help of Cherie and Esaun, Joanne has been in complete remission and living on her own since 2014. | Joanne Decl. ¶ 6 | Neither admitted nor denied. Joanne's mental state following her release from South Beach Psychiatric Center, whether living in a halfway home should be considered "living on her own", and Pinto's and Wrigley's activities following Joanne's release from South Beach are not at issue in this case. | |
| 62 | Cherie found Lois Orlin, a professional psychiatric social worker that has been assisting Joanne since 2014. | Joanne Decl. ¶ 6 | Admitted. | |
| 63 | With the help of Cherie, Esaun, and Lois (Joanne's support team) Joanne was able to move into my home at Concerned Living in Brooklyn, New York, where I have been living since October 2014. | Joanne Decl. ¶ 6 | Admit that Joanne was released from South Beach Psychiatric Center in late October 2014, and has been living since then at the Center for Concerned Living, a halfway home in Brooklyn, New York. The remainder of this paragraph is neither admitted nor denied. Pinto's and Wrigley's activities following Joanne's release from South Beach are not at issue in this case. | |
| 64 | Their support has also helped Joanne maintain compliance with her medications, which is something she struggled with in the past. | Joanne Decl. ¶ 6 | Neither admitted nor denied. Pinto's and Wrigley's activities following Joanne's release from South Beach are not at issue in this case. | |
| 65 | As a result of their help, Joanne has been able to recognize and overcome her mental illness over the past six years. | Joanne Decl. ¶ 6 | Neither admitted nor denied. Pinto's and Wrigley's activities following Joanne's release from South Beach are not at issue in this case. | |

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| 66 | Joanne has now been able to achieve stability in her life. | Joanne Decl. ¶ 3 | Neither admitted nor denied. | |
| 67 | Plaintiffs' allegations that Pinto's invoices contain inflated representations related to his visits to see Joanne are false. Pinto performed the services he billed for and Pinto's invoices are accurate. | Joanne Decl. ¶ 9; Pinto Decl. ¶ 2 | Denied. Whether Pinto represented that he would visit Joanne three times per week, and whether he in fact did so, are matters for proof at trial, including testimony subject to cross-examination. Plaintiffs has presented evidence that Pinto agreed to visit three times per week during the entire period from June 2014 through October 2014, and failed to do so. Defendants admit that Pinto visited less than this during 2014 (see item 46), South Beach records confirm this, and Pinto has denied having any records of his actual visits. A jury could reasonably conclude that Pinto also visited fewer than three times per week in 2013. | Item 46; Black Decl. ¶¶ 14-19; Exh. A (Pinto response to discovery request), response 13; Exh B (South Beach visitor records) |
| 68 | Pinto's representations regarding the number and duration of his visits are accurate. | Joanne Decl. ¶ 9; Pinto Decl. ¶ 3 | Denied. Ambiguous as to which representations by Pinto are referred to, and Pinto denies making any representation about visit frequency in 2014 (see item 48). Plaintiffs has presented evidence that Pinto agreed to visit three times per week during the entire period from June 2014 through October 2014, and failed to do so. Defendants admit that Pinto visited less than this during 2014, South Beach records confirm this, and Pinto has denied having any records of his actual visits.<br><br>    With regard to visit duration, Pinto charged for 5 hours per visit. Plaintiffs have presented evidence, from the South Beach Visitor logs, that his visits averaged a bit under an hour each. A reasonable allowance for travel time from Pinto's home in Brooklyn to the South Beach Center in Staten Island is an additional two hours round trip. Thus, even with reasonable allowance for travel time, it is implausible that each visit required 5 hours of Pinto's time.<br>    The claim as to visit duration is also not supported by the asserted sources. Joanne lacks personal knowledge of Pinto's travel time, and Pinto Decl. ¶ 3 refers only to the period from April 12, 2013 through June 3, 2013, before Joanne was committed to a psychiatric hospital. | Item 48; Black Decl. ¶¶ 14-19; Exh. A (Pinto response to discovery request), response 13; Exh B (South Beach visitor records)<br><br>Black Decl. ¶¶ 38-43; Exh. B (South Beach visitor records) |
| 69 | There were several times that Esaun visited Joanne when he didn't sign in. This includes occasions when Joanne saw Esaun's new motorcycle, times she visited with his family, and times he came outside of visiting hours. | Joanne Decl. ¶ 9 [should refer to ¶ 10] | Denied. Joanne lacks personal knowledge of when and whether Pinto signed in to South Beach Psychiatric Center when visiting her, or not. Defendants have presented no evidence of Pinto's actual visits and no evidence, other than Pinto's say so, that Pinto or his family members sometimes | Black Decl.¶¶ 10-12 and Exh. B (South Beach visitor records) |

