**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

SAMUEL HOY BLACK and BERNARD BLACK, as trustees
                           Plaintiffs,

                                  16-CV-430 (CBA) (ST)


      -against-

CHERIE WRIGLEY, ESAUN G. PINTO, SR., and
CPI INVESTIGATIONS INC.
      Defendants.
-----------------------------------------------------------------X


**<u>PLAINTIFFS MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

I. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGEMENT ON FIRST CAUSE
   OF ACTION FOR FRAUD (INVOICES)................................................................ 6

   A. Expenses in The Amount of $21,748.................................................................. 6

   B. $81,400 In Unperformed Services By Falsely Claiming Pinto Was Visiting Joanne Three
      Times Per Week, And $21,048 In Unperformed Services By Billing For Five Hours For
      Each Visit To Joanne. ............................................................................... 9

      1. Plaintiffs Presented Substantial Evidence Showing that Pinto's Bills for Hours Worked
         Were Fraudulent; Pinto Presented No Contrary Evidence. ............................................. 9

      2. Pinto's Fraudulent Billing Was Fraud, Not Merely Breach of Contract. ...................... 11

      3. Wrigley Is Responsible for Pinto's Misconduct Both as a Respondeat Superior and
         Because Wrigley's Deliberate, False Representations about Pinto Caused Bernard to
         Continue Trusting Him with Their Money. ................................................... 12

   C. $8,625 In Unperformed Services By Billing For 24 Hours Per Day For Pinto And A Driver
      During The Period From April 12-19, 2013 ....................................................... 13

II. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGEMENT ON PLAINTIFFS'
    SECOND CAUSE OF ACTION FOR FRAUD BY OMISSION (BANK ACCOUNTS)
    ...................................................................................................... 14

III. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGEMENT ON PLAINTIFFS'
     THIRD CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION
     (INVOICES AND BANK ACCOUNTS)................................................................ 17

IV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGEMENT ON PLAINTIFFS'
    FOURTH CAUSE OF ACTION FOR UNJUST ENRICHMENT (INVOICES)............ 17

   A. Plaintiffs Produced Substantial Evidence that Pinto's Expenses and Bills Were False, and
      Defendants Produced No Evidence to the Contrary. ............................................ 17

   B. The Doctrine of Accounts Stated Does Not Bar Recovery Because It Expressly Permits
      Reopening of Accounts for "Fraud, Mistake, or Other Equitable Considerations". .......... 18

V. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
   FIFTH CAUSE OF ACTION (UNJUST ENRICHMENT, SSDI BENEFITS)............... 21

VI. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
    SIXTH CAUSE OF ACTION (MONEY HAD AND RECEIVED, INVOICES) ........... 22

i

VII. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SEVENTH CAUSE OF ACTION (MONEY HAD AND RECEIVED, BANK ACCOUNTS)....................................................................................................... 23

VIII. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' EIGHTH CAUSE OF ACTION (MONEY HAD AND RECEIVED, SSDI BENEFITS)23

IX. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' NINTH CAUSE OF ACTION (MONEY HAD AND RECEIVED, ADVANCE FOR OCTOBER 2014)............................................................................................................ 24

X. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' TENTH CAUSE OF ACTION (MONEY HAD AND RECEIVED, PAYMENTS FOR JULY AND SEPTEMBER 2014)...................................................................................... 26

XI. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' ELEVENTH CAUSE OF ACTION (CONVERSION, INVOICES) ............................... 27

XII. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' TWELFTH CAUSE OF ACTION (CONVERSION, ADVANCE FOR OCTOBER 2014) ...................................................................................................................................... 27

XIII. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' THIRTEENTH CAUSE OF ACTION FOR CONSTRUCTIVE FRAUD (INVOICES) 29

XIV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FOURTEENTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION. 30

XV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FIFTHEENTH CAUSE OF ACTION: AIDING AND ABETTING AGAINST WRIGLEY ................................................................................................................... 31

CONCLUSION....................................................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**

@Wireless Enters. v. AI Consulting, LLC, No. 05-CV-6176 CJS(P), 2006 U.S. Dist. LEXIS 79874, at *8 (W.D.N.Y. Oct. 30, 2006) ............................................................ 33

American Home Assurance Co. v. Instituto Nacional De Reaseguros, 88 Civ. 0917, 1991 WL 4461, at *3 (S.D.N.Y. Jan.10, 1991) ............................................................... 20

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) ................................. 12

Boise v. Talcott, 264 F. 61, 66 (2d Cir.1920) ........................................................ 20

Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19 (2d Cir. 1996) ........ 11

Capax Discovery, Inc. v. AEP RSD Inv'rs, LLC, 285 F. Supp. 3d 579, 586 (W.D.N.Y. 2018) .. 11

Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833, 836 (1958) ............................................................................ 12

Chapman v. Forbes, 123 N.Y. 532, 537, 26 N.E. 3 ..................................................... 27

Childers v. N.Y. & Presbyterian Hosp., 36 F. Supp. 3d 292, 310-11 (S.D.N.Y. 2014) .............. 34

Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir.2006) ..................................... 15

Diefenthaler v. Mayor of City of N.Y., 111 N.Y. 331, 337, 19 N.E. 48 .................................. 27

Federal Ins. Co. v. Groveland State Bank, 37 N.Y.2d 252, 258, 372 N.Y.S.2d 18, 333 N.E.2d 334 ................................................................................................. 27

Hargrave v. Oki Nursery, Inc., 636 F.2d 897, 899 (2d Cir. 1980) ..................................... 11

Hopwood Plays, Inc. v. Kemper, 263 N.Y. 380, 385 (1934) ............................................ 21

In re Vogel, 23 Misc.3d 512, 516–17, 871 N.Y.S.2d 894, 898–99 (Sur.Ct. Westchester Cnty.2009) ............................................................................................ 31

James Talcott, Inc. v. United States Telephone Co., 52 A.D.2d 197, 383 N.Y.S.2d 39, 41 (1st Dept.1976) .......................................................................................... 21

Jo Ann Homes at Bellmore, Inc. v. Dworetz, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 250 N.E.2d 214 (1969) ........................................................................................... 15

Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc., 87 F.3d 44, 49 (2d Cir.1996) ...... 31

Lifeng Chen v. New Trend Apparel, Inc., 8 F. Supp. 3d 406, 451 (S.D.N.Y. 2014) .................. 31

MacDonnell v. Buffalo Loan, Trust & Safe Deposit Co., 193 N.Y. 92, 101, 85 N.E. 801, 803 (1908) ........................................................................................................................... 31

Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 181 (2d Cir. 2007). ............. 12, 15

Miller v. Schloss, 218 N.Y. 400, 408, 113 N.E. 337 .................................................................... 27

Nationscredit Comm. Corp. v. Matlock, 99 Civ. 32754, 2000 WL 1211579, at *6 (S.D.N.Y. Aug. 25, 2000) ............................................................................................................................ 20

Nationscredit Comm. Corp. v. Matlock, 99 Civ. 32754, 2000 WL 1211579, at *6 (S.D.N.Y. Aug. 25, 2000). ........................................................................................................................... 29

Navimex S.A. v. S/S "Northern Ice", 617 F.Supp. 103, 106 (S.D.N.Y.1984) ............................. 21

Orb Factory, Ltd. v. Design Science Toys, Ltd., No. 96 Civ. 9469(RWS), 1999 WL 191527, at *17 (S.D.N.Y. Apr. 7, 1999) ........................................................................................... 20

Panix Promotions, Ltd. v. Lewis, No. 01-cv-2709 (HB), 2002 WL 122302, at *2 (S.D.N.Y. Jan. 22, 2002) ......................................................................................................................... 26

Parsa v. State, 64 N.Y.2d 143, 148, 474 N.E.2d 235 (1984) ....................................................... 26

Polygram, S.A. v. 32-03 Enterprises, 697 F.Supp. 132, 136 (E.D.N.Y.1988) ............................ 20

Polygram, S.A. v. 32-03 Enterprises, 697 F.Supp. 132, 136 (E.D.N.Y.1988). ........................... 22

