UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

SAMUEL HOY BLACK and BERNARD BLACK, as trustees
      Plaintiffs,

                16-CV-430 (CBA) (ST)

  -against-

CHERIE WRIGLEY, ESAUN G. PINTO, SR., and
CPI INVESTIGATIONS INC.
 Defendants.

-------------------------------------------------------------------X

## DECLARATION OF BERNARD BLACK

BERNARD BLACK, pursuant to 28 U.S.C. § 1746, states as follows:

  1.  I have personal knowledge of the facts set forth in this declaration.

  2.  During the period from April 12, 2013 through the end of September 2014, while acting in my capacities as Executor of the Estate of Renata Black, co-trustee of the Supplemental Needs Trust for the Benefit of Joanne Black ("SNT"), and the financial conservator for my mentally disabled sister, Joanne Black ("Joanne"), I was deceived by Esaun Pinto ("Pinto") and Cherie Wrigley ("Wrigley"), for whom Pinto was working, into paying to Pinto large amount from assets of the SNT, for services he claimed to be providing to Joanne.

  3.  During this period, Joanne was either entirely under Pinto's control (April 12-June 3, 2013) or else a psychiatric inpatient first at Jersey City Medical Center, then at Meadowview Psychiatric Hospital in New Jersey, and then at South Beach Psychiatric Center in New York (June 3, 2013 until her release in late October 2014).

1

4.      I viewed Pinto's bills for services to Joanne as outrageous, but agreed to pay them from Joanne's trust funds, under pressure from Pinto and Wrigley, because at the time I did not have a better option.

5.      Pinto billed for, and was paid for, his own time, for the time of his associates, and for expenses he claimed to have incurred, including his own expenses and expenses directly for Joanne, some of which were billed generically as "JB shopping."

6.      I later learned that in addition to the large amounts that I paid Pinto from Joanne's trust funds, Pinto also: (i) made undisclosed withdrawals from Joanne's bank account at Chase Bank, in addition to those he disclosed to me; (ii) made undisclosed withdrawals from Joanne's bank accounts at Wells Fargo Bank (none of these were disclosed to me); and (iii) arranged to become Joanne's representative payee with the Social Security Administration, in order to receive directly her Social Security Disability Insurance ("SSDI") benefits (also not disclosed to me). Through these actions, taken together, Pinto took a total of $54,752 that did not belong to him. I provide details on each of these actions below.

7.      In Defendants' motion for summary judgment, Defendants: (i) do not deny that Pinto did these things; (ii) do not claim that I knew at the time of these withdrawals or that he had become Joanne's representative payee; (iii) do not provide any specific evidence on how, if at all, these funds were either used for Joanne's benefit or returned to Joanne.

8.      Defendants do not provide now, and did not provide in civil discovery, *any* written evidence of how these funds were spent – no bank statements; no records of expenses; no records of Pinto having returned any funds to Joanne – nothing. In response to customary requests for production of documents, neither Pinto or Wrigley produced not a single document of any kind. Defendant Pinto's Responses and Objections to Plaintiffs' First Request for Production of

Documents (April 6, 2018); Defendant Wrigley's Responses and Objections to Plaintiffs' First Request for Production of Documents (April 6, 2018). True and correct copies of both responses are attached to this Declaration as Exhibit A.

9. With regard to Pinto's actions as Joanne's representative payee, as a result of which he directly received **$10,975** from May 2014 through January 2015, Pinto denied in civil discovery having any documents in his possession relating to his receipt or use of these funds. Defendant Pinto's Responses and Objections to Plaintiffs' First Request for Production of Documents (April 6, 2018), Exh. A, Response 12.

10. I later learned that Pinto, who was being lavishly paid for visiting Joanne three times per week, in fact visited her substantially less often. I was able to obtain visit records for Pinto from South Beach Psychiatric Center for the period from May 22-October 23, 2014. A true and correct copy of these records is attached as Exhibit B. South Beach Psychiatric Center informed me that they did not have any records prior to May 22, 2014. A true and correct copy of their letter to this effect, addressed to my counsel Anthony Lamberti, is included in Exhibit B.

