October 3, 2012

EFILED Document
CO Denver County Probate Court 2nd JD
Filing Date Oct 16 2012 2:13PM MDT
Filing ID: 47073343
Review Clerk: Melissa Gaye Barnes

DATE FILED: October 16, 2012 2:13 PM
CASE NUMBER: 2012PR1772

2012PR1772

Ms. Cherie Wrigley
1946 Roadrunner Avenue
Thousand Oaks, CA 91320

To Whom It May Concern:

I am Cherie Wrigley and Joanne Black's first cousin. I have known Joanne since she was 9 years old, when she first came from New York to California to stay for a couple of weeks after her mother, Renata Black, had spent several months in a private mental institution. Renata told my mother (her sister, Helene Dain) that she was suffering from a nervous breakdown after the completion of her undergraduate degree. A few years later, Renata, had a second "nervous breakdown" after she graduated from dental school. Although Joanne never knew about these breakdowns and subsequent hospitalizations, her mother's absences seemed to take an enormous emotional toll, from which she never seemed to recover.

I am now retired, but for 32 years I was a resource specialist working principally with special needs children in a high school setting. My credentials include both general education, elementary and secondary, special education, elementary to secondary, ranging from severely emotionally disturbed to moderately learning disabled students. I also have a Pupil Personnel credential, which allows me to work in the capacity of a school guidance counselor, kindergarten through 12. I have a dual Master's degree in Special Education and Counseling and Guidance.

In the course of my professional duties, I belonged to numerous organizations, and read extensively all of the information that was provided, on a monthly, quarterly and yearly basis. These organizations include the following:

    1) NAMI, the National Association for Mental Illness.

    2) NARSAD, Brain and Behavior Research.

    3) California Association of Learning Disabilities.

    4) UCLA Behavioral Newsletter.

After my retirement, I continued to read all the aforementioned information, wanting to keep aware of all the newest research regarding mental illness. In addition, I began to work as a Court Appointed Special Advocate (CASA) for disabled children. I have also spent time volunteering with homeless and mentally ill patients in numerous capacities.

I have known Joanne for 45 years, since we were both children, and continue to be in regular contact with her. She will not accept my phone calls, but calls me regularly. Usually, she simply launches into an incoherent, delusional monologue, which is impossible to penetrate. On rare occasions, I can actually speak with her.

There were 3 times when Joanne and I became extremely close. We called each other almost weekly and visited on a regular basis. During all three of these periods, she was on strong anti-psychotic medications and seeing a psychiatrist weekly. Joanne's longest, most lucid period of relative recovery was from 2006-2009. She was on anti-psychotics mandated by the

1

state, attended a day care treatment center at Phelps Memorial Hospital almost full time, was monitored closely there, and saw a private psychiatrist once a week. After 2009 there was a gradual decline in her behavior and it became obvious to me that her medication was being lowered. I discussed this problem with Joanne and Renata to no avail. Joanne's behavior continued to deteriorate, and in 2010 she was hospitalized with a complete psychotic break. Once again, I saw the pattern repeat that if Joanne was not mandated to take medication by the state and under close supervision to ensure she actually took her medication, she would revert to the same patterns that she had for 35 years, become acutely delusional, psychotic, and disorganized in her thinking, and would become a danger to herself and others.

In my extensive personal and professional experience, there was never anyone who exhibited such extreme symptoms as Joanne's. It pains and saddens me to say so, and to convey the following information about Joanne, however, it is increasingly obvious that Joanne is in need of financial guardianship/conservatorship. Without a financial guardianship, she is likely to be a danger to herself and others, and will squander the money that her mother worked so hard to earn and save in order to provide for Joanne.

I visited Joanne when she was 11-12 years old, which was approximately in 1968. At that time, her family was comfortably middle class. My first vivid memory of her behavior around money was seeing her show me bags of beauty products that she had bought at the local drugstore.

She also wanted to show us (my sister and I) her closet, which she wanted us to help her to clean out and organize. While clearing out her closet, and we found at least four crumpled twenty dollar bills. Joanne's reaction was quite nonchalant and completely inappropriate. Joanne basically said "I don't know where this money keeps coming from. I know my dad gives me money, but don't know what happens to it afterwards."

As a teenager (I was four years older than Joanne), it was evident to me that Joanne didn't realize the value of the 20 dollar bill. In other words, the money could have been 1 dollar bills or 100 dollar bills, and this would not have mattered or been understood by her.

Her inability to understand the value and difference between $20 and $20,000 or two million dollars continues into the present.

While Joanne's mother, Renata Black was still alive (she is now deceased as of May 1, 2012), her mother, with help from a bookkeeper, managed Joanne's finances. This arrangement was very expensive, time consuming and fraught with problems. For example, during periods when Joanne was medication compliant, she sometimes would appear to be improving. However, whenever given any independence at all, she would completely lose any logical concept of money. Most of the time without direct supervision, Joanne becomes completely irresponsible with her finances, to the point that she ends up hospitalized and homeless. She has never succeeded in living stably in one place, even when her mother is paying the bills.