11

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| | | | visited Joanne without signing in or how often they did so. Further, an assertion that there were "several times" when Pinto did not sign in does not respond to the huge gap between Pinto's promise to visit three times per week, and his actual recorded visits, which were slightly over once per week for the period for which records are available. | |
| 70 | Pinto was not required to sign in each time he visited Joanne at South Beach hospital. | Pinto Dep. at 252:10 - 253:2 | Denied. Defendants have presented no evidence of Pinto's actual visits and no evidence, other than Pinto's say so, that it was possible for Pinto to visit Joanne without signing in. Pinto has denied having any records of his actual visits. | Black Decl. ¶ 8 and Exh. A |
| 71 | Pinto would visit with staff members, doctors, social workers, and attorneys on Joanne's behalf. | Pinto Dep. at 252:4-9 | Denied as ambiguous as to both time and location. Otherwise neither admitted nor denied. Pinto's activities, during whatever visits he made to the psychiatric hospitals in which Joanne was an inpatient during 2013 and 2014, are not an issue in this case. The issues are instead the frequency and duration of those visits. | |
| 72 | Pinto personally incurred expenses on behalf of Joanne that he was never reimbursed for. | Pinto Dep. at 217:23 - 218:2 | Denied. Pinto billed, in round numbers for many expenses, and has offered no evidence that he incurred even the $12,000 in expenses he claimed to have spent on Joanne for which he was reimbursed, let alone any additional expenses. Pinto's unsupported statement that he incurred more expenses than he was reimbursed for, with no specificity as to the nature, timing, or amount of these expenses, should be subject to cross-examination at trial. | Fantone Decl. Exh, D (Pinto bills) |
| 73 | Pinto incurred each and every expense listed in his invoices, and more that he did not list on the invoices. | Pinto Decl. ¶ 2 | Denied. See response to item 72. | |
| 74 | Pinto also spent the disputed amounts on out of pocket expenses. | Fantone Decl. Exh. D; Pinto Dep. at 217:23 - 218:2 | Denied. The reference to disputed amounts is ambiguous. See also response to item 72. | |
| 75 | Pinto also spent significant time helping Joanne with things that were not documented in the invoices. | Joanne Decl. ¶ 9 | Denied. Joanne has no personal knowledge of Pinto's billing and what time was and was not billed for, and any knowledge she may have should be tested through cross-examination. Plaintiffs have provided evidence that Pinto exaggerated the time he spent visiting Joanne. Also, the reference to "significant" time is ambiguous. | Black Decl. ¶¶ 38-43 and Exh. B |
| 76 | Pinto did not steal from Joanne or the Supplemental Needs Trust. | Pinto Decl. ¶ 4 | Denied. Pinto withdrew, without disclosure to Bernard, who was her financial conservator, around $55,000 from Joanne's Chase and Wells Fargo bank accounts and her | Black Decl.¶¶ 6=8 and Exhs. C-D (Chase and Wells |

12

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| | | | SSDI funds, which he has not accounted for. For the SSDI funds he received as Joanne's representative payee, he has denied having any documentation for his receipt or use of these funds. | Fargo bank statements); A (Pinto response to request for production of documents), response 12); |
| 77 | The allegation that Pinto stole $43,776.87 from Joanne's Chase and Wells Fargo bank accounts is false. With respect to each of the disputed transactions, Pinto utilized the funds for Joanne's benefit by either providing the funds directly to her, placing the funds in a safe location that she was aware of, or spending the funds at her direction for items or services that she needed. | Joanne Decl. ¶ 11 | Denied. Joanne has no personal knowledge of Pinto's withdrawals, and any knowledge she may have should be tested through cross-examination. Pinto has not denied making the withdrawals. Pinto withdrew these funds, without disclosure to Bernard, who was her financial conservator, and has not accounted for how he used them. Any claim that Pinto spent these funds for Joanne's benefit should be made by Pinto, and documented by him. | Black Decl. ¶¶ 6-8 & Exhs. C-D (Chase and Wells Fargo bank statements) |
| 78 | Pinto also used some of the withdrawals to reimburse himself for out-of-pocket expenses that he had previously incurred for Joanne's benefit, but was not reimbursed for. | Joanne Decl. ¶ 11 | Denied. Joanne has no personal knowledge of Pinto's expenses, and whether they exceed the expenses that Pinto reported to Bernard and was reimbursed for, and any knowledge she may have should be tested through cross-examination. Joanne provides no specificity as to which expenses Pinto supposedly paid, when, or in which amounts, and which expenses he was not reimbursed for. Pinto has provided no documentation for incurring even the $12,000 in expenses for which he was reimbursed, let alone any additional expenses. Any claim that Pinto incurred more than this amount in expenses should be made by Pinto, and documented by him. | Black Decl. ¶ 44-45 and Fantone Exh. D (Pinto bills) |
| 79 | Pinto never took or otherwise used any of the $43,776.87 for his own benefit. | Joanne Decl. ¶ 11 | Denied. See response to item 77. | |
| 80 | Esaun also spent at least $12,000.00 on Joanne for, among other things, motels, clothing, food, storage of belongings, and shopping, for which Bernard reimbursed him. | Joanne Decl. ¶ 12 | Admit that Bernard reimbursed Pinto for $12,000 in expenses that Pinto reported on his bills. Deny that he incurred these expenses. All expenses were reported, implausibly, in round numbers, and some were for implausible amounts. Denied. Joanne has no personal knowledge of the amounts of Pinto's expenses, and any knowledge she may have should be tested through cross-examination. | Black Decl. ¶¶ 44-45 and Fantone Exh. D (Pinto bills) |