Roberts v. Ely, 113 N.Y. 128, 20 N.E. 606 .................................................................................. 27

Schank v. Schuchman, 212 N.Y. 352, 358, 106 N.E. 127 ............................................................ 28

Smith v. Smith, No. 13-CV-1635 (SJF)(ARL), 2014 U.S. Dist. LEXIS 125371, at *21-22 (E.D.N.Y. Sep. 5, 2014) ................................................................................................. 18, 30

State of New York v. Seventh Regiment Fund, Inc., 98 N.Y.2d 249, 261, 746 N.Y.S.2d 637, 646, 774 N.E.2d 702 (2002) ...................................................................................................... 31

Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006) ................................ 30

Wilson v. Dantas, 746 F.3d 530, 536 n.2 (2d Cir. 2014) ............................................................. 32

## INTRODUCTION

Defendant Esaun Pinto is a convicted federal criminal, specializing in fraud; his 2007 criminal indictment listed a litany of felonies, including fraud, aggravated identity theft, fraudulent solicitation of private information from government agencies, and conspiracy, carrying up to 10 years of imprisonment. He eventually pleaded guilty to a misdemeanor section of a felony statute. Black Declaration ¶¶ 58-69 and Exh. G.  Between April 2013 and September 2014, Pinto, with the active assistance of his codefendant, Cherie Wrigley, stole hundreds of thousands of dollars from the Supplemental Needs Trust for the Benefit of Joanne Black ("SNT"), through unreported cash withdrawals, overbilling, and submission of fraudulent expense reports. As a part of Defendants' scheme, Pinto submitted numerous claims for reimbursement and bills, **but has not submitted a single receipt, bank statement, bill, or any other document that was not issued by Pinto himself**.

In discovery, Plaintiffs demanded that Pinto turn over all documents supporting his claimed expenses, which according to his invoices included hotels, airfare, meals, car rental, gas, storage, unspecified "JB shopping," and more.  **Pinto produced no receipts**.  Black Decl. Exh. A (Pinto response to request for production of documents), response 2.

Further, Plaintiffs obtained bank statements, showing that Pinto made numerous unauthorized and never-reported withdrawals of funds from bank accounts at Chase Bank and Wells Fargo Bank, totaling $43,776.87. Black Decl. ¶¶ 21-28; Black Decl. Exh. C (Chase Bank statements); Exh. D (Wells Fargo statements); Exh. I (summary of Pinto's withdrawals).  These bank accounts belonged to Joanne Black ("Joanne"), a mentally ill woman. At the time of Pinto's withdrawals, Joanne was in the midst of a profound psychiatric crisis and had a crew of individuals who oversaw her affairs: a court-appointed conservator (Bernard Black), a Guardian Ad Litem, a court-appointed attorney in Colorado, a separate court-appointed attorney in New York, and

1

hospital personnel, and the trustees of the SNT (Bernard Black, Samuel Black, and Anthony Dain). **Pinto concealed his cash withdrawals from all these individuals.**

Only Wrigley was aware of these withdrawals. Wrigley repeatedly vouched for Pinto's honesty. Black Decl. ¶ 76.  Wrigley convinced Joanne's conservator, Bernard Black, to allow Pinto to have access to Joanne's Chase bank cards for cash withdrawals for emergencies.  Bernard trusted Wrigley and therefore trusted Pinto.  This trust made it possible for Pinto to continue stripping assets from Joanne's bank accounts.  If Wrigley did not repeatedly vouch for Pinto's honesty, Bernard would not have allowed Pinto to continue to withdraw funds from Joanne's Chase account.  Black Decl. ¶ 77.  If Wrigley did not assure Bernard that Joanne's Wells Fargo accounts were safe, Bernard would have verified this and detected Pinto's theft from these accounts, long before he actually did so in late 2014.  Black Decl. ¶¶ 78, 84-85.

In addition, Joanne was receiving monthly Social Security Disability Insurance (SSDI) payments which were deposited by the Social Security Administration (SSA) directly into her Wells Fargo account.  Pinto, with Wrigley's knowledge (Black Decl. ¶ 79), applied to the SSA to become Joanne's representative payee. As a result of this move, the monthly SSA payments, which used to be deposited to Joanne's Wells Fargo account, were now received directly by Pinto. Pinto did so without obtaining permission from Joanne's conservator, Bernard Black, or from the Denver Probate Court, or from any other individuals with legal authority over Joanne's funds. Pinto's receipt of Joanne's SSDI payments lasted for 9 months, from May 2014 through January of 2015. Through this scheme, Pinto directly received $10,975 in Joanne's SSDI payments.  Black Decl. ¶¶ 30-31.

The SSA rules require Pinto, as Joanne's representative payee, to do all of the following: (1) safeguard SSDI funds by placing them in a separate bank account titled with Joanne Black as

beneficiary, (2) keep records of his receipt and use of these funds, (3) report to the SSA on his use of these funds, and (4) return to the SSA any funds he held when he ceased to become representative payee.  Black Decl. ¶¶ 64-66 and Exh. J (SSA Guide for Representative Payees). **Pinto did none of this**.  In response to a discovery request, Pinto denied having any records of his actions as representative payee.  Black Decl. Exh. A (Pinto response to request for production of documents), response 12.  If Bernard had not trusted Wrigley's assurances that Joanne's SSDI payments were sitting safely in her Wells Fargo accounts, he would have become Joanne's representative payee, stopped Pinto's theft of these payments, and ensured that these payments went into a trust for Joanne's benefit (as Bernard did when he became representative payee in early 2015).  Black Decl. ¶ 80.

In sum, Plaintiffs caught Pinto having made unauthorized and concealed appropriation of nearly $55,000 in Joanne's funds from a combination of (1) undisclosed withdrawals from Joanne's Chase Bank account, (2) undisclosed withdrawals from Joanne's Wells Fargo account, and (3) direct receipt of Joanne's SSDI benefits as a representative payee. Wrigley had access to Joanne's Wells Fargo statements, and was aware of at least some of these unauthorized and concealed withdrawals.  Black Decl. ¶ 81.  Pinto issued a single response – a blanket statement that he "never retained for my personal benefit" any funds from [Joanne's] Social Security Disability benefits, or from her bank accounts at Chase or Wells Fargo." Pinto Decl. ¶ 4.  **Pinto gave no specifics whatsoever: no receipts, no bank records, no documents.**  His victim, Joanne, signed a declaration, stating that she "directed him to place the [SSDI funds] in a specific location that I knew was safe."  Joanne Decl. ¶ 14.  What that location might be, neither Pinto nor Joanne ventures to say.  Pinto – or anyone – **never produced any bank documents or any other documentary evidence showing that such "safe location" ever existed**.

Further, Pinto fraudulently overbilled for the services he provided. Part of Pinto's job was to visit Joanne in a hospital. Plaintiffs provided documentary evidence that Pinto grossly overstated both the number of his visits and their length. Black Decl. ¶¶ 36-42 and Exh. B (South Beach Psychiatric Center visitor log).   In discovery, Plaintiffs demanded that Pinto produce all documentary evidence that he actually performed the job as he claimed. Pinto could have produced visitor logs, contemporaneously generated time logs, time-stamped receipts, phone records, location records, and so on. **Pinto produced no such evidence whatsoever.** He also denied having kept any records of his visits. Black Decl. Exh. A (Pinto response to request for production of documents), response 13.

Wrigley convinced Bernard Black to trust Pinto's billing by personally vouching for him. But for Wrigley's representations, Bernard would not have agreed to pay Pinto using Joanne's funds without detailed evidence on Pinto's specific visits to Joanne, and without documents showing the accuracy of Pinto's expenses and would have checked himself on Joanne's Wells Fargo accounts. Black Decl. ¶¶ 76-81, 84-85.

In sum, Pinto has never produced a single shred of paper – generated by someone other than Pinto himself – documenting the movement of money, or his expenses, his actual visits to Joanne while she was in a psychiatric hospital, or his actual work hours. His entire defense to the detailed, documented allegations in the Complaint is based on two pieces of evidence – (1) his own self-interested proclamations, and (2) a declaration signed by Joanne Black, his mentally ill victim, claiming that Pinto did not steal her money.