11. Based on these records, during the 15-week period from May 22-August 31, 2014, instead of visiting Joanne 3 times per week, as he was being paid to do, Pinto visited only 18 times, or an average of 1.2 times per week, excluding several visits on consecutive days in July 2014, when he accompanied Wrigley, for which Pinto billed separately and Wrigley paid him separately.

12. It is reasonable to assume that Pinto visited with similar frequency during other periods, for which visit records are not available. Pinto has asserted that he has no documentation whatsoever for when he visited Joanne or how long he spent on each visit. Defendant Pinto's Responses and Objections to Plaintiffs' First Request for Production of Documents (April 6, 2018), Exh. A, Response 13.

3

13. In November 2013, I sought to negotiate with Pinto to reduce his visit frequency to twice per week, at the same cost per visit. See Fantone Decl. Exh. L. Pinto refused to reduce his visit frequency and continued to bill for 3 visits per month at $750 per visit for the remainder of 2013.

14. In late 2013, I negotiated with Pinto for a reduction in his billing rate from the prior level of $2,250 per week for three weekly visits, plus travel expenses, to a flat rate of $8,000 per month for the same 3 weekly visits. This reduced rate is reflected in Pinto's bills starting January 2014.

15. This reduced rate mean that Pinto would be charging $8,000/(13 visits in an average moth) = $615 per visit, instead of his prior $750 per visit (plus expenses). This was still, in my judgment, an outrageous per-visit amount, even if less outrageous than before. I agreed to pay this per-visit rate only because of pressure from Pinto and Wrigley.

16. I never at any time agreed to a reduction in visit frequency during 2014 to less than 3 visits per week without a commensurate reduction in compensation to Pinto. Any such reduction would have involved an *increase* in the already outrageous per-visit rate that Pinto was charging, not a decrease.

17. Pinto proposed in February 2014 to reduce his visit rate to twice per week, *without* reducing the $8,000 monthly fee. I objected and told Pinto in a telephone call that I would agree to fewer visits per week if Pinto reduced his fees by a commensurate amount. He refused to reduce his fees, and stated that he would instead continue to visit Joanne 3 times per week.

18. Pinto's proposed reduction to 2 visits per week would have meant he was charging $923 per visit. There is no way that I would have, or did, agree to this level of billing. The purpose

4

of the flat fee arrangement which began in January 2014 was to reduce Pinto's per-visit charges, not to allow him to increase them by visiting less often for the same compensation.

19. I would have been happy, and proposed more than once, to reduce Pinto's visit frequency in return for a reduction in his fees. Pinto, however, was never willing to reduce his fees.

20. Wrigley told me that she was in constant contact with Pinto, usually daily and was monitoring his activities, his visits to Joanne in the hospital, and her progress. I relied on Wrigley to monitor Pinto's visits to Joanne and ensure that he was in fact visiting three times per week, as he had promised.

21. On a number of occasions, Pinto withdrew funds from Joanne's Chase bank account and accounted for this in his bills. However, on many occasions, he withdrew funds improperly, without disclosing this to me.

22. In reviewing the Chase bank statements, I caught some of these recurring failures by Pinto to record his withdrawals, but far from all of them. Exhibit C provides true and correct copies of bank statements for Joanne's Chase bank account for the period from April 2013 through September 2014. As shown on these statements, Pinto withdrew a total of **$52,003** from Joanne's Chase account during this period.

23. Pinto reported only some of these withdrawals on his bills (see Fantone Decl. Exh. D). In a few instances, I noticed the discrepancy between his actual withdrawals and those he had disclosed, and deducted the amount of undisclosed withdrawals that I noticed from future payments.

24. However, even after I caught and corrected some of Pinto's failures to report withdrawals from Joanne's Chase account, the total of all withdrawals which were counted toward

payment of his bills was only $22,600. This leaves the difference, of $52,003 minus $22,600 = **$29,403**, unaccounted for.

25. Joanne had both a checking account at **Chase Bank**, into which I deposited funds, and checking and savings accounts at **Wells Fargo Bank**, to which the Social Security Administration sent her Social Security Disability Insurance (SSDI) payments.