Joanne's lifelong diagnosed chronic illness of paranoid schizophrenia causes her to react in many financially irresponsible ways. For example, she will run away from an apartment or a halfway house and become homeless even when the rent has been paid, usually because she believes that she is not safe.

As a small example, Joanne recently acquired six different cell phone lines, exceeding the allotted five with the wireless company (Verizon), causing her bill to be upwards of $700 per month, on top of the purchase cost(s) of the six phones. The reason that she needed those six

phones/lines was her paranoia created a scenario that each phone line was being tapped and that a new virus had invaded each line. Her mother stepped in to pay the extraordinary cell phone bills, in order to retain contact with Joanne.

Insofar as Joanne's delusional state creating financial disaster, below are numerous examples:

1) Joanne believes that she has been married for almost a year to a famous attorney, Bruce Cutler. She believes that he is a billionaire/trillionaire and that he has purchased a condo for her at 245 W. 72nd Street, Broadway, #2A, New York, New York. That apartment happens to be in the same building where our grandmother lived for over 30 years, in Apartment 7A. Joanne is under the delusion that Bruce Cutler bought the building for her. She has mail/bills delivered to that address.

2) Due to the fact that she believes that she is married to a billionaire, she wants no part of financial assistance from Medicare or Medicaid. Joanne recently told me that she had called to cancel these benefits, even though she also told me that her kidneys are failing and that she is severely malnourished. Also, she has several painful oral abscesses and is in possible need of antibiotics, but refuses to go for medical care.

3) Another poor financial decision is that Joanne is refusing to sign paperwork to receive monies from a settlement with Workman's Compensation that was due her upon the death of her mother, Renata, because she believes that she is "married." Under the Workers' Compensation rules, if she were truly married, her benefits would cease. Besides, as she explained to me, she "is a rich woman" and does not need the money.

4) Joanne continues to ask me for money because she says that she has bought gold chains and diamonds from strangers on the streets. She then sent the jewelry to Bruce Cutler (her make-believe "husband") for security reasons, but then she also told me she had to pay ransom to the criminals who are holding Bruce. Her delusions along this line consume pages of details, and I've taken copious notes from her phone calls to me, which I can provide to the court.

5) Joanne told me on September 24, 2012, that she only has $15 left in her bank account, and although she was starving, that she needed to buy some clothes to wear because some people had stared at her. This is despite the fact that she has over five suitcases filled with clothes and according to the police in Colorado, she was wearing at least 10 layers of clothing, with the temperature being at least 100 degrees outside. The police also noted that her hygiene was extremely poor.

6) When Joanne told me that she needed a personal loan, rather than being able to admit or understand that she had mismanaged her funds, she claimed that her money had been stolen from her by (1) Verizon Wireless, (2) through inappropriate usage of her debit card, and (3) through embezzlement by Chase Bank, both in Aurora, Colorado and Briarcliff, New York.

In fact, Joanne currently receives a regular income, partly from Social Security Disability Insurance, and partly from weekly deposits to her bank account, which her mother was making and which her brother Bernard has continued to make after her mother's death.

Joanne has made numerous verbal threats, including threats to sue various companies and individuals, and to kill specific individuals in her family, including me and her brother. I believe that if she has direct access to the substantial amounts that her mother left for her, she is likely to attempt to carry out those threats.

3

*Suing.* Joanne wants to sue (1) Bernard Black (her brother), (2) Barbara Harris, (3) Barbara at Chase Bank in Briarcliff, New York [Barbara Kern is the assistant branch manager, who has had principal contact with Joanne], (4) Kate (Kate Litvak Black, Bernard's wife), (5) Kate and Bernard's children; and (6) numerous employees at Vanguard [where her mother's principal assets are currently deposited].

*Death threats.* She recently told me that she plans to kill the following people: (1) me; (2) her brother Bernard, and his wife and children; (3) her nephew Dustin Patenaude. As Joanne explained to me, she plans to get a "hit man" to kill me as soon as she gets her money from Vanguard). She would like to see "Bernie (Bernard Black) suffer on death row for all that he has done, or kill him with my bare hands, but most likely I will have to take him out with a hit man." She goes on to say "Death row is not good enough for him. I need to take matters into my own hands. He has stolen and embezzled my funds for long enough." Joanne told me at least twice that she wants to make Bernie suffer by taking out Kate and his family first.

She also told me that "Your adored Dustin (my nephew) is infested in the brain and everywhere with AIDS. He needs to die. It is my duty to hire a hit man. I need money to do this."

I can provide the court with an audiotape which details some of Joanne's delusions.

Sincerely,

*Cherie Wrigley*

Cherie Wrigley

4