13

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| 81 | Plaintiffs' accusation that Pinto stole several months of Joanne's Social Security Disability Insurance Benefits totaling $10,975.00 is also false. | Joanne Decl. ¶ 13 | Denied. Pinto has admitted that he was Joanne's representative payee for these payments. Neither he nor Joanne has provided any specifics on whether they were held in a separate bank account for her benefit, whether and how they were spent for Joanne's benefit or returned to Joanne, and Pinto has denied having any documentation with regard to his receipt or use of the payments he received as representative payee. Joanne's and Pinto's claims with regard to these funds should be tested through cross-examination | Black Decl. ¶¶ 30-33 and Exh. A (Pinto response to request for production of documents, response 12) |
| 82 | After Bernard took control of Joanne's finances she became afraid that he was going to steal her SSDI money. | Joanne Decl. ¶ 13 | Denied. The basis for Joanne's fear, if it existed at all, should be tested through cross-examination. Pinto, after stealing the SSDI funds from Joanne's Wells Fargo account, may have convinced Joanne to be concerned about them. Had he not stolen these funds, any concerns she may have had could have been readily assuaged by providing Wells Fargo bank statements to her, showing that no one had touched her funds. Pinto has denied having any records of his receipt or use of the funds he receives as Joanne's representative payee. | Black Decl. ¶¶ 26-33, Exh. A (Pinto response to request for production of documents, Exh. D (Wells Fargo statements) |
| 83 | Joanne's social worker at the time advised her that she could have the monthly payments sent directly to Pinto, who she trusted, and Joanne's social worker helped Joanne arrange for that to happen. | Joanne Decl. ¶ 13 | Neither admitted nor denied. What advice Joanne's social worker provided, if any, should be tested through cross-examination, and is not relevant to the question of whether Pinto took Joanne's Social Security Disability payments for his own benefit | |
| 84 | Each month when the SSDI checks were deposited into Joanne's account Pinto withdrew the SSDI funds and Joanne either spent the money, directed him to spend the money for things that she needed, or directed him to place the money in a specific location that she knew was safe. | Joanne Decl. ¶ 14 | Denied. It is unclear what personal knowledge Joanne had of Pinto's withdrawals of funds from Joanne's Wells Fargo accounts, at the time those withdrawals took place. It is unclear how Joanne could have spent these funds while a psychiatric inpatient, and neither Pinto nor Joanne provides any details of what the money was spent on. At the time of the withdrawals, Pinto was separately charging for, and was reimbursed for, all of his expenses related to Joanne, including "JB shopping." It is unclear what safe location Joanne is referring to. Pinto has provided no bank statements showing deposits of Joanne's Wells Fargo funds into a bank account for her benefit, and has denied having any documentation for his receipt or use of the payments he received as representative payee. Any knowledge Joanne | Black Decl. ¶¶ 26-33, Exhs. A (Pinto response to request for production of documents), response 12 and D (Wells Fargo statements); Fantone Decl. Exh. D (Pinto bills). |