But Joanne's opinions about Pinto's handling of her money have no value. Joanne has a lifelong mental illness so severe that she has never managed her own financial affairs, never held a job, and never exhibited any understanding of money in her entire life. Black Decl. ¶¶ 71-73.

Throughout Joanne's life, her financial, personal, and medical affairs have always been managed by her family and, during the period relevant to this case, a crew of conservators, guardians, social workers, and trustees. Even today, Joanne has (1) a financial conservator, (2) a guardian ad litem, (3) a court-appointed attorney, (4) a psychiatric social worker paid by her conservator, and (5) a second social worker assigned to her by the State of New York. She lives in a specialized living facility for mentally disabled adults.  Joanne Decl. ¶ 6; Black Decl. ¶ 71.

Joanne lacks the capacity to understand the sophisticated theft and fraud schemes carried out against her by Defendants. Defendant Wrigley herself wrote a letter to the Denver Probate Court, testifying to Joanne's lifelong lack of capacity to understand money. Black Decl. ¶ 73 and Exh. L (Wrigley letter). Wrigley wrote to the court that Joanne does not "understand the value and difference between $20 and $20,000 or two million dollars."  Exh. L (Wrigley letter), at 2.  As Wrigley explained to the court, "Most of the time without direct supervision, Joanne becomes completely irresponsible with her finances." *Id.*

Even if Joanne were not severely mentally ill in general, and profoundly, acutely ill at the times relevant to this case, she does not have personal knowledge of Pinto's asset transfers or spending, and thus cannot testify to these matters. Joanne was not present during Pinto's alleged purchases. Pinto testified that he often paid cash (Pinto Dep. pp.  219:16-17; 226:23-24; 229:13-16, see Black Decl. Exh. M).  If Pinto obtained or kept any receipts, he has not disclosed those in discovery despite a specific request for them.  Black Decl. Exh. A (Pinto response to request for production of documents), response 2. Joanne simply has no first-hand knowledge on any issues related to Pinto's spending patterns.

To summarize: Pinto, without any disclosure or permission, (1) withdrew almost $44,000 from Joanne's bank accounts, (2) redirected to himself and spent without a trace about $11,000 in

Joanne's SSDI payments, (3) submitted fraudulent expense reports for tens of thousands of dollars, and (4) grossly overbilled for both the number of visits he actually made to Joanne and the length of those visits. If Pinto's financial affairs were legitimate, he could have easily produced evidence thereof. He could have submitted his receipts for airfare, hotels, transportation, and purchases; phone records and other documents proving his locations, bank statements showing where he placed the money that he withdrew from Chase and Wells Fargo and received as representative payee, and so on. **But Pinto has never turned over a single bill, receipt, bank statement, or other document generated by anyone other than Pinto himself**. Moreover, he denies having any records of his visits, or any records of his actions involving the funds from Chase and Wells Fargo accounts and Joanne's SSDI payments.

On the basis of this "evidence", Defendants are asking for summary judgment in their favor. Their games must not be rewarded. A reasonable jury could (and we believe will) conclude that a mysterious, unreported disappearance of nearly $55,000 was theft; that the failure to turn over a single receipt for tens of thousands in expenses was fraud; and that Pinto billed for visits to Joanne that never took place, and padded the hours for each visit besides.

## I.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGEMENT ON FIRST CAUSE OF ACTION FOR FRAUD (INVOICES)

### A.  Expenses in The Amount of $21,748

Defendants' MOL falsely states that "Pinto's invoices and declaration establish that he spent at least the disputed amounts on these expenses". Def. MOL at 6.  In reality, **Defendants did not produce a single document to verify any of Pinto's expenses**.  Defendants' only non-Pinto "evidence" that he incurred the expenses listed on his invoices, in the amounts he claimed, is the declaration drafted by Defendants and signed by their mentally ill victim, Joanne Black. Neither Pinto's nor Joanne's declarations provide any specifics as to any movements of money –

no amounts, no bank accounts, no lists of items purchased, no receipts, etc. They simply assert that Pinto spent the amounts that he asserted he spent, with no evidence.

Joanne's declaration is not based on Joanne's first-hand knowledge of any relevant facts. As discussed in the Introduction, Joanne has no basis for opining how much money Pinto spent for his own expenses or for her expenses.  Due to her lifelong illness, she has never managed any financial matters and has little understanding of money.  Black Decl. ¶¶ 71-73 and Exh. L. Worse yet, during the time of Pinto's fraudulent expense reports and bills, Joanne was involuntarily committed to a psychiatric institution, in a state of acute psychosis. At that time, Joanne had difficulty understanding her own identity – she believed she was married to a billionaire mob lawyer who was kidnapped by the Mafia.  Black Decl. ¶ 75 and Exh. L (Wrigley letter) and Exh. N (Verizon phone bills). She had no capacity to keep track of Pinto's activities, even simple ones like the incidence or duration of his alleged visits. Joanne has not supported her declaration with any documentary evidence.  Joanne's statement in her Declaration as to expenses incurred by Pinto is not based on facts for which she has personal knowledge and should be stricken. At the very least, the jury should get the opportunity to see Joanne's cross-examination, where her incapacity and lack of personal knowledge will be made obvious.

Defendants' entire argument for summary judgment on the causes of action for reporting false and inflated expenses is that "Plaintiffs have failed to produce any evidence in opposition to defendants' ample showing that Pinto earned the amount he was paid and incurred the expenses listed in his invoices." Def. MOL at 15-16. As shown above, Defendants have hardly made an "ample showing." **Defendants produced no documents, receipts, records, bank statements, etc. whatsoever.**

Plaintiffs have met their burden of providing evidence from which a jury could conclude that Pinto's reported expenses are false: virtually every number in Pinto's "expenses" is a round number. For example, in one reimbursement demand, he claimed $800 for gasoline, $800 for airfare, $2,200 for a rental car; $1,200 for an unspecified Joanne's "motel"; $1,000 for an unspecified "hotel" for some other individuals; $400 for Joanne's unspecified "clothing", and $700 for her "food." Fantone Decl. Exh. D (Pinto bill for period ending April 23, 2013). **Res ipsa loquitur: since truthful expenses do not come all in round numbers, the "expenses" that Pinto submitted were false.**  They are also self-evidently false because they are so vague and lacking any details, such as specific amounts for specific meals, or the identity of the hotel or motel. Id.

Further, Pinto's bills are self-evidently false because not one of them is supported by any documentary evidence, even for claims for thousands of dollars in reimbursements. A standard practice nationwide is to keep receipts for expenses that exceed a de minimus amount, such as $25. Plaintiffs have shown that Pinto did not do so.  This fully satisfies Plaintiffs' burden of presenting evidence that Pinto's reported expenses were false. If Pinto wants to argue that he incurred these expenses, he must present receipts – which he refused to do, even in discovery.

Pinto's self-interested proclamations and Joanne's uninformed assertions are not sufficient to remove the case from the jury, given the evidence that Pinto's submitted expense reports were false on their face.  Given the prima facie evidence of false expense reports provided by Plaintiffs, the burden should be on Pinto to prove what expenses he actually incurred.  Defendants cite no case, and Plaintiffs have not found any, in which a defendant's bald say so, without any documentation of expenses, was found to defeat a claim of fraud.

**B.  $81,400 In Unperformed Services By Falsely Claiming Pinto Was Visiting Joanne Three Times Per Week, And $21,048 In Unperformed Services By Billing For Five Hours For Each Visit To Joanne.**

*1.  Plaintiffs Presented Substantial Evidence Showing that Pinto's Bills for Hours Worked Were Fraudulent; Pinto Presented No Contrary Evidence.*

From the time when Joanne was committed to a psychiatric hospital in June 2013 through August 2014, Pinto billed and was paid for visiting Joanne three times per week, for five hours each visit. For June through December 2013, Pinto's bills assert that he visited three times per wee, for five hours per visit.  Fantone Decl. Exh. D (Pinto bills).  After that, Pinto billed a flat monthly rate of $8,000 for the same number and duration of visits.  Black Decl. ¶¶ 14-19.  **Pinto never provided a shred of evidence that these visits occurred as billed, other than Pinto's self-serving proclamations**. Pinto could have produced a multitude of verifiable evidence, including: parking receipts, toll receipts, gas station receipts, phone records, receipts from convenience stores that he claimed he used around the time of his visits, billing records from CPI Investigations, the company he worked for at the time, and his own calendar. He produced nothing, and in discovery, denied having any records of his visits.  Black Decl. Exh. A (Pinto response to request for production of documents), response 13.