26. In addition to his undisclosed withdrawals from Joanne's Chase bank account, Pinto also made undisclosed withdrawals from Joanne's Wells Fargo accounts, leaving minimal balances in these accounts. Exhibit D contains true and correct copies of Wells Fargo bank statements for Joanne's accounts, and shows Pinto's withdrawals.

27. These withdrawals totaled **$14,374** over April 2013 through September 2014.

28. I had no knowledge of the withdrawals from Joanne's Wells Fargo accounts while they were occurring. I learned about them only through investigating what had happened to Joanne's Wells Fargo accounts, beginning in late 2014.

29. Prior to that investigation, I did not monitor these accounts. I assumed that, since Joanne was receiving SSDI payments and, as a psychiatric inpatient, not spending them, the funds were accumulating in her Wells Fargo accounts.

30. Beginning in May 2014, Pinto arranged to become Joanne's representative payee for her SSDI payments. For the period from then through January 2015, the Social Security Administration sent Joanne's SSDI payments directly to Pinto. This was a total of **$10,975.**

31. Pinto was not authorized to be Joanne's representative payee. As Joanne's financial conservator, I was. The order of the Denver Probate Court, dated March 5, 2013, conveying conservatorship powers expressly gave me this authority. Exhibit E contains a true and correct copy of this order.

32. Wrigley participated in the Colorado conservatorship proceedings and knew that I was specifically authorized by the Denver Probate Court to become Joanne's representative payee for her SSDI benefits. Pinto and Wrigley concealed from me Pinto's actions in becoming Joanne's representative payee.

33. During the time when Pinto was first stealing funds from Joanne's Wells Fargo accounts and then obtaining her SSDI payments directly, as Joanne's representative payee, both Pinto and Wrigley falsely assured me that Joanne's Wells Fargo account was safe and that Pinto had the debit card for this account.

34. Pinto and Wrigley also never disclosed to me at any time that Pinto had withdrawn the SSDI payments from Joanne's Wells Fargo accounts.

35. Joanne moved from the Meadowview Psychiatric Hospital in New Jersey to the South Beach Psychiatric Center in Staten Island, New York, in November, 2013.

36. I asked South Beach Psychiatric Center to provide me with its records of visits by Pinto to the South Beach facility. South Beach was able to provide records for the period from May 22, 2014 through October 23, 2014, but asserted that it had no records prior to that. See Exhibit B.

37. Based on those records, Pinto made a total of 18 visits to see Joanne during the 15-week period from May 22, 2014 through August 31, 2014, excluding visits together with Wrigley for which he charged Wrigley separately. This is an average of **1.2** visits per week, and is far below the 3 times per week that he claimed to be visiting, and was paid for visiting.

38. The average length of Pinto's visits to see Joanne, from the time he signed in to the time he sighed out, was 56 minutes. See Exhibit B.

39. Pinto lives in Brooklyn, New York.

40. Pinto typically visited Joanne at the South Beach Psychiatric Center in the afternoon, well before rush hour. See Exh. B (South Beach Visitor log showing arrival and departure times).

41. Based on my knowledge of New York City distances and travel times, it is reasonable to estimate that Pinto spent at most one hour each way traveling from his home in Brooklyn to the South Beach Psychiatric Center in Staten Island.

42. Two hours in round-trip travel time plus one hour in time spent visiting equals 3 hours. Nonetheless, Pinto billed for 5 hours for each visit. See Fantone Decl. Exh. D (Pinto bills).

43. Pinto thus exaggerated both the number of visits he made, and the length of time needed for each visit.

44. Pinto reported all expenses in round numbers. See Fantone Decl. Exh. D (Pinto bills). For hotel and rental car bills, in many cases, he did not provide the name of the hotel or car rental company.

45. Pinto has provided no receipts for any of his asserted expenses.

46. Some of his asserted expenses are facially suspect. For example:

   a. Pinto claimed that he spent $1,000 for a rental car for April 12-16, 2013, plus $300 for gas. Pinto was in Denver during the period, and could not possibly have spent $300 for gas for local travel. Nor could he plausibly have spent $1,000 to rent a car locally for this short period of time.

   b. Pinto also sought and obtained reimbursement for $200 per week for a Denver motel, for 6 weeks *after* Joanne left Denver. See Fantone Decl. Exh. D (Pinto bills).

  c. Pinto sought and obtained reimbursement for the week of May 7-13, 2013 for two different motels, each for $600 per week.

  d. Pinto billed over the period for 153 consecutive hours of work, without sleeping.