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| | | | may have had should be tested through cross-examination. The timing of those withdrawals is inconsistent with Joanne's statement. | |
| 85 | At some point Joanne had to pay some of the SSDI money to one of the hospitals. | Joanne Decl. ¶ 14 | Denied. Joanne's assertion that she paid an unspecified amount of money at an unspecified time to an unspecified hospital, without any written evidence of the bill or the payment, is implausible and should be tested through cross-examination. What is known is that Pinto first withdrew Joanne's SSDI funds from her Wells Fargo accounts, later became her representative payee and received Joanne's SSDI payments directly, has never provided any documentation for how either source of funds was spent, and has denied having any records for his receipt or use of the payments he received as representative payee. | Black Decl. ¶¶ 26-33 and Exhs. A (Pinto response to request for production of documents) response 12) and D (Wells Fargo statements) |
| 86 | Pinto never took or otherwise used any of the disputed SSDI payments for his own benefit. | Joanne Decl. ¶ 14 | Denied. Joanne lacks personal knowledge of what Pinto did with the funds he either withdrew from her Wells Fargo accounts, or received directly as her representative payee, and any knowledge she may have should be tested through cross-examination. What is known is that Pinto withdrew Joanne's SSDI funds from her Wells Fargo accounts, later became her representative payee and received her SSDI funds directly, has never provided any documentation for how either source of funds was spent, and has denied having any documentation with regard to his receipt or use of the payments he received as representative payee. | Black Decl. ¶¶ 26-33 and Exhs. A (Pinto response to request for production of documents) response 12 and D (Wells Fargo statements) |
| 87 | Pinto did not retain for his personal benefit any funds from Joanne's Social Security Disability benefits, or from her bank accounts at Chase or Wells Fargo. | Pinto Decl. ¶ 4 | Denied. What is known is that Pinto made undisclosed withdrawals from Joanne's Chase and Wells Fargo accounts, became Joanne's representative payee and received her SSDI funds directly, has never provided any documentation for how any of these funds were either saved for her and later returned to her, or spent for her benefit, in addition to the disclosed spending for which Pinto was reimbursed, and denies having any documentation with regard to the SSDI payments he received as representative payee. | Black Decl. ¶¶ 21-33 and , Exhs . Exhs. A (Pinto response to request for production of documents) response 12, C (Chase bank statements), and D (Wells Fargo statements) |
| 88 | Pinto sought payment by Bernard, from Estate funds, of $3,950 for visiting Joanne with Wrigley during Wrigley's first visit in September 2014. Bernard did not pay this amount, as | Compl. ¶ 546 | Admitted. | |

15

| item | Defense Statement | Sources | Response | Sources |
|---|---|---|---|---|
| | he had already paid Pinto and CPI for the full month of September. | | | |
| 89 | When Plaintiffs made the payment of $2,300 to Wrigley, they were aware that Wrigley was requesting reimbursement of payment she had provided to Pinto over and above his monthly flat rate fee. | Compl. ¶¶ 485, 569 | Denied. Not supported by the cited sources. As stated in Compl. ¶ 485 Bernard did *not* reimburse Wrigley for her alleged payment of $2,300 to Pinto for chauffeur services. | Compl. ¶ 485. |
| 90 | Plaintiffs refused to reimburse Wrigley with respect to the reimbursement requested for September 2014. | Compl. ¶486 | Denied as ambiguous as to what reimbursement is referred to. Admit that Bernard did not reimburse Wrigley for her asserted expenses to visit Joanne in September 2014, including the $3,950 charged by Pinto to Wrigley, referred to in item 88. | |
| 91 | Plaintiffs did not ask Joanne why Pinto became her SSDI Representative Payee, or what happened with the $10,975.00 in unaccounted payments. When asked why he never inquired into Pinto's involvement with the SSDI payments, Bernard answered: "I don't know that I asked the question why. I simply did not." | Bernard Sept. 8 Dep. at 50:2-8 | Denied as incomplete and misleading. Pinto and Wrigley never disclosed to Bernard that Pinto had become Joanne's representative payee or that SSDI payments were not accumulating in, Joanne's Wells Fargo bank accounts. Bernard assumed that, since Joanne was a psychiatric inpatient and was not spending these funds, that they were accumulating in her Wells Fargo bank accounts. It is Pinto, not Joanne, who is responsible for providing information on what happened to the payments. Pinto has denied having any documents relating to his receipt or use of these payments. | Black Decl. ¶¶ 30-34, 67, and Exhs. A (Pinto response to request for production of documents), response 12, and K (Wrigley email to Bernard r/e Wells Fargo account) |

Dated this 23rd day of February, 2021

/s/ Michael H. Schaalman
Michael H. Schaalman
Halling & Cayo, S.C.
320 E. Buffalo St., Suite 700
Milwaukee, Wisconsin 53202
(414) 271-3400
mhs@hallingcayo.com

16