Plaintiffs obtained visitor records from the psychiatric facility where Joanne was housed for the period from May 22, 2014 on.  The hospital denied having logs prior to May 2014, so this is the only evidence available to Plaintiffs. Black Decl. ¶ 10 and Exh. B.  These log records demonstrated that during the 15 week period from May 22 through the end of August 2014, Pinto visited Joanne not three times a week, as he billed, but only 189 times in total, or 1.2 times a week (excluding several visits with Wrigley for which he billed Wrigley separately). These records also show that average visit lasted not 5 hours, as he billed, but 56 minutes.

Defendants' MOL claims that he visited three times per week in 2013, but reduced his visit frequency in 2014 and that "Pinto's invoices during this time period [2014] do not contain any representations as to the number and duration of his visits to Joanne." [Def. MOL at 8].

Notice the careful wording of this sentence. Pinto's *invoices* do not list the number of visits or duration of those visits during this period, but his invoices were not the only places or ways in which Pinto made representations about his visits. In 2014, Pinto and Bernard Black agreed to switch Pinto's compensation from billing for each visit, plus travel expenses, to billing a flat monthly fee of $8,000 for the same three-times-a-week visiting arrangement. This change was prompted by Bernard Black, who sought and obtained a *reduction* in the per-visit cost that Pinto was charging. Black Decl. ¶ 14.  Under the old, per-visit, payment system, Pinto was paid $750 per visit (plus expenses); under the new, flat-fee system, Pinto got a reduced rate of $615 per visit (in an average month).  Black Decl. ¶ 15.  It would have made no sense for Bernard to agree to a reduction in visit frequency, without a commensurate reduction in the billing rate.  If it were true, as Pinto now claims, that Pinto's monthly-fee arrangement involved visiting Joanne only twice a week, it would have meant that Pinto was *raising* his per-visit rate to over $900 per visit – an outrageous amount to pay for a simple hospital visit for an individual with no medical training, no experience in treating mentally disabled persons like Joanne, no college degree (Pinto dep. At 6, see Black Decl. Exh. M), and a criminal history.

At a minimum, the question of whether Pinto promised to continue to visit Joanne three times per week in 2014, and thus, submitted demonstrably fraudulent bills, is a question for the jury to decide.

### 2. Pinto's Fraudulent Billing Was Fraud, Not Merely Breach of Contract.

Plaintiffs produced extensive evidence showing that Pinto (1) made specific promises to perform services, (2) did not perform as promised, (3) submitted fraudulent expense reports and bills, (4) obtained payments under these fraudulent expense reports and bills, and (5) have failed to turn over any receipts or other documents in support of his expenses or billing. In their MOL, Defendants claim that this does not constitute fraud because it was merely a breach of contract. [Defendants MOL at 8-9.]  This is not correct.

New York's fraud doctrine includes a well-recognized fraud by inducement, whose essential elements are: (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995); *Capax Discovery, Inc. v. AEP RSD Inv'rs, LLC*, 285 F. Supp. 3d 579, 586 (W.D.N.Y. 2018).

Fraudulent statements that induce a party to enter into a contract are actionable in tort, regardless of the enforceability of the contract itself. *See Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir. 1980), *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833, 836 (1958). Under New York law, a plaintiff may therefore maintain parallel contract and tort actions where the allegations "involve misstatements and omissions of present facts, not contractual promises regarding prospective performance." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007). This is because " '[a] warranty is not a promise of performance, but a statement of present fact.' " *Id.* (quoting *First*

11

*Bank of the Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 690 N.Y.S.2d 17, 21 (N.Y.

1999)).” As the Second Circuit held:

> Defendant's allegations in this case involve misstatements and omissions of present facts,
> not contractual promises regarding prospective performance. A misrepresentation of
> present facts is collateral to the contract (though it may have induced the plaintiff to sign
> the contract) and therefore involves a separate breach of duty.... That the alleged
> misrepresentations would represent, if proven, a breach of the contractual warranties as
> well does not alter the result. A plaintiff may elect to sue in fraud on the basis of
> misrepresentations that breach express warranties. Such cause of action enjoys a
> longstanding pedigree in New York. *Id*.

As is required under the New York law, Plaintiffs produced evidence that (1) specifies

the statements that Plaintiffs contend were fraudulent (Pinto's fraudulent bills and his

representations to Bernard Black about visit frequency during 2014), (2) identifies the speaker

(Pinto), (3) states where and when the statements were made (Pinto's specific bills and, for 2014,

a telephone conversation with Bernard Black), and (4) explains why the statements were

fraudulent (evidence that Pinto's bills were false). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493

F.3d 87, 99 (2d Cir. 2007). Pinto's self-interested, *ex post* proclamations that he performed as

promised are not sufficient to remove the case from the jury.


   *3.   Wrigley Is Responsible for Pinto's Misconduct Both as a Respondeat Superior and
   Because Wrigley's Deliberate, False Representations about Pinto Caused Bernard to
   Continue Trusting Him with Their Money.*

Wrigley is responsible for Pinto's fraudulent billing on several grounds. First, Wrigley

hired Pinto;  Pinto's bills report Wrigley as his "client"; Pinto treated Wrigley as his client, to

whom he reported. Black Decl. ¶¶ 48-57; Fantone Decl. Exh. D (Pinto bills). As such, Wrigley is

responsible for Pinto's misconduct as a respondeat superior. Second,

Wrigley repeatedly and actively pressured Bernard Black to transfer assets to Pinto and

convinced the Blacks to trust Pinto.  Black Decl. ¶¶ 76-82.  Wrigley repeatedly told the Blacks

that she was vouching for Pinto's honesty, quality of his work, accuracy of his billing. At times,

12

Wrigley paid Pinto herself and then, demanded reimbursement from the Blacks, thus vouching for the accuracy of Pinto's billing. Black Decl. ¶ 50.  The payments for which Wrigley sought reimbursement totaled $45,000 in 2013 and an additional $2,300 in 2014.  Black Decl. ¶¶ 50, 53.

### C.  $8,625 In Unperformed Services By Billing For 24 Hours Per Day For Pinto And A Driver During The Period From April 12-19, 2013

Plaintiffs alleged that Pinto fraudulently inflated the hours he worked for Joanne between April 12-April 22, 2013. Compl. ¶¶ 501, 595(c). Defendants' only response, as before, is Pinto's self-serving proclamations (without any documents in support), and a declaration signed by Joanne Black about the events that happened when she was in the midst of a well-documented, complete psychotic breakdown.

Pinto's bills for this period (Fantone Decl. Exh. D) provide an example of Pinto's fraudulent billing. Pinto billed for 153 consecutive hours of his personal work (at $150/hour) for the period from 4 pm on 4/12 through 1 am on 4/19. In the entire period for which Pinto billed was 153 hours; Pinto was claiming to have worked nonstop for 153 hours.

The same invoice lists an unnamed "driver" working for 33 consecutive hours from 4 pm on 4/17 to 1 am on 4/19. Just like Pinto, the driver supposedly worked (as a driver?) without sleeping or resting at all. Two of those days overlapped with the work by Pinto; both Pinto and driver were allegedly working 24 hours a day, with no breaks or sleep.

Further, the invoice lists an unnamed "bodyguard", working from 1 am on 4/19 to 8 am on 4/22. The total number of hours in that time period is 79. The bodyguard claims to have worked 55 hours during that 79-hour period, at $75/hour.