47. During the time that Pinto was working for Wrigley, but sending bills to me for payment, I incorrectly believed that Pinto was working for me, in my capacities as Executor of the Estate of Renata Black and a co-trustee of the SNT.

48. This belief was incorrect. Pinto's bills at all times reflected that his client was Wrigley, and only Wrigley. Every Invoice that Pinto and CPI issued in this matter stated that his "Client" was Wrigley. His initial bills were sent only to Wrigley. For example, on April 16, 2013, Pinto emailed Wrigley requesting payment for bills of $22,000 plus expenses to be detailed later. Fantone Decl. Exh. E (Pinto email to Wrigley).

49. Wrigley hired Pinto, without my advance knowledge or my approval.

50. Wrigley, on a number of occasions, paid Pinto directly, and then sought reimbursement from me, using Joanne's funds. I reimbursed Wrigley for $45,000 for her payments to Pinto during 2013. For these payments, I trusted Wrigley to review and verify the accuracy of Pinto's billing.

51. During the period from April 19 through June 3, 2013, when Joanne was staying at a highway motel in New Jersey, Pinto and Wrigley refused to inform me of Joanne's location.

52. After I stopped paying Pinto from Joanne's funds, with the last payment in September 2014, Wrigley continued to pay Pinto for his services, for at least the remainder of 2014 and for most or all of 2015.

53. Wrigley also paid Pinto for additional services to Wrigley and Joanne, including paying him $2,300 for services in July 2014. Exhibit F is a true and correct copy of Wrigley's request for reimbursement for her trip to New York in July 2014, including $2,300 paid to Pinto.

54. Wrigley has acknowledged under oath that "I did indeed retain his [Pinto's] services" and that "I paid all disbursements related to his retention, all at my own expense." Wrigley's Response to Amended Petition in Matter of Black ¶ 15 (Sept. 21, 2015) (Index no. 80253, N.Y. Supreme Court, Richmond County). I do not attach her sworn statement in this regard as an exhibit because it was filed in a sealed guardianship proceeding, but can provide it, subject to a protective order.

55. After I ceased paying Pinto from Joanne's funds at the end of September 2014, Wrigley continued to pay him at a rate of $6,000 per month from October 2014 through at least September 2015. *Id.*

56. When I attempted in September 2014 to act on my mistaken belief that Pinto would accept instructions from me, Pinto refused to act on my instructions, refused to speak to me or respond to my emails and phone calls, and made it clear through these and other actions that he was working for Wrigley and only for Wrigley.

57. For example, my email to Pinto dated September 27, 2014, included in the email chain in Fantone Decl. Exh. P, recounts my failed efforts to reach him during September 2014. In this email, I list my efforts to contact Pinto and conclude: "You have not answered my phone calls, you have not returned my phone calls, and you have not replied to my emails." Pinto replied on September 29, 2014, and refused to engage in substantive conversations with me. I responded on September 30, 2014 and advised him that any services he was providing to me were terminated.

10

58. Pinto was indicted in 2007 for various federal crimes, including wire fraud, aggravated identity theft, solicitation of federal tax information, fraudulently obtaining Social Security Administration information, and conspiracy. Some of these crimes provided for felony-level penalties. Exhibit G contains a true and correct copy of Pinto's indictment.

59. Pinto pled guilty in 2009 to violating 18 U.S.C. §§ 641 and 642, and received a misdemeanor-level sentence. Exhibit G contains a true and correct copy of Pinto's plea agreement and a true and correct copy of his guilty plea.

60. Exhibit G also contains is a true and correct copy of the sentencing memorandum filed by the federal prosecutor in connection with Pinto's guilty plea.