Overall, between 4/12 and 4/22, Pinto charged the Black family $28,725 for his and his associates' work. In addition, for that same period, Pinto billed – without ever producing a single receipt – for $6,700 in expenses. His billed expenses included: hotel -- $1,000, rental car -- $2,200;

gas -- $800, Joanne Black – "clothing" -- $400, Joanne Black food -- $700, Joanne Black motel - $1,200, and Joanne Black cash -- $500.  Fantone Decl. Exh. D (Pinto bills).

It is self-evident that billing for 153 consecutive hours of work is evidence of fraud. Pinto could not possibly have worked that many hours without sleeping.  Nor is it plausible that the driver worked (drove) for 33 consecutive hours without sleeping.  The same is true for billing only round numbers in expenses, without any receipts.

**Pinto has never produced a single piece of paper showing the accuracy of his billing**, other than the blanket assertion in his declaration that the bills were accurate.  He claims in his declaration to know this despite having no receipts.  Under these circumstances, a jury could reasonably decide to disbelieve some, most, or all of Pinto's expense claims.

## II. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGEMENT ON PLAINTIFFS' SECOND CAUSE OF ACTION FOR FRAUD BY OMISSION (BANK ACCOUNTS)

Plaintiffs allege that: "Defendants Pinto and CPI knowingly made material omissions of facts when they failed to disclose on invoices or otherwise reveal to Bernard Black that Defendant Pinto stole money from Joanne Black's Chase and Wells Fargo bank accounts on multiple occasions, as detailed above." Compl. ¶ 605. Plaintiffs further allege that Defendants Pinto and CPI "omitted the bank withdrawals for the purpose of inducing Bernard Black to rely upon these incomplete, false invoices," and "[a]s a result, [plaintiff] paid more to Defendants Pinto and CPI then they were due, reducing the assets available to the SNT." Compl. ¶¶ 607, 610.

In New York, a plaintiff alleging fraud must show that the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result. *See, e.g., Crigger v. Fahnestock & Co.,* 443 F.3d 230, 234 (2d Cir.2006); *Jo Ann Homes at Bellmore, Inc. v.*

*Dworetz,* 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 250 N.E.2d 214 (1969). "Where a defendant…

seeks to show fraud by omission, it must prove additionally that the plaintiff had a duty to disclose

the concealed fact." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir.

2007). Here, Plaintiffs produced evidence in support of all of the above. Defendants produced no

admissible evidence to the contrary, other than Pinto's self-serving proclamations.

Uncontested bank documents demonstrate that Pinto withdrew nearly $44,000 from

Joanne's bank account while Joanne was involuntarily committed to a mental institution. Due to

Joanne's extreme condition, she had no legal capacity to comprehend any financial matters or

consent to any actions with respect to finances. All of her affairs, from financial to personal and

medical, were managed not by Joanne herself, but by her attorneys, conservator, guardian ad litem,

doctors, the trustees of the SNT, and the court. It is uncontested that Pinto not only never obtained

permission from any of these individuals to withdraw these assets, but he never reported his

withdrawals to any of them. **Even today, after discovery, Pinto has not produced any records

as to where he placed the cash he withdrew or how he used it**. Since it is undisputed that Pinto

took the money without permission and concealed this fact until he was caught, a reasonable jury

could conclude that Pinto stole the money.

Defendants' only "evidence" that the stolen cash was not stolen are (1) self-serving

proclamations by Pinto, and (2) a single conclusory statement by the mentally ill Joanne Black,

asserting that Pinto "plac[ed] the funds in a safe location that I was aware of." Joanne Decl. ¶ 11.

Which funds is Joanne talking about here? How much? Taken from where? When? Placed in which

"safe location"?  A bank account?  Which account, in whose name?  Where are the records that

such "safe location" ever existed? When did Pinto make Joanne "aware" of the massive amounts

he withdrew from her Chase and Wells Fargo accounts and placed in this safe location?  When and how were the funds returned to Joanne?  On all this, Joanne's declaration is silent.

As discussed in Introduction and in Part I.A., at the time when Pinto was withdrawing these funds (without reporting to any of Joanne's court-appointed personnel), Joanne was in a state of acute psychosis, in a hospital. She had no capacity to understand any financial matters or give consent to any asset transfers. Even if Joanne were not severely incapacitated at that time, she had no way of verifying that Pinto indeed placed the funds he withdrew from her bank accounts in a "safe location."  Pinto response to request for document production, response 12, Black Decl. Exh. A.  Thus, Joanne's statements are not based on any first-hand knowledge and must be stricken.

At the very least, the jury should be permitted to hear Joanne's cross-examination, where Plaintiffs will show that Joanne signed her declaration, prepared by Defendants, without understanding its contents, and that Joanne had no information about where the withdrawn money was.

Defendants claim that "there is no evidence on the record to indicate that Pinto had any obligation to document Joanne's use of her own funds from the Chase or Wells Fargo account. Absent such a duty to disclose, Plaintiffs cannot prove fraud by omission." [Def's MOL at 12]. This is red herring. *Joanne* had no duty to document her spending, but *Pinto* had a duty to: (1) obtain permission for any asset withdrawals from individuals who had legal capacity to manage Joanne's financial affairs, including Bernard as her court-appointed conservator, and (2) a duty to report all his withdrawals to these individuals, and (3) a duty to report to those individuals what he, Pinto, did with the money that he withdrew. Further, under the Rules of the Social Security Administration, Pinto, as a representative payee, had special duties to place Joanne's SSDI funds

16

in a specially-designated account and be responsible for their use, including keeping records of that use. Black Decl. ¶¶ 64-66 and Exh. J (SSA Guide for Representative Payees).

Pinto did none of this. He was withdrawing assets of an ill woman, who was then hospitalized in a state of acute psychosis, in complete secrecy, without permission or reporting to anyone other than Wrigley. Wrigley knew of at least some of his actions, including his becoming representative payee (Black Decl. ¶ 79), was covering up his actions, vouching for his honesty, and pressuring the Blacks to continue entrusting Pinto with access to Joanne's money.

### III. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGEMENT ON PLAINTIFFS' THIRD CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION (INVOICES AND BANK ACCOUNTS)

New York Courts apply the elements of fraud to claims for fraudulent misrepresentation. *See Smith v. Smith*, No. 13-cv-1635, 2014 U.S. Dist. LEXIS 125371, at *22-23 (E.D.N.Y. Sep. 5, 2014). With respect to Defendants' overstatements of his expenses and bills for services, these elements are identical to Plaintiffs' first cause of action. The analysis is identical to the one in Section I above. With respect to Defendants' unauthorized and unreported withdrawal of assets, the elements are the same as for Plaintiffs' Second cause of action, and are discussed in Section II above.

### IV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGEMENT ON PLAINTIFFS' FOURTH CAUSE OF ACTION FOR UNJUST ENRICHMENT (INVOICES)

#### A. Plaintiffs Produced Substantial Evidence that Pinto's Expenses and Bills Were False, and Defendants Produced No Evidence to the Contrary.

Defendants' primary argument here is that "Plaintiffs have failed to produce any evidence in opposition to defendants' ample showing that Pinto earned the amount he was paid and incurred the expenses listed in his invoices." Def. MOL at 15-16. As shown above, Defendants' sole "ample

showing" is Pinto's undocumented say-so. **Defendants did not produce a single document, receipt, bank statement, phone record, verifying any of Pinto's expenses or evidencing any hours of work by him or his employees**, except proclamations issued by Pinto himself.

Pinto's reported expenses are self-evidently false: virtually every number on them is a round number, and there are no details. For example, in an invoice 41213, dated October 5, 2015, Pinto claimed to have incurred an expense of $1000 for an unnamed "hotel" for unnamed individuals; $1000 for a "rental car" from an unknown company, for unknown number of days; and $800 for airline tickets for unknown individuals. Fantone Decl. Exh. D (Pinto bill for period ending April 23, 2013). Res ipsa locuitur: since truthful expenses do not come in round numbers, the receipts that Pinto submitted were fraudulent. They are also self-evidently false because not one of them is supported by documentary evidence, even for claims for thousands of dollars in reimbursements. A standard practice nationwide is to keep receipts for large-amount expense reports. Further, Pinto's hourly billing is also self-evidently false: when one looks carefully at his bills and calculates hours, it turns out that Pinto billed himself and an unnamed "driver" for working 24 hours a day for multiple days in a row. Fantone Decl. Exh. D (Pinto bill for period ending April 23, 2013).