61. Exhibit H provides true and correct copies of the checking account statements for the Estate of Renata Black for the period from April 2013 through October 2014. All payments to Pinto, as well as the $45,000 that I paid to Wrigley in 2013 to reimburse her for payments to Pinto, were made from this account.

62. Exhibit I provides a summary of Pinto's bills to Wrigley and payments for those bills made from the Estate of Renata Black to either Pinto or Wrigley. I prepared this summary based on Pinto's bills (Fantone Decl Exh D) and payments to Wrigley and Pinto for those bills (Exhibit H)

63. In my accounting for the Estate of Renata Black, as estate Executor, I treated the payments to Pinto as if the Estate had first distributed these funds to the SNT, and the SNT had paid them.

64. Exhibit J provides a true and correct copy of a Guide for Representative Payees, published by the Social Security Administration (SSA). Under page 6 of this Guide, Pinto as Joanne's representative payee, was required to open a separate bank account to receive Joanne's

SSDI payments, titled in the name of Joanne Black as beneficiary, with Pinto as her financial agent. Pinto did not do so, and has instead denied having any records whatsoever of his receipt or use of Joanne's SSDI payments. Defendant Pinto's Responses and Objections to Plaintiffs' First Request for Production of Documents (April 6, 2018); Exh. A, Response 12.

65. Under the SSA Guide for Representative Payees, page 8, Pinto as Joanne's representative payee, was required to keep records on and report annually to SSA on how he spent the SSDI benefits he received on Joanne's behalf. Exh. J, at 8. Pinto did not do so, and has instead denied having any records whatsoever of his receipt or use of Joanne's SSDI payments. Defendant Pinto's Responses and Objections to Plaintiffs' First Request for Production of Documents (April 6, 2018); Exh. A, Response 12.

66. Pinto has admitted having Joanne's Chase and Wells Fargo debit cards, and making the withdrawals listed above. Instead, he has sought to justify these withdrawals. For example, in Defendants' Statement of Material Facts item 77, Defendants state: "The allegation that Pinto stole $43,776.87 from Joanne's Chase and Wells Fargo bank accounts is false. With respect to each of the disputed transactions, Pinto utilized the funds for Joanne's benefit . . . ."

67. With regard to the Wells Fargo debit card, Wrigley wrote to Bernard, with cc to Pinto, on November 19, 2013: "Esaun should have Joanne's Wells Fargo card. That is the bank acct. where the [SSDI] check is auto deposited into." A true and correct copy of this email is attached as exhibit K.

68. Exhibit L is a true and correct copy of a letter written by Defendant Wrigley to the Denver Probate Court dated October 3, 2012, which among other things summarizes Joanne's mental state at the time of the events in this case, including the death threats she was making against multiple family members.

69. Joanne has never held a full-time paying job and has never managed her own financial affairs.

70. Exhibit M is a true and correct copy of the deposition of Esaun Pinto, taken on May 8, 2019, in the case of Sarah Black et al. v. Anthony Dain et al., Case. No. 1:16-cv-01238 (E.D.N.Y).

71. Since she was released from South Beach Psychiatric Center in October 2014, Joanne has lived at a halfway house for the mentally disabled run by the State of New York, the Concern for Independent Living located at 805 East New York Avenue, in Brooklyn New York.

72. Joanne is not financially or otherwise independent, and receives support from the staff at the Concern for Independent Living, her financial conservator, a psychiatric social worker, Lois Orlin, who is paid by the conservator, a second social worker assigned by the State of New York.

73. Joanne, during her lifetime, has never been financially independent or capable of managing her own money. As Wrigley explained to the Denver Probate Court in a letter supporting my petition for conservatorship, Joanne does not "understand the value and difference between $20 and $20,000 or two million dollars." Exh. L (Wrigley letter), at 2. As Wrigley explained to the court, "Most of the time without direct supervision, Joanne becomes completely irresponsible with her finances. *Id.*

74. During the period from September 2014 to the present, I have repeatedly tried to visit Joanne, write to her (by letter and email), and telephoned her. She has not been willing to meet me and has not replied to any of my letters, emails, or phone calls.