This fully satisfies Plaintiffs' burden of presenting evidence that Pinto's reported expenses were false. If Pinto wants to argue that he incurred such unbelievable expenses, he must present receipts – which he refused to do, even in discovery.

**B. The Doctrine of Accounts Stated Does Not Bar Recovery Because It Expressly Permits Reopening of Accounts for "Fraud, Mistake, or Other Equitable Considerations".**

Having produced no evidence whatsoever to back up Pinto's charges, Defendants claim that the doctrine of "accounts stated" precludes Plaintiffs from recovering. Def. MOL at 16.

Defendants are misrepresenting the New York law of accounts stated. An account stated may be reopened for "fraud, mistake or other equitable considerations." *Nationscredit Comm. Corp. v. Matlock,* 99 Civ. 32754, 2000 WL 1211579, at *6 (S.D.N.Y. Aug. 25, 2000). *Boise v. Talcott,* 264 F. 61, 66 (2d Cir.1920) (reopening permitted for "fraud or mistake"; *Orb Factory, Ltd. v. Design Science Toys, Ltd.,* No. 96 Civ. 9469(RWS), 1999 WL 191527, at *17 (S.D.N.Y. Apr. 7, 1999) (reopening permitted if "the debtor can show that all or some of the accounts stated are erroneous or fraudulent"); *Polygram, S.A. v. 32-03 Enterprises,* 697 F.Supp. 132, 136 (E.D.N.Y.1988) (reopening is permitted if "fraud, mistake, or another equitable consideration is present").

"Because an account stated is not conclusive as a settlement, if mistake is shown to impeach it, an account stated can always be opened upon proof of mistake or fraud." *American Home Assurance Co. v. Instituto Nacional De Reaseguros,* 88 Civ. 0917, 1991 WL 4461, at *3 (S.D.N.Y. Jan.10, 1991). See also *Hopwood Plays, Inc. v. Kemper,* 263 N.Y. 380, 385 (1934). "The failure to object raises a presumption of correctness which may be rebutted by proof of any circumstances tending to a contrary inference." *James Talcott, Inc. v. United States Telephone Co.,* 52 A.D.2d 197, 383 N.Y.S.2d 39, 41 (1st Dept.1976). Even if a party fails to object on time, it is permitted to show proof of factual mistakes. *See Navimex S.A. v. S/S "Northern Ice",* 617 F.Supp. 103, 106 (S.D.N.Y.1984).

Plaintiffs presented substantial evidence that fraud, factual mistakes, and other equitable considerations were present, permitting reopening of Pinto's billing. Bernard Black paid Pinto's bills only because he was defrauded by Pinto and Wrigley. Black Decl. ¶¶ 20, 32-34, 76-77. Wrigley falsely vouched for Pinto's honesty and urged Bernard to accept Pinto's bills as correct, despite Pinto's failure to provide receipts.  Black Decl. Exh. C (Wrigley email to Bernard). On

several occasions, when Bernard did not pay Pinto instantly, as he demanded, Wrigley paid Pinto herself and then demanded urgent wire transfers from Bernard.  Bernard relied on Wrigley to confirm the accuracy of Pinto's billing. Black Decl. ¶50.

Pinto and Wrigley cultivated in Bernard a sense of urgency and panic, claiming that if Pinto was not paid immediately, Joanne would be gravely harmed.  For example, when Wrigley first hired Pinto, Bernard wanted to "talk first" before agreeing to Wrigley's plan to send Pinto to Denver.  Fantone Decl. Exh. C (Bernard email to Wrigley, April 9, 2013). Wrigley would not wait, wired money to Pinto, and wrote back the next day saying "I have already wired him the money. . . . What is the hold up?? You can pay me back soon!  She [Joanne] is so troubled." Fantone Decl. Exh. C (Wrigley email to Bernard, April 10, 2013). Wrigley told Bernard that if Pinto was not immediately paid, he might abandon Joanne in an unknown location in New Jersey This would gravely endanger Joanne's life due to her acute psychiatric condition.  Black Decl. ¶ 82.  For much of the time from April through Joanne's admission to a psychiatric hospital in early June, Pinto and Wrigley knew Joanne's exact location, but Bernard did not, and Pinto refused to tell him; thus this threat was credible. *Id.*

Further, at the time when Bernard was making payments to Pinto, he did not know that Pinto was making undisclosed withdrawals from Joanne's bank accounts or, in 2014, that he had redirected Joanne's SSDI payments to himself.  Black Decl. ¶ 6.  Only after Bernard ceased paying Pinto did he investigate, obtain access to Joanne's Wells Fargo statements and realize that Pinto had been stealing Joanne's money.  Black Decl. ¶¶84-85.  Finally, even while Bernard was besieged by Pinto's and Wrigley's demands for immediate payment, due to Joanne's exceptional condition, Bernard still kept asking questions and putting them both on notice that Pinto's bills are being questioned: "I continue to be frustrated by the lack of an integrated bill showing all expenses

and payments… *Cherie advises me that you will be able to document some additional expenses during that period, and I'm willing to consider that, if you provide me with details*." Ex. J to Fantone Decl. at 2 (email from Bernard Black to Pinto, emphasis added).  Thus, "fraud, mistake, or another equitable consideration is present", justifying reopening of accounts. *Polygram, S.A. v. 32-03 Enterprises,* 697 F.Supp. 132, 136 (E.D.N.Y.1988).

## V. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FIFTH CAUSE OF ACTION (UNJUST ENRICHMENT, SSDI BENEFITS)

Undisputed documentary evidence shows that Pinto, without obtaining permission from any individual with legal authority over Joanne's affairs, and without notifying any such individuals, petitioned to become Joanne's representative payee. Black Decl. ¶¶ 30-31. In this capacity, Pinto was directly receiving Joanne's SSDI benefits from May 2014 through January 2015. Id. It is also undisputed that Pinto turned over no receipts as to his use of this money. Under page 6 of the SSA Guide for Representative Payees, Pinto was required to open a separate bank account to receive Joanne's SSDI payments, titled in the name of Joanne Black as beneficiary, with Pinto as her financial agent.  Black Decl. ¶¶ 64-66 and Exh. J (SSA Guide for Representative Payees).  Pinto did not do so, and has instead denied having any records whatsoever of his receipt or use of Joanne's SSDI payments.  Defendant Pinto's Responses and Objections to Plaintiffs' First Request for Production of Documents (April 6, 2018); Exh. A, Response 12. Wrigley knew about Pinto's actions, but concealed them. Black Decl. ¶32.

Defendants' only response on this claim is Pinto's self-serving proclamations that he used all this money on Joanne, and the declaration signed by the mentally ill Joanne, saying that Pinto spent money on her. As discussed above in Introduction, Part I.A, and Part II, Joanne has no first-hand knowledge as to how Pinto spent money, because (1) she was not present when Pinto was

spending the money, and Pinto testified to not having any records of his spending; (2) she was at that time involuntarily committed in a psychiatric hospital and lacking legal and actual capacity to comprehend any financial matters.

## VI. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SIXTH CAUSE OF ACTION (MONEY HAD AND RECEIVED, INVOICES)

Plaintiffs presented substantial evidence that Pinto's invoices were fraudulent. As discussed above in Part I.A. and IV.A, Pinto's expense reports were self-evidently false, since they included only round numbers, no details of any spending, and no receipts. Pinto's hourly billing also was self-evidently false, since it involved billing for individuals working 24 hours straight for multiple days, no details of work done, often not even the names of individuals who were allegedly working, and no receipts of any sort. Fantone Decl. Exh. D (Pinto bills).

Defendants did not produce a single piece of paper to show that Pinto's expenses or hours worked were real. On the basis of this evidence, a reasonable jury can (and should) conclude that Defendants should not be permitted to keep improperly obtained payments.