75. During 2012 and 2013, Joanne believed that she was married to a billionaire lawyer – a real person named Bruce Cutler who has defended famous organized crime figures. Exh L

13

(Wrigley letter), at 2.  She changed her name on her telephone bills to Joanne Bruce-Cutler or Joanne Cutler.  See Exhibit N, which provides a true and correct copy of Joanne's Verizon phone bills during this period.

76. Wrigley repeatedly vouched to me for Pinto's honesty.  For example, on April 10, 2013, she wrote to me: "I DO TRUST HIM.  I have spent a lot of time on this . . . ."  Fantone Decl. Exh. C (Wrigley email to Bernard Black).

77. I trusted Wrigley, and relied on Wrigley's vouching for Pinto's honesty.  Without that trust, I would not have continued to put money into the Chase bank account, from which Pinto withdrew it.  Without that trust, I would not have been willing to pay Pinto using Joanne's funds without details on his specific visits to Joanne, and without more details on his expenses.

78. Wrigley assured me, when I inquired, that the SSDI payments that were going into Joanne's Wells Fargo accounts were safe.  Without those assurances, and my trust in them, I would have verified that the Wells Fargo accounts were intact, and would have discovered Pinto's theft from those accounts, long before I actually did so in late 2014.

79. Wrigley knew, but never informed me, that Pinto had become Joanne's representative payee.  Exh O is a true and correct copy of Pinto's and Wrigley's Responses to Plaintiffs' First Set of Requests for Admission.  In response 30, Wrigley admits that she knew that Pinto had become Joanne's representative payee.

80. If I had not trusted Wrigley's assurances that Joanne's Wells Fargo payments were safe, I would also have discovered, earlier than I did, that Pinto had become Joanne's representative payee and was receiving her SSDI payments directly.  I would have become Joanne's representative payee myself, as I later did in early 2015 when I learned about Pinto's theft from

Joanne's Wells Fargo accounts, ensured that these payments would go into a trust for Joanne (as I did when I became representative payee), and stopped Pinto's theft of Joanne's SSDI payments.

81. Wrigley had online access to Joanne's phone and bank records, including Joanne's Wells Fargo statements. I had no direct access myself, and trusted her to monitor the Wells Fargo accounts. She was either aware that Pinto was making unauthorized withdrawals from them, or negligent in not supervising Pinto.

82. Wrigley repeatedly pressured me into acceding to Pinto's demands for payment. In the initial period from April-June 2013, Wrigley led me to believe that if I did not pay him, he might abandon Joanne, in some location I did not know, because Pinto and Wrigley refused to tell me where Joanne was. I acceded to this pressure.

83. My action at the end of September 2014 in refusing to make additional payments to Pinto was based on his misconduct during September 2014, including Pinto refusing to respond to me, his cutting short my visit to see Joanne and false statements he made to the Court Visitor in September 2014 about me and about his own charges for his services. Exhibit P is a true and accurate copy of the Report of Court Visitor Linda Babcock to the Denver Probate Court, dated Sept. 24, 2014.

84. One aspect of the Court Visitor Report that greatly troubled me was Joanne's statement to the Court Visitor that "He has taken my social security check from me while I have been in the hospital." Exh. P at 4. I knew that I had not done so, and I had believed Wrigley when she assured me that Joanne's SSDI payments were flowing to Joanne's Wells Fargo account. See Exh. K (Wrigley email to me). If Joanne believed I had taken her SSDI money, then someone must have caused her to so believe, and Pinto was the only plausible someone. I therefore obtained

15

access to Joanne's Wells Fargo statements, as her conservator. From those statements, toward the end of 2014, I learned for the first time, that Pinto had depleted these accounts.

85. I also learned, from reviewing the Well Fargo account statements, that in 2014, SSDI payments had stopped flowing to these accounts. I investigated further, and learned that Pinto had made himself Joanne's representative payee for her SSDI payments.

86. At this time, starting in the fall of 2014, I also investigated whether Pinto had been visiting Joanne three times per week, as he had promised. This investigation led me to learn that he had been visiting her far less often. See Exh. B (South Beach Psychiatric Center visitor log).

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Evanston, Illinois on February 11, 2021.

*Bernard S. Black*

Bernard S. Black