Defendants' only responses here are: (1) Pinto's self-serving proclamations, (2) Joanne's declaration, based on no first-hand knowledge of Pinto's expenses, and (3) a grossly misrepresented New York doctrine of accounts settled, which does not bar recovery here because fraud was involved. For the response to Joanne's declaration, see above Introduction, Section I.A, Section II. For the response to Defendants' arguments re the doctrine of accounts settled, see above section IV.B.

## VII. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SEVENTH CAUSE OF ACTION (MONEY HAD AND RECEIVED, BANK ACCOUNTS)

Plaintiffs presented bank statements, showing that Pinto made numerous unauthorized and never-reported withdrawals from Joanne's accounts at Chase Bank and Wells Fargo Bank, totaling $43,776.87. Black Decl. ¶¶ 21-28; Black Decl. Exh. C (Chase Bank statements); Exh. D (Wells Fargo statements); Exh. I (summary of Pinto's withdrawals). Pinto never obtained a permission for these withdrawals from any individual with legal authority over Joanne's affairs.

Defendants did not produce a single shred of paper to document Pinto's movement of money. Their only response to this claim is Pinto's undocumented, self-serving proclamations. Def. MOL at 18. This is not sufficient to remove the case from the jury.

## VIII. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' EIGHTH CAUSE OF ACTION (MONEY HAD AND RECEIVED, SSDI BENEFITS)

This cause of action is very similar to the Fifth cause of action (unjust enrichment, SSDI benefits), see above Section V. Undisputed documentary evidence shows that Pinto, without obtaining permission from any individual with legal authority over Joanne's affairs, and without notifying any such individuals, petitioned to become Joanne's representative payee. Black Decl. ¶¶ 30-31. In this capacity, Pinto obtained almost $11,000 in Joanne's SSDI benefits, which he never reported nor documented. Pinto failed to comply with the SSA rules for representative payees. Black Decl. ¶¶ 64-66 and Exh. J (SSA Guide for Representative Payees). Pinto denied having any records whatsoever of his receipt or use of Joanne's SSDI payments. Defendant Pinto's Responses and Objections to Plaintiffs' First Request for Production of Documents (April 6, 2018); Exh. A, Response 12. That money simply vanished without any records.

Defendants' only response is Pinto's self-serving proclamations, and the declaration signed by the mentally ill Joanne, who had no first-hand knowledge of Pinto's activities. This is not enough to remove the case from the jury, in the face of voluminous evidence that Pinto moved the money without permission, without disclosure, in violation of the SAA rules, and spent it without a trace.

## IX. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' NINTH CAUSE OF ACTION (MONEY HAD AND RECEIVED, ADVANCE FOR OCTOBER 2014)

After Pinto's actions in September 2014 caused him to cease paying Pinto, Bernard investigated and discovered that Pinto, with Wrigley's active assistance, have been defrauding the Black family through (1) unauthorized and unreported withdrawals of money from Chase and Wells Fargo accounts, (2) submission of false expense reports, (3) overbilling, and (4) unauthorized receipt of Joanne's SSDI benefits. Black Decl. ¶¶ 84-86.

It is undisputed that, before refusing to pay additional funds to Pinto, Bernard pre-paid him $4,000 for services to be performed in October 2014.  Bernard ceased paying Pinto at the end of September due to Pinto's misconduct, the extent of which only began to become known to Bernard in September.  Black Decl. ¶¶83-86.  Thus, Pinto and CPI were not entitled to keep the $4,000 payment. Defendants respond by misrepresenting to this Court the doctrine of "money had and received".

In New York, a claim for money had and received is created "when one party possesses money that in equity and good conscience he ought not to retain and that belongs to another." *Parsa v. State*, 64 N.Y.2d 143, 148, 474 N.E.2d 235 (1984).  "Under New York law, an action for money had and received lies when '(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) **under principles of equity and good**

**conscience, defendant should not be permitted to keep the money**.'" *Panix Promotions, Ltd. v. Lewis*, No. 01-cv-2709 (HB), 2002 WL 122302, at *2 (S.D.N.Y. Jan. 22, 2002) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984) (citation omitted, emphasis added)). The action for money had and received allows plaintiff to recover money that has come into the hands of the defendant "impressed with a species of trust" (see *Chapman v. Forbes,* 123 N.Y. 532, 537, 26 N.E. 3) because under the circumstances it is " 'against good conscience for the defendant to keep the money' " (*Federal Ins. Co. v. Groveland State Bank,* 37 N.Y.2d 252, 258, 372 N.Y.S.2d 18, 333 N.E.2d 334, quoting *Schank v. Schuchman,* 212 N.Y. 352, 358, 106 N.E. 127). The remedy is available "if one man has obtained money from another, through the medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass" *Miller v. Schloss,* 218 N.Y. 400, 408, 113 N.E. 337. The action depends upon equitable principles in the sense that broad considerations of right, justice and morality apply to it, but it has long been considered an action at law. *Roberts v. Ely,* 113 N.Y. 128, 20 N.E. 606; *Diefenthaler v. Mayor of City of N.Y.,* 111 N.Y. 331, 337, 19 N.E. 48.

Here, Pinto committed massive fraud against the Black family, which involved unauthorized and undisclosed withdrawals from bank accounts, unauthorized and undisclosed redirection of Joanne's SSDI payments, overbilling, and fraudulent expense reports. A part of Pinto's and Wrigley's fraud was to convince Bernard Black to pay Pinto $4,000 for his October 2014 services. If Bernard knew that Pinto had been secretly withdrawing money and submitting false reimbursement requests, he would not have paid Pinto any advances for future work. Black Decl. ¶77. Thus, Pinto "has obtained money from another, through the medium of… deceit", as is required by the test in New York. *See Miller v. Schloss, supra,* 218 N.Y. p. 408, 113 N.E. 337.  Allowing Pinto to keep this money, which he obtained by deceiving Bernard into payment,

does not fit "the principles of equity and good conscience." *Schank v. Schuchman,* 212 N.Y. 352, 358, 106 N.E. 127.

Defendants claim that Plaintiffs should not be entitled to the return of $4,000 because the proper action here is a breach of contract, not equitable claim of money had and received. MOL 23-24. This is incorrect. Pinto did not breach a contract here. Instead, Pinto and Wrigley *defrauded* Bernard Black into paying Pinto $4,000, by misrepresenting Pinto's *prior* actions: by concealing Pinto's prior withdrawals of assets, and by falsely claiming that Pinto's earlier billing had been truthful. Contrary to Defendants' claim, the $4,000 at issue did not come to Pinto through an honest contract – it came to Pinto through fraud and deceit. But for Wrigley's and Pinto's fraud in the inducement, there would have been no payment. As such, the recovery for "money had and received" is available.

### X. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' TENTH CAUSE OF ACTION (MONEY HAD AND RECEIVED, PAYMENTS FOR JULY AND SEPTEMBER 2014)

The tenth cause of action is based on the same allegation as the Fourth cause of action (unjust enrichment based on fraudulent billing). Defendants are not entitled to summary judgment on the Tenth cause of action for the same reasons as explained in Section IV: Plaintiffs generated ample evidence of fraudulent billing; Defendants did not produce a shred of documentary evidence to the contrary; and Defendants cannot rely on the "accounts stated" doctrine to prevent Plaintiffs from recovering because that doctrine expressly permits reopening of accounts for "fraud, mistake or other equitable considerations." *Nationscredit Comm. Corp. v. Matlock,* 99 Civ. 32754, 2000 WL 1211579, at *6 (S.D.N.Y. Aug. 25, 2000).

## XI. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' ELEVENTH CAUSE OF ACTION (CONVERSION, INVOICES)

Defendants' sole evidence on this cause of action is, again, Pinto's own undocumented, self-serving proclamations that his invoices were not fraudulent. Def. MOL at 25.

As discussed in Sections I.A, IV.A, and VI above, Pinto's reimbursement requests were self-evidently false, as they contained only round numbers, no specifics, and no receipts, even when listing tens of thousands of dollars worth of expenses. Pinto's bills for services were likewise self-evidently false, as they billed for the same individuals working for 24 hours straight, several days in the row; contained no details, and typically did not even name the individuals who were allegedly performing services. This, together with the fact that Defendants have not produced a single piece of documentary evidence for tens of thousands of dollars in payment demands, is sufficient for a jury to conclude that Defendants are not entitled to the payments, and thus committed conversion. See Section I, supra.

## XII. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' TWELFTH CAUSE OF ACTION (CONVERSION, ADVANCE FOR OCTOBER 2014)

"According to New York law, conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006) (quotations, brackets and citation omitted). "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Smith v. Smith*, No. 13-CV-1635 (SJF)(ARL), 2014 U.S. Dist. LEXIS 125371, at *21-22 (E.D.N.Y. Sep. 5, 2014) (citing *Colavito v. New York Organ Donor Network. Inc.*, 8 N.Y.3d 43, 50, (2006).

Defendants' claim here is that they did not commit conversion because "Plaintiffs *voluntarily* paid $8,000 to Pinto prior to September 1, 2014". Def. MOL at 26 (emphasis added). This is false: Bernard Black did not "voluntarily" pay Pinto – he was *defrauded* by Pinto and Wrigley into transferring that money. If Wrigley and Pinto had honestly told Bernard that Pinto had been withdrawing money from Joanne's bank accounts without authorization and disclosure, and submitting false reimbursement requests, and inflating his bills, Bernard would not have agreed to pay Pinto anything. Black Decl. ¶77.

Since Pinto and Wrigly defrauded Bernard into giving Pinto the advance for October 2014, Plaintiffs' possessory right to the disputed $4,000 is superior to that of Pinto. As such, Plaintiffs fully satisfy the New York requirements for the conversion claim.

Further, Defendants incorrectly assert that Plaintiffs' conversion claim must fail because Plaintiffs did not previously demand that Defendants return the money that were wrongfully received through overbilling. Def. MOL at 25. This, again, misstates the applicable law. The law only requires the plaintiff to make a demand for the return of property "[i]f a defendant acquired the disputed property lawfully." *Lifeng Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 451 (S.D.N.Y. 2014) (internal citations omitted). "[T]here is no requirement for demand and refusal if the defendant did not acquire the property through lawful means." *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.,* 87 F.3d 44, 49 (2d Cir.1996). Pinto did not acquired the disputed money lawfully – he defrauded Plaintiffs into transferring money to him. Thus, Plaintiffs have no duty to first make out-of-court demands for Pinto's overbilling.

Further, the demand is not required if making the demand would be futile. *See State of New York v. Seventh Regiment Fund, Inc.,* 98 N.Y.2d 249, 261, 746 N.Y.S.2d 637, 646, 774 N.E.2d 702 (2002). It is obvious, given Pinto's and Wrigley's actions in the last several years, that

28

any demands would have been futile. Likewise, the demand is also not required if, in the interim, the recipient of the property has transferred or destroyed it, *see, e.g., MacDonnell v. Buffalo Loan, Trust & Safe Deposit Co.,* 193 N.Y. 92, 101, 85 N.E. 801, 803 (1908); *In re Vogel,* 23 Misc.3d 512, 516–17, 871 N.Y.S.2d 894, 898–99 (Sur.Ct. Westchester Cnty.2009) (citing cases). In sum, Plaintiffs' action for conversion is not affected by their failure to make a futile demand to return money that Defendants acquired through fraud.

Defendants also attempt to argue that Plaintiffs' claim to the $4,000 is more properly presented as a breach of contract or debt collection, which allegedly negates the conversion claim. This is not so. Plaintiffs have consistently argued, and presented evidence, that Defendants *defrauded* them of this amount. The fact that Defendants can concoct some additional legal claims against themselves, with respect to that same stolen money, does not change the fact that Plaintiffs' claim is based on fraud or other tortious wrong.

## XIII. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' THIRTEENTH CAUSE OF ACTION FOR CONSTRUCTIVE FRAUD (INVOICES)

"The elements of constructive fraud are the same as those for actual fraud, except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties." *Wilson v. Dantas*, 746 F.3d 530, 536 n.2 (2d Cir. 2014) (quoting *Klembczyk v. Di Nardo*, 265 A.D.2d 934, 705 N.Y.S.2d 743, 744 (4th Dep't 1999). Plaintiffs alleged that "Defendants Pinto and CPI had a fiduciary or confidential relationship with Plaintiffs at all relevant times, including when they created and submitted the invoices." Compl. ¶ 691.

Defendants argue that Pinto's relationship with the Black family was not fiduciary or confidential. Def. MOL at 28. This is bizarre. A confidential or fiduciary relationship means a relationship "warranting the trusting party to repose his confidence in the defendant and therefore

relax the care and vigilance that he would normally exercise in the circumstances." *@Wireless Enters. v. AI Consulting, LLC*, No. 05-CV-6176 CJS(P), 2006 U.S. Dist. LEXIS 79874, at *8 (W.D.N.Y. Oct. 30, 2006).

Here, Bernard Black entrusted Pinto with fundamental care and safety of his mentally ill sister, Joanne, who could not fend for herself. Bernard, as a conservator for Joanne, also entrusted Pinto with open access to Joanne's bank accounts (Pinto abused that trust by withdrawing money without permission and notice). There is no doubt that the level of financial and personal authority that Pinto received from the Black family meant that Plaintiffs "repose[d] their confidence" and "relax[ed] the care and vigilance" when it came to Pinto. Bernard placed his trust in Pinto due to relentless vouching by Wrigley, who claimed that Pinto was honest and dependable. Black Decl. ¶¶ 76-77. Bernard, as a conservator and trustee for Joanne's SNT, paid Pinto, instructed Pinto on what to do, received Pinto's reports, and coordinated Joanne's care with Pinto. There is no doubt that Pinto was a fiduciary for Bernard and the Black family as a whole. At the very least, a reasonable jury can and will conclude so.

### XIV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FOURTEENTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp.

3d 292, 310-11 (S.D.N.Y. 2014) (citing *Hydro Inv. Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

Defendants falsely argue that this claim must fail because Pinto and Wrigley had no duties to give correct information to Plaintiffs because they had no special relationship with them. This is self-evidently false. Plaintiffs entrusted Pinto and Wrigley with significant powers over their family affairs. Pinto had a nearly unilateral control over the welfare and safety of the mentally ill Joanne Black. Pinto had access to Joanne's bank accounts, which contained assets of the Black family. Pinto and Wrigley both were paid with the assets of the Black family, for the highly personal, confidential services they provided to the Black family. Pinto and Wrigley both had access to highly confidential information about the Black family, from medical to financial to personal. There is massive volume of evidence, showing that Defendants indeed had special relationship with Plaintiffs, and thus had a duty to give correct information – the duty that Defendants breached by providing false information and failing to disclose their actions.

### XV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FIFTHEENTH CAUSE OF ACTION: AIDING AND ABETTING AGAINST WRIGLEY

Plaintiffs alleged that Wrigley had actual knowledge of Pinto's violations and substantially assisted him to advance the commission of all of his torts. Compl. ¶¶ 704-707. Plaintiffs presented substantial evidence that Wrigley both knew about Pinto's violations and actively assisted him. Black Decl. ¶¶32-34, 77-78. In response, Defendants' MOL strangely argues that if, hypothetically, Plaintiffs were to only allege that Wrigley "should have known" about Pinto's misconduct, that would not have been enough. Def. MOL at 29-31. Irrelevant. Plaintiffs clearly alleged – and presented extensive evidence – that Wrigley *actually* knew about Pinto's misconduct and acted deliberately to advance his goals. Black Declaration ¶¶ 20, 32-34, 47-54, 77-78.

**CONCLUSION**

Defendants' Motion for Summary Judgment relies on a combination of making disputed claims, asserting demonstrably false "facts," and ignoring other facts, many indisputable.  When limited to actually undisputed facts, Defendants have no argument to support summary judgment, which should be denied.

Dated: February 11, 2021

Dated this 23rd day of February, 2021

/s/ Michael H. Schaalman
Michael H. Schaalman
Halling & Cayo, S.C.
320 E. Buffalo St., Suite 700
Milwaukee, Wisconsin 53202
(414) 271-3400
mhs@hallingcayo.com
