Filed Date: 9/21/21

U.S. DISTRICT COURT
EASTERN DISTRICT OF
NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
SAMUEL H. BLACK *et al.*,

                 Plaintiffs,

   -against-

CHERIE WRIGLEY *et al.*,

                 Defendants.
----------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
16-CV-430 (CBA)

**AMON, United States District Judge:**

    Plaintiffs Samuel Black and Bernard Black ("Plaintiffs") bring this action against defendants Cherie Wrigley, Esaun Pinto, and CPI Investigations ("Defendants"), primarily alleging that Defendants defrauded Plaintiffs out of funds that were purportedly used in connection with Defendants' care and supervision of Joanne Black ("Joanne"). Defendants move for summary judgment in their favor on each of Plaintiffs' claims. For the reasons stated below, the motion is granted.

## I.    BACKGROUND

    Plaintiffs are co-trustees of a trust fund (the "SNT") established for the care of Joanne. (E.C.F. Docket Entry ("D.E.") No. 96 ("Defs.' 56.1")[1] ¶ 4.) Plaintiff Bernard Black ("Bernard") is Joanne's brother, and Plaintiff Samuel Black is Joanne's nephew. (Id. ¶¶ 2–3.) Defendant

---

[1] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that I have deemed the underlying factual allegation undisputed. I have deemed facts averred in a 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed. See Huang v. GW of Flushing I, Inc., No. 17-CV-3181 (PKC) (LB), 2021 WL 54085, at *1 n.1 (E.D.N.Y. Jan. 6, 2021); see also Local Rule 56.1(d) ("[E]ach statement controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). I have also deemed admitted facts in opposition to which a party cites a source that does not in fact support the denial. See Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001) (explaining that where the record does not support an assertion made in a Rule 56.1 statement, that assertion should be disregarded), abrogated on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 175-78 (2009). Further, to the extent that a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party]" without specifically controverting those facts," I have disregarded those portions of the statement. Risco v. McHugh, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012).

Cherie Wrigley ("Wrigley") is Joanne and Bernard's cousin. (Id. ¶ 39.) Defendant Esaun Pinto ("Pinto") is the vice president of Defendant CPI Investigations and has known Joanne for approximately twenty years. (See id. ¶¶ 9–10.) In 2010, Joanne began struggling with her mental health, suffering from paranoia and delusions after she stopped taking her prescribed medications. (Id. ¶¶ 11–12.) Although she had been living in an apartment near her mother, Renata Black, and staying with Renata on weekends, Joanne ran away from home and hid her location from her family. (Id. ¶¶ 11–13.) At the time of Renata's death in 2012, Joanne was living in Colorado, struggling with her mental health, and almost homeless. (Id. ¶ 18.) When Renata died, she left a significant portion of her estate to the SNT. (D.E. No. 1 ("Compl.") ¶ 5.)

In April of 2013, Wrigley, in consultation with Bernard, arranged for Pinto to travel to Colorado to find Joanne and move her to the East Coast. (See Defs.' 56.1. ¶¶ 20–24.) The parties dispute whether Bernard authorized the trip beforehand. (See id.) Pinto traveled to Colorado to seek out Joanne and, after locating her, worked with some associates to bring her to New Jersey, where he continued to monitor her, (see id. ¶¶ 25–29), until she was involuntarily committed to Jersey City Medical Center in New Jersey in June of 2013, (id. ¶ 38). Joanne remained committed to various mental healthcare facilities until October 2014. (Id. ¶ 41.) During the time that Joanne resided in these facilities, Pinto visited Joanne, a service for which he was paid by Bernard. (See id. ¶¶ 44–46, 60.) As will be discussed in further detail below, the parties dispute whether Pinto's payment was conditioned on his visiting Joanne at least three times per week and whether Pinto in fact did so. (See id. ¶¶ 44, 49.) Joanne avers that, during the time that she was committed to mental healthcare facilities in 2013 and 2014, Pinto performed tasks for her, including meeting with healthcare professionals on her behalf, going to the bank, and shopping for her. (See id. ¶ 43.) Between June and December of 2013, Pinto submitted invoices for payment to Bernard

2

reflecting the number of hours of his own time for which he billed as well as requests for reimbursement of certain expenses he claimed to have incurred on Joanne's behalf and credits for amounts Pinto withdrew from Joanne's bank accounts.  (See generally D.E. No. 88-4 ("CPI Invoices").)  Beginning in January of 2014, Pinto's invoices no longer contain any representations as to the number of visits he made or hours of his own time billed, because the parties switched to a flat rate payment of $8,000 per month.  (See Defs.' 56.1 ¶¶ 48–49.)

On September 30, 2014, Bernard emailed Pinto, writing that Pinto should "consider [his] services to [Bernard] as financial conservator for Joanne, executor of the estate of Renata Black, and co-trustee of her trust accounts terminated, effective as of today, September 30, 2014."  (Id. ¶ 57.)  Thereafter, Plaintiffs brought the instant suit alleging that Pinto and CPI Investigations, with the assistance of Wrigley, bilked the SNT out of hundreds of thousands of dollars by, inter alia, billing for services never performed and expenses never incurred and failing to report as credits against their bills money withdrawn from Joanne's bank accounts.  Defendants now move for summary judgment on each of Plaintiffs' claims.

## II.    RELEVANT PROCEDURAL HISTORY

This case has a robust procedural history that need not be fully recounted here.  The relevant procedural history for this motion is as follows.  On September 30, 2017, I denied Defendants' motion to dismiss.  Following that order, the Defendants filed an answer to the complaint on October 13, 2017.  The parties began discovery on October 17, 2017 and set an initial deadline for the close of discovery for August 16, 2018.  The Plaintiffs filed their initial interrogatories and requests for documents on February 2, 2018.  (See, D.E. Nos. 76-1, 76-2, 76-3.)  On April 6, 2018, Defendants provided Plaintiffs with responses and objections to those requests.  (See, D.E. Nos. 76-5, 76-6, 76-7.)

3

On February 23, 2018, the Defendants requested a pre-motion conference in anticipation of filing a motion to dismiss the complaint without prejudice, or in the alternative, stay the proceedings. The Defendants informed the Court that the Denver Probate Court had suspended Plaintiffs from serving as trustees of the SNT, and thus, they believed Plaintiffs no longer had standing to prosecute the case. I held a pre-motion conference on April 12, 2018 and ordered the parties to agree to a stay while awaiting a ruling from the Denver Probate Court. Outside of court, the parties agreed to a 60-day stay on April 27, 2018. (D.E. No. 76-4.) After the stay, discovery was conducted in parallel with the related case, Black v. Dain, 16-cv-01238 (CBA) (ST), and fact discovery for both cases was scheduled to conclude by February 22, 2019. Letter Motion for Discovery to Judge Tiscione with Proposed Discovery Schedule, Dain, 16-cv-01238 (CBA) (ST) (E.D.N.Y. Aug. 14, 2018), ECF No. 186; First Motion for Extension of Time to Complete Discovery, Dain, 16-cv-01238 (CBA) (ST) (E.D.N.Y. Feb. 12, 2019), ECF No. 192; (see also D.E. No. 79 at 4:7.)

On March 18, 2019, almost a year after the Defendants filed their responses and objections to the Plaintiffs' original discovery requests, and a month after the close of fact discovery, the Plaintiffs contacted the Defendants to object to their "deficient" productions. (D.E. No. 76-8.) On April 22, 2019, after attempting to contact the Defendants again regarding their "deficient" discovery productions, the Plaintiffs moved to compel discovery from Defendants. (D.E. No 76.) Defendants responded on April 29, 2019, writing to United States Magistrate Judge Steven L. Tiscione that the motion to compel is "untimely and ought to be summarily denied by this court" as "[P]laintiffs did not confer with defendants regarding deficient discovery responses until March 18, 2019, nearly one year after receiving defendants' responses and objections and almost one month after the discovery deadline had passed." (D.E.

4

No. 77.) On May 2, 2019, Magistrate Judge Tiscione held oral argument on the motion to compel. At that argument, Magistrate Judge Tiscione asked Plaintiffs why they had failed to bring up the discovery dispute "over the nine months that discovery was not stayed." (D.E. No. 79 at 7:17-18.) Plaintiffs argued that the Defendants had failed to provide any "documents despite saying that documents will be provided as they become available." (Id. at 8:10-11.) Magistrate Judge Tiscione responded that if Plaintiffs "didn't like their response a year ago" they should have had "a meet and confer, and if you couldn't resolve the issue, bring[] it to the court's attention in a timely manner, you sat on it for over a year. Discovery is closed." (Id. at 11:9-12.) Magistrate Judge Tiscione concluded the hearing by denying the motion to compel, noting that Plaintiffs' "lack of diligence in pursuing this earlier is not good cause for allowing this kind of motion to compel after discovery is closed." (Id. at 12:15-17.) On December 7, 2020, Defendants served Plaintiffs with notice of their instant motion for summary judgment. (D.E. No. 87.)

## III.   STANDARD OF REVIEW

A party is entitled to summary judgment if the pleadings and evidence that would be admissible at trial show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam). At the summary judgment stage, the court's task is not to resolve disputed issues of fact, but "to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The role of the district court is not to weigh the evidence and determine the truth of the matter, but rather to answer 'the threshold inquiry of whether there is the need for a trial.'" Transflo Terminal Servs., Inc. v. Brooklyn Res. Recovery, Inc., 248 F. Supp. 3d 397, 399 (E.D.N.Y. 2017) (quoting Anderson, 477 U.S. at 249).

The moving party carries the burden of demonstrating the absence of a material factual question. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether this burden has been satisfied, a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quoting Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004)). Nevertheless, the nonmoving party cannot rest on speculations, conjectures, or denials but "must 'set forth specific facts showing that there is a genuine issue for trial.'" Rubens v. Mason, 527 F.3d 252, 254 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(e)). A genuine issue exists only where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. When reviewing the evidence submitted for a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). With that said, Rule 56 does not obligate the district court "to hunt through a record, especially a voluminous record" like the one here "to find buried gems that might save a party's case." Hernandez v. Coca Cola Refreshments USA, Inc., No. 12 Civ. 234(BMC), 2013 WL 6388654, at *3 (E.D.N.Y. Dec. 6, 2013).

## IV.   DISCUSSION

### A.   Categories of Expenses at Issue

Because Plaintiffs base their claims upon numerous different types of expenditures for which they allege Pinto wrongfully received payment from SNT funds, a more detailed overview of Plaintiffs' claims and the expenditures upon which they are based is in order. In addition to the claims listed below, Plaintiffs allege aiding and abetting liability against Wrigley with respect to all of the other causes of action in this case.

### 1.  Reimbursement for Pinto's Expenses

Plaintiffs claim that Pinto and CPI sought and received reimbursement for expenses they did not in fact incur, and fraudulently inflated the amounts of other expenses. Pinto and CPI listed the expenses for which they sought reimbursement on their invoices. (See generally CPI Invoices.) These expenses included, by way of example, clothes, toiletries, and other types of quotidian purchases made for Joanne. (See id.) Plaintiffs bring claims sounding in fraud (first cause of action), fraudulent misrepresentation (third cause of action), unjust enrichment (fourth cause of action), money had and received (sixth cause of action), conversion (eleventh cause of action), constructive fraud (thirteenth cause of action), and negligent misrepresentation (fourteenth cause of action) based upon these allegedly false and inflated expenses.

### 2.  Payment for Services

Plaintiffs also claim that Defendants wrongfully received payment for services not actually rendered. Specifically, Plaintiffs base their claims on payments made for the following categories of services.

### 1. Services Rendered April 12–19, 2013

As stated above, Pinto, accompanied by two associates, traveled to Colorado in April of 2013 to locate Joanne and bring her to the East Coast. The CPI invoice for this period reflects that Pinto billed for 153 hours of his own time between "4/12 [at] 4pm to 4/19 [at] 1am. (153 hrs @ $150 per hour)," 33 hours of a driver's time between "4/17 [at] 4pm to 4/19 [at] 1am (33 hrs @ $50 per hour)," and 55 hours of a bodyguard's time between "4/19 at 1am to 4/22 [at] 8am (55 hrs. @ $75 per hr)." (Id. at 1.) Plaintiffs allege that Pinto and his associates did not actually work the hours reflected in this invoice, and bring claims sounding in fraud (first cause of action), fraudulent misrepresentation (third cause of action), unjust enrichment (fourth cause of action), money had

7

and received (sixth cause of action), conversion (eleventh cause of action), constructive fraud (thirteenth cause of action), and negligent misrepresentation (fourteenth cause of action) based on these payments.

### 2. Payment for Three Five-Hour Visits with Joanne per Week

As noted above, once Joanne became a resident at an inpatient mental healthcare facility, Pinto visited her several times per week, a service for which Plaintiffs paid him with SNT funds. The parties dispute (1) whether Pinto was obligated to visit Joanne a specific number of times per week and (2) whether he accurately represented the frequency and duration of his visits. The evidence supporting the parties' positions in this dispute will be discussed in greater detail below. In brief, however, Plaintiffs claim that Pinto represented that he would visit Joanne three times per week for five hours each visit (including travel time) but failed to fulfill this promise and was therefore overpaid for his services. Plaintiffs accordingly bring claims sounding in fraud (first cause of action), fraudulent misrepresentation (third cause of action), unjust enrichment (fourth cause of action), money had and received (sixth cause of action), conversion (eleventh cause of action), constructive fraud (thirteenth cause of action), and negligent misrepresentation (fourteenth cause of action) based on the alleged overpayments related to the duration and frequency of Pinto's visits to Joanne.

### 3. Advance for October 2014

Plaintiffs paid Pinto and CPI $8,000 in advance for services to be rendered in September 2014. (Defs.' 56.1 ¶ 52.) Bernard subsequently told Pinto to cut his monthly rate to $4000 per month, and, as discussed in more detail below, the parties dispute whether Pinto agreed to this reduction. (Id. ¶ 55.) Plaintiffs consequently characterize this $8,000 payment as one meant to cover Pinto's $4,000 per month fee for the months of September and October 2014. Because

Bernard terminated Pinto and CPI's relationship with the SNT at the end of September, Plaintiffs seek to recover the $4,000 that they claim was an advance for services ultimately not rendered in October 2014. Plaintiffs bring causes of action sounding in money had and received (ninth cause of action) and conversion (twelfth cause of action) based on this $4,000 "advance" payment.

### 4. July and September 2014 Payments

In addition to payments made by Plaintiffs from SNT funds, Pinto and CPI occasionally received payment for their services from Wrigley. Plaintiffs bring claims based on two payments made by Wrigley to Pinto and CPI for which Wrigley sought (but did not receive) reimbursement from the SNT. (See id. ¶¶ 88–90.) Specifically, Plaintiffs allege that Wrigley paid Pinto (1) $2,300 for four visits he made to Joanne with Wrigley in July 2014 and (2) $3,950 for several visits he and Wrigley made in September 2014. Plaintiffs further allege that Wrigley sought reimbursement for these payments from the SNT, but that Bernard refused to reimburse her because Pinto had already been paid a flat rate for his services for those months. Plaintiffs bring claims sounding in unjust enrichment (fourth cause of action) and money had and received (tenth cause of action) based upon these two payments. At oral argument, Plaintiffs' counsel represented to me that they were no longer pursuing these claims, but that the complaint had not "been amended to drop that" but that "we're not trying to recover monies that were not paid by Mr. Black." (Transcript of Oral Argument on May 21, 2021 ("O.A.") at 16:16–17:9.)

### 5. Withdrawals from Joanne's Bank Accounts

Pinto had access to a debit card linked to Joanne's Chase bank account and used this debit card to make withdrawals. (See D.E. No. 95 ("Pls.' 56.1") ¶ 8.) Pinto occasionally listed such withdrawals on his invoices as credits offsetting the amount due from Plaintiffs and the SNT. Plaintiffs allege, however, that on numerous other occasions, Pinto withdrew money from Joanne's

bank account but failed to list these withdrawals on his invoices, leading to his being overcompensated. Defendants maintain that, in these instances, Pinto did not retain the withdrawn funds and instead either spent the funds at Joanne's direction for her benefit or provided them directly to Joanne. Plaintiffs, alleging that Pinto retained these funds, bring claims sounding in fraud (second cause of action), fraudulent misrepresentation (third cause of action), money had and received (seventh cause of action), and negligent misrepresentation (fourteenth cause of action) based on these withdrawals.

### 6. Joanne's SSDI Benefits

Pinto also had access to Joanne's Wells Fargo bank account into which her Social Security Disability Insurance ("SSDI") benefits were deposited. (See Pls.' 56.1 ¶¶ 9–10[2]; D.E. No. 89 ("Joanne Decl.") ¶ 14.) Pinto made withdrawals from this Wells Fargo account and ultimately became Joanne's Representative Payee, a position that entitled him to receive her SSDI benefits directly from the Social Security Administration ("SSA"). (See Pls.' 56.1 ¶ 11.) Plaintiffs allege that Pinto wrongfully retained these SSDI benefits and bring claims sounding in fraud (second cause of action), fraudulent misrepresentation (third cause of action), unjust enrichment (fourth and fifth causes of action), money had and received (seventh and eighth causes of action), and negligent misrepresentation (thirteenth cause of action) based on Pinto's alleged retention of Joanne's benefits.

### B.   Fraud and Negligent Misrepresentation Claims

---

[2] Defendants purport to deny that Pinto had access to a debit card linked to Joanne's Wells Fargo account and used the debit card to withdraw funds from that account. (See Pls.' 56.1 ¶ 9.) However, Defendants admit that, before Pinto became Joanne's Representative Payee in May of 2014, Joanne's SSDI payments were deposited into her Wells Fargo account, (see id. ¶ 10), and Joanne avers that "[e]ach month when the SSDI checks were deposited into my account [Pinto] withdrew the SSDI funds," (Joanne Decl. ¶ 14).

I first address Defendants' arguments with respect to Plaintiffs' first, second, third, thirteenth, and fourteenth causes of action—Plaintiffs' claims sounding in fraudulent or negligent misrepresentation. "To prove a claim of fraud under New York law a plaintiff must show, by clear and convincing evidence, . . . that the defendant made a material misrepresentation of fact, knowing of its falsity and with the intent to induce reliance, and that the plaintiff justifiably relied on that misrepresentation to her detriment . . . ." Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 491 (2d Cir. 2014). The elements of a claim for fraudulent misrepresentation under New York law are the same. See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 186–87 (2d Cir. 2004). A plaintiff seeking to show fraud by omission must prove all of the elements of a fraud claim plus the additional element that the defendant "had a duty to disclose the concealed fact." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 181 (2d Cir. 2007). The elements of a constructive fraud claim are the same as those for actual fraud with the exception that the scienter element is replaced by the requirement that the plaintiff prove that the defendant had a fiduciary or confidential relationship with the plaintiff. In re Platinum-Beechwood Litig., 377 F. Supp. 3d 414, 423–24 (S.D.N.Y. 2019).

Because a court ruling on a summary judgment motion must consider the ultimate standard of proof that would apply at a trial, see Anderson, 477 U.S. at 255, on a defendant's motion for summary judgment, the "plaintiff has the burden of providing sufficient evidence that would allow a reasonable jury to find, by clear and convincing evidence, that each of the elements of fraud has been met." The Sample Inc. v. Pendleton Woolen Mills, Inc., 704 F. Supp. 498, 505 (S.D.N.Y. 1989). "The clear and convincing evidence standard demands a high order of proof and forbids the awarding of relief whenever the evidence is loose, equivocal, or contradictory because fraud will not be assumed on doubtful evidence or circumstances of mere suspicion." Hindsight Sols.,

11

LLC v. Citigroup Inc., 53 F. Supp. 3d 747, 772 (S.D.N.Y. 2014) (internal citation and quotation marks omitted).

Finally, the elements of a negligent misrepresentation claim under New York law are:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

Hydro Invs., Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).

### 1. Misrepresentation Claims Based on Expenses

I first address Plaintiffs' misrepresentation claims related to Pinto's expenses. In brief, Plaintiffs claim that Pinto fraudulently or negligently misrepresented his entitlement to reimbursement for expenses he never incurred by listing these expenses on his invoices. Defendants argue that Plaintiffs cannot prove that Pinto made any false representations as to his expenses and proffer Pinto's sworn statement that he incurred each of the expenses listed on his invoices for which he sought reimbursement, (Defs.' 56.1 ¶ 73; D.E. No. 89 ("Pinto Decl.") ¶ 2), and Joanne's sworn statement that Pinto spent at least $12,000 on Joanne for expenses including motels, clothing, food, storage, and shopping, (Defs.' 56.1 ¶ 80; Joanne Decl. ¶ 12).[3] In response,

---

[3] Plaintiffs cite to some evidence in the record suggesting that Joanne has never managed her own finances and, due to her mental illness, has little understanding of the value of money. (See D.E. No. 99-12.) In contrast, in the report of Linda Babcock, the Denver Probate Court's Court Appointed Visitor, Babcock notes that Joanne "is on her medications currently and is lucid and articulate." (D.E. No. 99-16.) Because I need not rely on Joanne's declaration to find that Plaintiffs fail to demonstrate a genuine issue of material fact with respect to the falsity of Pinto's claimed expenses, I do not reach Plaintiffs' attack on Joanne's capacity to understand how much money Pinto spent for her expenses. I do note in passing that Plaintiffs' attacks on the credibility of Joanne's declaration ring hollow when they were provided ample opportunity to depose Joanne as to her capacities and the events underlying this lawsuit and chose not to. Cf. Smith v. N.Y. & Presbyterian Hosp., 440 F. Supp.3d 303, 318 n.5 (S.D.N.Y. 2020) (noting that, where plaintiff chose not to depose a witness and then objected to the use of that witness's affidavit on the grounds that the affidavit included facts that "were not produced in discovery" and that the witness was not deposed, plaintiff could not "use her decision not to depose [the witness] as a shield from the affidavit"); (see also D.E. # 97 ("Pls.' Opp.") at 15 (listing potential questions that could have been asked of Joanne regarding her affidavit.).)

Plaintiffs argue that they have satisfied their burden to present evidence from which a jury could conclude that Pinto's expense claims were false because they have demonstrated that Defendants failed to produce receipts or other documentation backing up Pinto's claimed expenses, and that Pinto listed his expenses on his invoices in round numbers and "since truthful expenses do not come all in round numbers, the 'expenses' that Pinto submitted were false." (Pls. Opp. at 8.) However, Plaintiffs' argument improperly attempts to shift Plaintiffs' burden onto Defendants. See Waran v. Christie's Inc., 315 F. Supp. 3d 713, 719 (S.D.N.Y. 2018) (granting summary judgment to defendants on fraud claims because "while [plaintiff] contends that [defendant] fails to prove its [representations] were legitimate, this overlooks that it is ultimately [plaintiff's] burden to prove the opposite—that the [representations] were false.")  Although Pinto's failure to document his expenses is perhaps troubling, it is not clear and convincing evidence that he never in fact incurred those expenses.  Nor is Plaintiffs' unsupported assertion that "truthful expenses do not come all in round numbers" sufficient evidence from which a reasonable jury could find that Pinto's representations are false.

Plaintiffs' argument devolves into something of a Catch-22 on summary judgment. On the one hand, even if the numbers on the invoices are self-evidently fraudulent, then Bernard, a self-professed "genuine expert in finance," (D.E. No. 99-16 at 5), could not possibly have "reasonably relied" on the clearly false numbers. See Anhui Konka Green Lighting Co. v. Green Logic LED Elec. Supply, Inc., No. 18 Civ. 12255(PAE), 2019 WL 6498094, at *9 (S.D.N.Y. Dec. 3, 2019) ("'A plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making an inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth' of defendant's statements." (quoting Equinox Gallery Ltd. v. Dorfman, 306 F. Supp. 3d 560, 578 (S.D.N.Y. 2018) (alteration omitted))); cf.

Terra Sec. ASA Konkursbo v. Citigroup, Inc., 740 F. Supp. 2d 441, 448 (S.D.N.Y. 2010) ("A plaintiff must demonstrate that there was some basis for it to have relied on the alleged misstatement or omission. . . . The reasonableness of a claim of reliance must be considered in light of the plaintiff's sophistication."). On the other hand, if the numbers on the invoices are not self-evidently fraudulent, Plaintiffs have failed to satisfy their burden of proof and cannot proceed with their fraud claims. In either event, Defendants are entitled to summary judgment on these claims.

> 2.   **Services—April 12–22, 2013**

As discussed above, Plaintiffs allege that Pinto overbilled for his and his associates' time during the period April 12–22, 2013 and bring claims for fraudulent and negligent misrepresentation based on this alleged overbilling. In support of their motion for summary judgment on these claims, Defendants proffer (1) Pinto's declaration, stating that his invoices are accurate and that "[he] and/or [his] employees worked all hours of each day to secure, monitor, and care for Joanne" during the disputed period, (Defs.' 56.1 ¶ 26[4]); (2) Joanne's statement corroborating that Pinto provided round-the-clock care during the disputed period, (id. ¶¶ 26–27); and (3) emails from April and May of 2013 in which Pinto and Bernard discuss the number of hours Pinto worked, (see id. ¶¶ 28, 33–34). Plaintiffs cite to no record evidence in response and instead argue that it is "self-evident" that Pinto's bills are fraudulent because Plaintiffs doubt that Pinto and his associates would have been physically able to work the consecutive number of hours for which they billed. But the record does not require the inference that Pinto was actively working

---

[4] In their response to Defendants' Rule 56.1 Statement, Plaintiffs purport to deny that Pinto and his associates worked around the clock to secure, monitor, and care for Joanne. However, Plaintiffs cite only to the CPI invoices in support of this denial. (Ds' 56.1 ¶ 26; Pls.' 56.1 ¶ 26.) The cited invoices do not support Plaintiffs' purported denial, and so Plaintiffs' denial will be disregarded. See Holtz, 258 F.3d at 74 (explaining that where the record does not support an assertion made in a Rule 56.1 statement, that assertion should be disregarded and the record reviewed independently).

14

for 153 hours straight without ever sleeping. Instead, the invoice bills for "Esaun Pinto: Protection Hours from 4/12, 4pm to 4/19, 1am (153 hrs @ \$150 per hour)." (D.E. No. 88-4 at 1.) Based on his declaration and Defendants' Rule 56.1 submissions, it is plausible that Pinto was "on call" for 153 hours straight, and accordingly billed for that time. (Ds' 56.1 ¶¶ 26–27 ("Pinto and/or his employees were with Joanne working all hours of each day"); Pinto Decl. ¶ 3 ("I and/or my employees worked all hours of each day.").) Plaintiffs have not offered any evidence, much less clear and convincing evidence, on the record to suggest that Pinto inappropriately billed for this time. As discussed above, Plaintiffs' argument that the invoices are "self-evidently" false is inherently self-defeating. Even if Pinto's claimed hours worked are "self-evidently" false, Bernard cannot claim that he reasonable relied on them. Anhui Konka, 2019 WL 6498094, at \*9 ("'A plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making an inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth' of defendant's statements." (quoting Equinox Gallery Ltd., 306 F. Supp. at 578)).

The next entry on the invoice, with which Plaintiffs also take issue for the same reason, reveals another flaw in Plaintiffs' reasoning. The invoice bills for "Driver, 4/17, 4pm to 4/19, 1am (33hrs @ \$50 per hour)." (D.E. 88-4 at 1.) Plaintiffs charge that "[j]ust like Pinto, the driver supposedly worked (as a driver?) without sleeping or resting at all." (Pls.' Opp. 13.) But the invoice bills for the driver's time, not necessarily for the driver's work. Standing alone, the invoice does not suggest that the driver worked for 33 hours straight. Alone, the invoice only supports that Pinto requested reimbursement for 33 hours of the driver's time. Plaintiffs have not produced any evidence to suggest otherwise.

15

Plaintiffs' last claim is their most specious—that the "invoice lists an unnamed 'bodyguard,' working from 1am on 4/19 to 8 am on 4/22 . . .. The bodyguard claims to have worked 55 hours during that 79-hour period, at $75/hour." (Pls.' Opp. 13.) This too seems plausible, the bodyguard purportedly worked 55 hours from 1 AM on April 19 through 8 AM on April 22—three full days and nights, and from midnight to 8am on April 22. The invoice bills for 55 of 79 hours, allowing for 24 hours of unaccounted-for time across three nights, or 8 hours of sleep each night. Without more, Plaintiffs have not provided evidence that Pinto's billing was fraudulent.

To defeat summary judgment, "nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and they 'may not rely on conclusory allegations or unsubstantiated speculation.'" Jeffreys 426 F.3d at 554 (first quoting Matsuhita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); and then quoting Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 428 (2d Cir. 2001)). Plaintiffs here offer nothing more than metaphysical doubt and unsubstantiated speculation. Defendants are entitled to summary judgment on Plaintiffs' fraudulent and negligent misrepresentation claims based on Pinto's billing for services rendered between April 12, 2013 and April 22, 2013.

### 3. Services—Weekly Visit Duration and Frequency

Plaintiffs claim that Pinto was overpaid as a result of his misrepresentation of the number and duration of visits he made to Joanne while she resided in various mental healthcare institutions. Plaintiffs claim that between June 2013 and August 2014, Pinto represented that he would visit Joanne at least three times a week for five hours per visit. (See Compl. ¶¶ 473–80.) Plaintiffs allege that Pinto instead visited Joanne an average of only 1.2 times per week and overcharged by two hours for the visits he did make. (See id. ¶¶ 417–80.) In support of their motion for summary judgment, Defendants offer Joanne's sworn statements that Pinto's invoices are accurate, (Joanne

16

Decl. ¶ 9), and that Pinto visited her an average of 3 times per week in 2013, but that the frequency of his visits declined in 2014 as her condition improved, (id. ¶ 8), and Pinto's sworn statements that the representations made in his invoices are accurate, (Pinto Decl. ¶¶ 3–4).

As an initial matter, there is some disagreement as to whether and in what form Pinto made representations concerning the frequency and duration of his visits. Even assuming, however, that Pinto represented that he would visit Joanne three times a week for five hours per visit, Defendants are entitled to summary judgment on Plaintiffs' claims arising out of Pinto's visits between June 2013 and May 22, 2014. For this period, Plaintiffs have proffered no evidence concerning the number and duration of Pinto's visits, i.e., no evidence suggesting that Pinto made false representations. Instead, Plaintiffs repeat their argument that Pinto's inability to present documentation of visits he claimed to have made constitutes evidence of fraud. I have already rejected this argument with respect to Plaintiffs' expense-related claims. It is the Plaintiffs' obligation to prove that Defendants committed fraud; it is not the Defendants' obligation to prove that they did not. (See, e.g., O.A. 8:14–15.) Plaintiffs have therefore failed to raise a genuine issue of material fact as to whether Pinto's representations related to visits made between June 2013 and May 22, 2014, if any, are false. As a result, Defendants are entitled to summary judgment on claims related to visits made between June 2013 and May 22, 2014.

For the period from May 22, 2014 through August 31, 2014, however, Plaintiffs provide visitor logs[5] from the facility in which Joanne resided. (See D.E. No. 99 ("Bernard Decl.") ¶ 10; D.E. No. 99-2.) These visitor logs reflect that Pinto visited Joanne only 22 times during this

---

[5] Defendants argue that I should not consider these visitor logs because they are attached as an exhibit to Bernard's declaration, and as such have not been authenticated by their author or an individual with personal knowledge of the facts contained therein. However, even if evidence is not properly authenticated at the summary judgment stage, so long as the evidence "will be presented in admissible form at trial," it may be considered on summary judgment. Santos, 243 F.3d at 683; see also Harleysville Worcester Ins. Co. v. Wesco Ins. Co., 752 F. App'x 90, 93–94 (2d Cir. 2019) (summary order) (affirming consideration of unauthenticated business record on summary judgment because proponent could provide an affidavit from a records custodian to authenticate the document at trial).

roughly fourteen-and-a-half-week period, an average of one-and-a-half visits per week. (See id.) However, Pinto's deposition testimony in Black v. Dain, 16-cv-1238, cited in Defendants' Rule 56.1 submission and attached to Bernard's declaration, suggests that he made more visits than the logs suggest. Specifically, Pinto testified that he "went there so often that I didn't have to sign in. . . . [A]t South Beach oftentimes I met with the doctors or social workers prior to meeting Joanne. So they would meet me outside. We'd talk, and then I would get escorted in. Those moments I went through the employee entrance, I didn't go through the business entrance." (D.E. No. 99-13 ("Pinto Deposition"), 252:14–253:2). This is consistent with statements made by Joanne's doctor at South Beach, Dr. Noshin Chowdhury. In Linda Babcock's Court Appointed Visitor Report, Dr. Chowdhury noted that "Mr. Pinto has been there for every aspect of her care consistently." (D.E. No. 99-16 at 8.) Given the dispute over the number of visits Pinto made, it is necessary to determine, then, whether Plaintiffs have raised a genuine issue of material fact as to whether Pinto represented that he would visit Joanne more frequently during this period.

For the months of June through December of 2013, the CPI Invoices list the number of hours Pinto billed—generally[6] 15 hours per week. (See CPI Invoices 8–22.) Between January and September 2014, however, the CPI Invoices contain no representations as to the number of hours Pinto worked or visits he made, and instead reflect only that a flat rate of $8,000 per month (with some adjustments for withdrawals or extra expenses) was due. (See id. 22–31.) Defendants argue that because the CPI Invoices for 2014 contain no specific representations as to the number of hours Pinto worked or visits he made, Plaintiffs may not bring fraud claims based on Pinto's visits during this period. In response, Plaintiffs proffer Bernard's sworn statement that Pinto

---

[6] During the month of June 2013, Pinto's weekly hours billed differed each week, ranging between 6 and 22 hours. For all other months in 2013, Pinto billed for 15 hours of his time each week.

18

verbally represented that he would continue to visit Joanne three times per week during a telephone call in February of 2014. (See Bernard Decl. ¶ 17.)

Defendants argue that I should ignore Bernard's sworn statement because it is so contradicted by certain email evidence that no reasonable juror could accept it. Specifically, Defendants point to (1) a September 2013 email from Bernard to Pinto in which Bernard wrote "Cherie and I think that once Joanne is moved, your visits can be cut back in frequency, initially twice per week[,]" (Defs.' 56.1 ¶ 45); (2) a February 2014 email from Pinto to Bernard in which Pinto wrote "I have reduced my visits to twice a week on most weeks" and that "moving forward a flat rate may be less of a hassle for both of us" and proposed a rate of $8,000 per month, (id. ¶ 47); and (3) a September 2014 email from Pinto to Bernard in which Pinto wrote that he would "continue to visit [Joanne] at least twice a week[,]" (D.E. No. 88-16 at 3.)

Defendants' evidence on this point is not conclusive. With regard to the September 2013 email from Bernard, Pinto's written response, if any, is not reflected in the record, and Bernard acknowledges that he "sought to negotiate with Pinto to reduce his visit frequency to twice per week" but avers that Pinto refused to reduce his visit frequency. (See Bernard Decl. ¶ 13.) With regard to the February 2014 email, Bernard's written response does not address Pinto's visit frequency or his flat fee proposal, (see D.E. No. 88-13), but Bernard avers that he told Pinto in a subsequent telephone call that he would agree to a reduction in visits per week only if Pinto agreed to a commensurate reduction in fees, that Pinto refused this offer, and that Pinto insisted he would continue visiting Joanne three times a week. (see Bernard Decl. ¶ 14.) Finally, the September 2014 email from Pinto indicating that he would "continue to visit her at least twice a week" was sent on September 29, 2014—one day before Bernard emailed Pinto to terminate his services. (See

D.E. No. 88-16 at 2-3.) This email provides extremely limited context for the agreed-upon frequency of visits.

The documentary evidence supporting Defendants' version of events is far from comprehensive and unequivocal, and Bernard's declaration lays out a version of the facts that is both internally consistent and consistent with the email evidence proffered by Defendants. Drawing all reasonable inferences in the light most favorable to Plaintiffs, as I must here, I cannot conclude that Bernard's sworn statements concerning Pinto's representations in February of 2014 that he would visit Joanne three times a week are so fanciful that "no reasonable juror would undertake the suspension of disbelief necessary to credit" them. Jeffreys, 426 F.3d at 555. I am not convinced otherwise by the fact that nearly seven months after the representation in question, Pinto sent one email in which he stated that he would continue to visit Joanne twice a week.

In sum, Plaintiffs have raised genuine issues of material fact as to whether Pinto made representations as to the frequency and duration of his visits and whether those representations were false for the period for which Plaintiffs have produced the South Beach Visitor Logs. This conclusion does not end the matter, however, as Defendants make further arguments with respect to both (1) Plaintiffs' fraud claims and (2) their negligent misrepresentation claims. I deal with each in turn.

### i. Defendants' Remaining Arguments Concerning Plaintiffs' Fraud Claims

Defendants' remaining arguments concerning Plaintiffs' fraud claims point to the parties' agreement that Pinto would bill Bernard at a flat fee of $8,000 a month in advance. Defendants argue that, during the period for which Plaintiffs supply visitor logs backing up their claims, Pinto's representations constituted forward-looking promises of future performance (which are

actionable only in contract) rather than misrepresentations of present facts (which are actionable as fraud). Specifically, Defendants note that "[f]or the time period of May 22, 2014 to August 31, 2014, the record reveals that Pinto requested monies in advance." (D.E. No. 92 ("MSJ") at 8.) "New York [law] distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement." Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 184 (2d Cir. 2007); see also Spinelli v. NFL, 903 F.3d 185, 209 (2d Cir. 2018) ("Where a plaintiff alleges . . . that the defendant simply misrepresented its intent to perform under a contract, no separate claim for fraud will lie, and the plaintiff must instead bring an action for breach of contract.").

Plaintiffs do not meaningfully dispute that Pinto's agreement with Bernard to bill in advance at a rate of $8,000 per month, allegedly for three visits a week, was a promissory statement. Indeed, Plaintiffs expressly use contract-like language in their brief, stating that they have "produced extensive evidence showing that Pinto (1) made specific promises to perform services" and that "(2) [Pinto] did not perform as promised." (Pls.' Opp. 16 (emphasis added).) Instead, Plaintiffs argue that Pinto's alleged misrepresentations are actionable under a fraudulent inducement theory. But even "[m]isrepresentations made to induce a party to enter a contract are not actionable as fraud . . . unless they are 'collateral' to the contract induced." Spinelli, 903 F.3d at 209 (quoting Wall v. CSX Transp., Inc., 471 F.3d 410, 415–16 (2d Cir. 2006)). "A fraud claim may be considered collateral to a contract if the contract, including its representations and warranties, does not address the factual bases of the fraud claim." FPP, LLC v. Xaxis US, LLC, 764 F. App'x 92, 94 (2d Cir. 2019) (summary order). Accordingly, courts have permitted a plaintiff to bring a fraudulent inducement claim where, e.g., one party to a written contract

misrepresented its intention to abide by a separate oral agreement on the geographical restriction on resale of the goods covered by the written contract. See, e.g., Deerfield Commc'ns Corp v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954 (1986).

Pinto's alleged misrepresentation is not actionable under a fraudulent inducement theory because it is not "collateral" to the agreement. Pinto's alleged misrepresentation—his agreement to bill Bernard in advance a flat fee of $8,000 per month in exchange for visiting Joanne three times a month—is identical to his performance of obligations under the parties' agreement and is therefore not actionable as fraud. See Cronos Grp. Ltd. v. XComIP, LLC, 156 A.D.3d 54, 67 (2017) (affirming the proposition that "a false assurance that the promisor will perform a preexisting contractual obligation is not collateral to the contract").

Plaintiffs seem to make an alternative argument that the invoices themselves are evidence of present, fraudulent misrepresentation. (Pls.' Opp. 17.) But as the Defendants note, the invoices for the relevant time period make no representations regarding the requisite number of visits or the duration of those visits. (D.E. No. 88-4.) As a result, the invoices cannot be a standalone basis for a fraud claim. The invoices would not be actionable under a fraudulent inducement theory, as they post-date the purported agreement between Pinto and Bernard in February 2014, and therefore could not have induced entrance into the contract. Defendants are therefore entitled to summary judgment on Plaintiffs' fraud claims arising out of payment for Pinto's visits to Joanne from May 22, 2014 through August 31, 2014.

## ii. Defendants' Remaining Arguments Concerning Plaintiffs' Negligent Misrepresentation Claim

I next consider Defendants' remaining arguments concerning Plaintiffs' negligent misrepresentation claim. Defendants argue that Plaintiffs cannot prevail on their negligent

misrepresentation claim because Plaintiffs have failed to raise a triable issue of fact as to whether Pinto "had a duty, as a result of a special relationship, to give correct information." Hydro Invs., 227 F.3d at 20. Defendants argue that Pinto's status as an employee fails to establish the type of "special relationship" required to impose liability for a negligent misrepresentation. Without citation to any case law or authority, Plaintiffs assert that because "Plaintiffs entrusted Pinto and Wrigley with significant powers over their family affairs . . . [including] nearly unilateral control over the welfare and safety of the mentally ill Joanne Black . . . the Defendants indeed had special relationship with Plaintiffs, and thus had a duty to give correct information." (Pls.' Opp. 31.)

Not every relationship gives rise to a "special relationship" that can trigger an obligation to provide truthful information. Two separate lines of cases in New York establish when a plaintiff may recover for negligent misrepresentation. In Stewart and in the cases that follow it, the Second Circuit has explained that, under New York law, "a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty." Stewart v. Jackson & Nash, 976 F.2d 86, 90 (2d Cir. 1992); see also Prime Mover Cap. Partners, L.P. v. Elixir Gaming Techs., Inc., 793 F. Supp. 2d 651, 674 (S.D.N.Y. 2011). Meanwhile, in Credit Alliance, the New York Court of Appeals held that an accountant may be held liable for negligent misstatements only where she is in privity with the plaintiff or in "a relationship . . . sufficiently approaching privity." Credit All. Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 553, amended on other grounds, 489 N.E.2d 249 (N.Y. 1985). Although Credit Alliance involved negligent misrepresentations by an accountant, the Court of Appeals has subsequently held that "these requirements do not apply to accountants only" and has applied the test to other professionals, like engineers. Sykes v. RFD Third Ave. 1 Assocs., LLC, 15 N.Y.3d 370 (2010). The Second Circuit has addressed these two tests for a duty of truthfulness by noting that:

23

[Stewart and its progeny] can be read to limit negligent misrepresentation claims to those cases in which a fiduciary duty is implicated. Although these opinions state that a negligent misrepresentation claim will not lie unless the parties share a fiduciary or otherwise 'special' relationship, they cannot be read to preclude such a cause of action brought on grounds of privity or near-privity. The latter basis for a negligence action has been continually reaffirmed by the New York Courts, as well as by the Second Circuit . . . . Courts have reconciled the discrepancy in the caselaw by recognizing a fiduciary duty as one, but not the exclusive, basis for a negligent misrepresentation claim.

Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 584 n.15 (2d Cir. 2005).

Neither Plaintiffs nor Defendants meaningfully engage with either of these lines of cases. But a precise reconciliation of this caselaw is unnecessary to resolve Plaintiffs' negligent misrepresentation claims. Defendants make an additional argument in their reply brief that did not appear in their opening brief but is dispositive of the issue.[7] Like with fraud claims, under New York law, "[p]romises of future conduct are not actionable as negligent misrepresentations." Murray v. Xerox Corp., 811 F.2d 118, 123 (2d Cir. 1987); see also Hydro Invs., 227 F.3d at 20–21 ("[T]he alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition."); Harte v. Ocwen Fin. Corp., 13-CV-5410(MKB), 2014 WL 4677120, at *14 (E.D.N.Y. Sept. 19, 2014) (same). As discussed above, Plaintiffs do not convincingly argue that Pinto's statements to Bernard about the frequency and duration of his visits to Joanne are misrepresentations of present fact, rather than a promise of future conduct. As

_____

[7] Although a district court may decline to consider an argument raised for the first time in a reply brief, the "district court enjoys broad discretion . . . to consider arguments made for the first time in a reply brief." Compania Del Bajo Caronia (Caromin), C.A. v. Bolivarian Republic of Venezuela, 341 F. App'x. 722, 724 (2d Cir. 2009) (summary order). Defendants' argument that promises of future conduct are not actionable in a negligent misrepresentation claim is very similar to their argument that promissory statements are not actionable in a fraud claim. (Compare MSJ 5–6; 8–9, with D.E. No. 93 ("Defs.' Reply") at 14.) Because Plaintiffs had the opportunity to respond to that argument in their responsive briefing, I exercise my discretion to consider this argument. Cf. Trahan v. Lazar, 457 F. Supp. 3d 323, 354 (S.D.N.Y. 2020) ("Negligent misrepresentation 'involves most of the same elements as fraud, with a negligence standard substituted for the scienter requirement.'" (emphasis omitted) (quoting Carroll v. LaBoeuf, Lamb, Greene & MacRae, LLP, 623 F. Supp. 2d 504, 510 (S.D.N.Y. 2009)). Here, the outcome of Defendants' summary judgment motion turns on my finding that promissory statements cannot substantiate a negligent misrepresentation claim, and not on the lower scienter standard of negligent misrepresentation.

a result, I find that the Defendants are entitled to summary judgment on Plaintiffs' negligent representation claims.

### 4. Bank Account Withdrawals and SSDI Benefits

Defendants are entitled to summary judgment on Plaintiffs' claims of fraudulent and negligent misrepresentation alleging that Pinto failed to faithfully report money he withdrew from Joanne's bank accounts or received from the SSA as her Representative Payee as offsets on his invoices, leading to him being overcompensated for his services. Defendants argue that Pinto's invoices accurately reflected the payment due because he did not retain or use these disputed funds for his benefit.

In support of this argument, Defendants offer Pinto's and Joanne's sworn statements that Pinto did not retain these funds, (Defs.' 56.1 ¶¶ 79, 86–87), and Joanne's sworn statements that Pinto instead provided these funds directly to Joanne, (id. ¶ 77), spent them at Joanne's direction, (id.), used them to reimburse himself for out-of-pocket expenses he incurred for Joanne's benefit, (id. ¶ 78), or placed the funds in a secure location for safekeeping at Joanne's direction, (id. ¶ 84). Joanne also averred that she paid some portion of her SSDI benefits to one of the hospitals in which she resided. (Id. ¶ 85.) Moreover, in Pinto's sworn testimony, attached to Bernard's declaration, he claims that "from the day I picked [Joanne] up in Colorado . . . she believed that her brother was stealing her inheritance" and that, at the direction of Joanne while she was hospitalized at South Beach, Pinto purchased a lockbox and placed $8,000 from the Wells Fargo account into it in order to "safeguard against Bernard." (Pinto Deposition 258:8–9, 262–264.) Plaintiffs purport to deny these facts, but their evidence does not advance their argument. Plaintiffs cite to (1) the Chase and Wells Fargo bank statements for Joanne's accounts, (2) Pinto's twelfth response to Plaintiffs' requests for production of documents, (3) the CPI invoices, and (4) portions

of Bernard's declaration. (Defs.' 56.1 ¶¶ 77–79, 84–87.) The bank account statements reflect that withdrawals were made but have no bearing on the relevant issue here—what happened to the funds after they were withdrawn. Nor does Pinto's twelfth response to Plaintiffs' request for production—in which Pinto represents that he has no documents showing or evidencing the receipt or use of funds he received from the SSA as Joanne's Representative Payee—rebut Joanne's and Pinto's sworn statements. The CPI Invoices are similarly unhelpful to Plaintiffs, as they merely list the hours Pinto claims to have worked, the expenses for which he sought reimbursement, and the money withdrawn from Joanne's bank accounts that he retained and treated as an offset to his bills. Finally, the portions of Bernard's declaration cited do not support Plaintiffs' denial of Defendants' proffered undisputed facts detailing Pinto's disposition of the disputed funds. Bernard avers, generally speaking, that (1) Pinto did not disclose the disputed withdrawals or the fact that he became Joanne's Representative Payee, (Bernard Decl. ¶¶ 6–7, 26–33); (2) that Defendants produced no documentation of how the disputed funds were spent, (id. ¶¶ 8, 44–45); and (3) that Bernard, Joanne's conservator, did not authorize Pinto to become Joanne's Representative Payee, (id. ¶ 31). None of these claims contradicts Joanne's[8] and Pinto's sworn statements detailing how Pinto disposed of the disputed funds. Summary judgment is warranted where the non-movant's "allegations are not substantiated in any way and most are directly contradicted by the affidavits of those who would have first-hand knowledge of the incidents in question." Scotto v. Almenas,

---

[8] While Plaintiffs have pointed to record evidence tending to show that, at certain points in her life, Joanne lacked a clear understanding of the value of money, they fail to identify record evidence demonstrating that Joanne's mental condition at the time she submitted her declaration was so deteriorated as to prevent her from remembering how she may have directed Pinto to use her money. (See D.E. No. 99-12.) Moreover, there is also record evidence demonstrating that, at times, Joanne may have had a fixation on her finances. (See Pinto Deposition at 257:24–258:5 ("Joanne, when I got to Colorado, Joanne knew some very exact numbers. She knew exactly what was in the Roth IRA down to the penny. She had communicated with them in Vanguard and she knew a lot that I didn't know. Because of her condition, I didn't know whether to believe her or not.").) However, as stated in Footnote 3, I need not reach the question of Joanne's capacity, because Plaintiffs have not produced any evidence showing that Pinto improperly retained any money he retrieved from Joanne's Chase account or her SSDI benefits. Plaintiffs have offered no evidence to genuinely dispute the facts alleged in Pinto's declaration.

26

143 F.3d 105, 115 (2d Cir. 1998). Accordingly, Plaintiffs have failed to proffer any record evidence raising a triable issue of fact as to whether Pinto's invoices contained false representations—i.e., that Pinto improperly retained the funds he withdrew from Joanne's bank accounts and received on her behalf from the SSA without reporting them.[9]   Plaintiffs have therefore not met their burden to demonstrate a genuine dispute of material fact as to an essential element of their fraudulent and negligent misrepresentation claims, entitling Defendants to summary judgment.

### C.   Unjust Enrichment and Money Had and Received Claims

I next address Plaintiffs' claims sounding in unjust enrichment and money had and received. To state a claim for unjust enrichment under New York law, a plaintiff must allege that "(1) [the] defendant was enriched, (2) at [the] plaintiff's expense, and (3) equity and good conscience militate against permitting [the] defendant to retain what [the] plaintiff is seeking to recover." Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004). A claim for unjust enrichment is "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff"; therefore, an "unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 791 (2012). The elements of a claim for money had and received under New York law are similar to the elements of unjust enrichment: (1) the defendant received money belonging to the plaintiff; (2) the defendant benefitted from the receipt of the money; and (3) under principles of equity and good conscience, the defendant should not be permitted to keep the money.

---

[9] Plaintiffs also argue that Pinto's lack of documentation may have run afoul of SSA rules governing the conduct of Representative Payees, because the funds withdrawn from Joanne's Wells Fargo account were comprised of her SSA benefits. However, it is the truthfulness of the representations made on Pinto's invoices, not his compliance with SSA rules, that is at issue here.

Cohen v. BMW Inv. L.P., 144 F. Supp. 3d 492, 501 (S.D.N.Y. 2015). In brief, Plaintiffs argue that by receiving payment for expenses not incurred and services never provided, Pinto and CPI received funds that rightfully belonged to the SNT and should be forced to return these allegedly unearned funds.

### 1. Expenses

Plaintiffs claim that Pinto and CPI requested and received reimbursement for expenses they did not in fact incur, thereby being unjustly enriched. Defendants make the same argument they made with respect to Plaintiffs' expense-based fraud claims: that they have provided evidence in the form of Pinto's and Joanne's sworn statements that Pinto incurred every expense for which he was reimbursed, while Plaintiffs have failed to produce evidence demonstrating the opposite. Accordingly, Defendants argue, Plaintiffs cannot prove the first element of their unjust enrichment and money had and received claims: that Pinto and CPI received money belonging to Plaintiffs. Once again, Plaintiffs' only response is to cast doubt by pointing out that Pinto reported his expenses in round numbers and has not produced any receipts backing up his expenses. But this is Plaintiffs' case, and it is ultimately Plaintiffs' burden to prove that Defendants received money belonging to them. At the summary judgment stage, a nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). Plaintiffs have not offered any "hard evidence" demonstrating that there is a genuine dispute of fact as to whether Defendants were enriched at Plaintiffs' expense or received money belonging to Plaintiffs, and thus Defendants are entitled to summary judgment on Plaintiffs' unjust enrichment and money had and received claims based on Pinto's expenses. See Goldfine v. Sichenzia, 73 A.D.3d 854, 854–55 (2010) (granting summary

judgment on money had and received claim where plaintiffs failed to allege that defendant received money belonging to them).

### 2. Services—April 12–19, 2013

Plaintiffs next claim that Pinto and CPI were unjustly enriched when they allegedly inflated the hours worked by Pinto and his associates while searching for and tending to Joanne in Colorado between April 12 and 19, 2013. Again, Defendants point to Joanne's and Pinto's sworn statements that Pinto's invoices are accurate and that Pinto and his team spent twenty-four hours a day supervising her during the disputed period. (Defs.' 56.1 ¶ 26.)

Plaintiffs cite to no record evidence suggesting that Pinto and his associates did not in fact work the hours claimed on their invoices. Instead, Plaintiffs make the same argument they made with respect to their fraud claims based on this time period—that this billing "was self-evidently false" because Plaintiffs doubt that Pinto and his associates would have been physically able to work the number of hours for which they billed. Plaintiffs' unsupported doubts as to Pinto's ability to work the hours for which he billed, without more, are insufficient to defeat summary judgment, as summary judgment cannot be defeated "on the basis of conjecture or surmise." Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1992)). Moreover, as discussed above, the CPI Invoices do not demonstrate that Pinto or his driver worked for extreme stretches of time without sleeping, eating or taking a break. Instead, they merely reflect the time that Pinto and his driver billed for services administered over the relevant time period.

### 3. Services—Weekly Visit Duration and Frequency

It is not clear whether Plaintiffs include alleged overpayments for Pinto's weekly visits to South Beach as part of their unjust enrichment claim based on Pinto's invoices. Plaintiffs'

complaint alleges that "Defendants Pinto and CPI were enriched at Plaintiffs' expense by submitting invoices and accepting payment for expenses they did not incur and services they did not perform, as described above." (Compl. ¶ 626) (emphasis added). Arguably this allegation includes alleged overpayment for Pinto's weekly visits, but Plaintiffs do not address those overpayments at all in their discussion of the unjust enrichment claims in their brief in opposition. (See Pls.' Opp. 17–21.) And in their reply brief, Defendants do not list the unjust enrichment claim/fourth cause of action as pertaining to Pinto's weekly visits. (See Defs.' Reply 16 ("For these reasons, Defendants are entitled to summary judgment on Plaintiffs' claims related to Pinto's allegedly unperformed visitations (Plaintiffs' First, Third, Sixth, Eleventh, Thirteenth, and Fourteenth causes of action.").)

Assuming that Plaintiffs' complaint pleads an unjust enrichment claim as to the weekly visit duration and frequency, Defendants are also entitled to summary judgment on this claim. I have already determined that Plaintiffs fail to raise a genuine dispute of material fact as to the duration and frequency of Pinto's visits for the period before May 22, 2014. For the period after May 22, 2014, for which Plaintiffs have raised a factual dispute by pointing to the South Beach Visitor Logs, Defendants have argued broadly that they are nonetheless entitled to summary judgment for unjust enrichment claims related to the invoices under the doctrine of accounts stated. Under New York law, "[a]n account stated is an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due." Jim-Mar Corp. v. Aquatic Constr., Ltd., 600 N.Y.S.2d 790, 791 (App. Div. 1993). Such "'[a]n agreement may be implied where a [debtor] retains bills without objecting to them within a reasonable period of time, or makes partial payment on the account.'" H. Daya

Int'l Co. v. Arazi, 348 F. Supp. 3d 304, 311 (S.D.N.Y. 2018) (quoting Am. Express Centurion Bank v. Cutler, 916 N.Y.S.2d 622, 623 (App. Div. 2011)).

However, an account stated may be reopened upon proof of fraud or mistake. See Evolution Mkts., Inc. v. Alpental Energy Partners, LLC, 221 F. Supp. 3d 361, 372 (S.D.N.Y. 2016). Although the doctrine can be employed affirmatively, as a cause of action arising under New York law to recover payment due, see, e.g., LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 64 (2d Cir. 1999), the doctrine has also been employed as a defense against the reopening of a paid account, see, e.g., Assembly Point Aviation, Inc. v. Richmor Aviation, Inc., No. 13-CV-298, 2016 WL 7742808, at *7–8 (N.D.N.Y. Mar. 16, 2016); In re Rockefeller Ctr. Props., 241 B.R. 804, 819 (Bankr. S.D.N.Y. 1999).

Defendants argue that Plaintiffs, having paid the CPI Invoices, may not belatedly complain that the invoices were inaccurate. Plaintiffs respond that, with regard to the invoices, the doctrine of account stated should not apply because they have raised a triable issue of fact as to whether there was fraud, factual mistake, or other equitable considerations sufficient to permit a reopening of these accounts. As it pertains to these weekly visits, Plaintiffs argue that Bernard paid Pinto's bills "only because he was defrauded by Pinto and Wrigley," Wrigley falsely vouched for Pinto's honesty and accuracy when Bernard relied on her to ensure that Pinto was performing as promised, and Wrigley pressured Bernard to pay Pinto's invoices. (Pls.' Opp. 19.)

Plaintiffs submit that they have "presented 'substantial evidence'" of Pinto's fraud, but as stated above, Plaintiffs have not submitted any evidence outside of the South Beach Visitor Logs. At best, those logs are sufficient to show that Pinto may not have visited the requisite number of times. But as discussed above Plaintiffs have failed to convincingly argue that Pinto's representation (as recounted in Bernard's declaration) that he would visit Joanne three times per

31

week in exchange for a flat rate of $8,000 per month was a misrepresentation of a present fact rather than a promissory statement. As a result, Pinto's representations could not have been fraudulent. See Merrill Lynch & Co., 500 F.3d at 184 ("New York [law] distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement.").

Plaintiffs' also point to an email from Wrigley to Bernard, dated April 10, 2013, to suggest that Wrigley "falsely vouched for Pinto's honesty and urged Bernard to accept Pinto's bills as correct." (D.E. No. 88-3). Here, Plaintiffs seem to argue that Wrigley's purportedly false vouching for Pinto gives rise to a mistake of fact that is sufficient to re-open the account. This is incorrect. First, Wrigley's email was sent on April 10, 2013, at the very beginning of Pinto's involvement in this case—it cannot provide grounds for a factual mistake that induced Bernard to pay invoices well over a year later, from May 22 through September 30, 2014. Moreover, the email does not say what Plaintiffs purport it does. In the email, Wrigley writes "I DO TRUST HIM. I have spent a lot of time on this and I think Joanne trusts him for now." (Id.) Nowhere in the email does Wrigley vouch for the correctness of Pinto's bills. A unilateral mistake (such as Bernard's purportedly mistaken understanding of Pinto's trustworthiness) can be grounds to reform a contract where the plaintiff was "induced" into the contract "by the defendant's fraudulent misrepresentation." Simek v. Cashin, 738 N.Y.S.2d 393, 394 (App. Div. 2002). Plaintiffs have not provided any evidence that Wrigley's assertion that she trusted Pinto was fraudulent, or that it induced Bernard to pay Pinto's invoices over a year later.

Plaintiffs further rely on Bernard's declaration statement that "[i]n the initial period from April–June 2013, Wrigley led me to believe that if I did not pay [Pinto], he might abandon

32

Joanne, in some location I did not know, because Pinto and Wrigley refused to tell me where Joanne was." (D.E. No. 97 ¶ 82; see also Pls.' Opp. 20.) But this evidence, too, fails to show that Bernard was induced by mistake or fraud to pay Pinto's invoices for the visits covered by the South Beach Visitor Log. Indeed, the purported statements by Wrigley recounted in the Black Declaration occurred between April and June of 2013; the relevant time frame for the South Beach visits is May 22, 2014 to August 31, 2014—almost a full year later.

Additionally, Plaintiffs seem to argue that had Bernard known that Pinto was "making undisclosed withdrawals from Joanne's bank accounts or, in 2014, that he had redirected Joanne's SSDI payments to himself," Bernard would not have agreed to the invoices. Plaintiffs cite only limited record evidence for this premise. First, Plaintiffs cite to paragraph six of Bernard's declaration, which only supports the premise that Pinto made undisclosed withdrawals and became Joanne's payee—but not that he improperly retained the money. As discussed supra, Plaintiffs have produced no evidence to suggest that Pinto retained any of the money from Joanne's SSDI benefits or her Chase account—they have only produced evidence that the funds were withdrawn, nothing more. As a result, Defendants' explanations, discussed in Pinto's and Joanne's declarations, that the money was withdrawn for Joanne with her consent, have gone unrebutted. Moreover, a review of the record indicates that Bernard understood there were discrepancies between the Chase withdrawals that Pinto listed on his invoices and the withdrawals reflected in the Chase statements. (See, e.g., D.E. No. 88-9 at 3 (May 26, 2013 email from Bernard Black to Esaun Pinto in which Bernard recounts inconsistencies between the withdrawals listed on the invoices and withdrawals reflected in Chase statements).) Because Plaintiffs have not presented evidence that Pinto inappropriately retained funds, and because there is evidence on the record that

33

Bernard was aware of inconsistencies on the invoices and continued to pay Pinto, this too cannot defeat Defendants' account stated defense.

Finally, Plaintiffs point to an email between Bernard and Pinto in which they claim that Bernard objected to Pinto's bills. This is a generous gloss of the email. The cited email, from Bernard to Pinto sent on July 2, 2013 reads:

> I will pay your latest bill from June 3 forward, adjusted for any under or over payment prior to that. I continue to be frustrated by the lack of an integrated bill showing all expenses and payments. The attached spreadsheet is my best effort, after substantial effort, to build such a bill, relying on your statements for specific weeks and your most recent statement. My records show payment of $94,900.00 and billing of $90,776 for net overpayment of $4,214. This is for bills through June 24. If my records are not correct, please advise me. Cherie advises me that you will be able to document some additional expenses during that period, and I'm willing to consider that, if you provide me with details. Otherwise, I consider the period from inception through June 24 to be closed.

(D.E. No. 88-10 at 2.) This email does not reflect an objection by Bernard. Instead he consents to paying bills through June 3 and notes that he considers "the period from inception through June 24 to be closed." If anything, this email supports Defendants' argument of account stated—showing that Bernard "closed" a period of billing. Moreover, the email has only nominal relevance to invoices covering the May 22, 2014 to August 31, 2014 period, as the email was sent almost a year prior. As a result, Plaintiffs have not presented any evidence sufficient to defeat Defendants' account stated defense. Therefore, Defendants are entitled to summary judgment on the unjust enrichment claims with respect to the weekly visit duration and frequency.

### 4.    Bank Account Withdrawals and SSDI Benefits

Defendants also move for summary judgment on Plaintiffs' unjust enrichment and money had and received claims based upon Pinto's alleged retention of money withdrawn from Joanne's bank account and Joanne's SSDI benefits. As I concluded above with respect to Plaintiffs' fraud claims, Plaintiffs have not demonstrated a genuine dispute of material fact with respect to whether

Pinto retained these funds.  Accordingly, Plaintiffs cannot establish that Defendants received funds belonging to Plaintiffs, an essential element of their unjust enrichment and money had and received claims.  Defendants are therefore entitled to summary judgment on these claims.

### 5.  July and September 2014 Payments

Defendants are also entitled to summary judgment on Plaintiffs' unjust enrichment and money had and received claims based on the extra payments made by Wrigley to Pinto for his services in July and September 2014.  Plaintiffs fail to raise a triable issue of fact with respect to whether Defendants were enriched at Plaintiffs' expense or received money belonging to Plaintiffs. Plaintiffs' theory is that Pinto and CPI were unjustly enriched by the amount that Wrigley paid them on top of their usual flat monthly rate paid by Plaintiffs.  (See Compl. ¶ 670 ("The amount that Defendant Wrigley paid for those months should have been returned to the Estate of Renata Black, from which it would have been contributed to the SNT.").)  However, Plaintiffs admit that, although Wrigley sought reimbursement from the SNT for these extra payments to Pinto and CPI, Bernard denied her request. (Defs.' 56.1 ¶¶ 89–90.) At oral argument, Plaintiffs' counsel clarified that they "are not pressing [their] unjust enrichment claim with the money related to payments to Ms. Wrigley that were never made."  (O.A. 16:16–20, 16:21–17:9.)

### 6.  October 2014 Advance

Plaintiffs ninth cause of action for money had and received is based on Pinto's retention of $4,000 that Plaintiffs characterize as an advance payment for services to have been rendered in October 2014. (See Defs.' 56.1 ¶¶ 52–54.) It is undisputed that Bernard initially paid Pinto $8,000 in advance for services to be rendered in September 2014, (id. ¶ 53), and then subsequently instructed Pinto to reduce his monthly fee to $4,000 on September 2, 2014, (id. ¶ 54). In that email, Bernard instructed Pinto "[w]e are also at the start of a new month, September. For

September and going forward, please reduce your billing to half of the prior level ($4k/month), and document all visits to Joanne—record your Hours." (Id.) The parties dispute whether Pinto agreed to this reduction. (Id. ¶ 55.) Pinto responded to Bernard: "Got it. Call you later." (D.E. No. 88-15 at 1.) When Bernard subsequently wrote to Pinto on September 30, 2014, to terminate their agreement, he demanded that Pinto refund the "advance payment . . . for October 2014" of $4,000. (Id. ¶ 57.)

Defendants argue that Plaintiffs cannot establish the first element of their money had and received claim—that the defendant received money belonging to the plaintiff—because the money in question was willingly and intentionally paid to Pinto with the expectation of performance, not repayment. Indeed, "courts have found that plaintiffs lack the requisite possessory interest" for a money had and received claim "in money freely given to a defendant with the expectation of performance." Fernbach, LLC v. Cap. & Guarantee Inc., No. 08 Civ. 1265(SHS), 2009 WL 2474691, at *5 (S.D.N.Y. Aug. 12, 2009). Defendants also argue that "an action for money had and received is derived from an implied contract, and 'a contract cannot be implied in fact where there is an express contract covering the subject matter involved.'" Panix Promotions, Ltd. v. Lewis, No. 01 CIV. 2709(HB), 2002 WL 122302, at *3 (S.D.N.Y. Jan. 22, 2002) (quoting Julien J. Studley, Inc. v. N.Y. News, Inc., 70 N.Y.2d 628, 629 (1987)). In response, Plaintiffs argue that "Pinto did not breach a contract" and instead "Pinto and Wrigley defrauded" Plaintiffs into paying the advance "by misrepresenting Pinto's prior actions: by concealing Pinto's prior withdrawals of assets, and by falsely claiming that Pinto's earlier billing had been truthful." (Pls.' Opp. 26.)

The remedy for money had and received is available "if one man has obtained money from another, through the medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass." Panix Promotions, 2002 WL 1222302, at *2 (quoting Miller v. Schloss, 218 N.Y.

400, 408 (1916)).  But Plaintiffs have not presented any evidence to support their conclusory argument that "Pinto and Wrigley defrauded Bernard Black into paying Pinto $4,000, by misrepresenting Pinto's prior actions: by concealing Pinto's prior withdrawals of assets, and by falsely claiming that Pinto's earlier billing had been truthful." (Pls.' Opp. 26.)  Plaintiffs have not pointed to any evidence on the record that Pinto and Wrigley actively "concealed" Pinto's prior withdrawals of assets.  Indeed, there is ample evidence that Pinto reported some of the Chase withdrawals on the invoices.  (See, e.g., D.E. No. 88-4 at 3, 5, 8.)  As for the Wells Fargo account, as discussed above, Plaintiffs have not provided any evidence that Pinto improperly retained any funds that were withdrawn.  Additionally, Plaintiffs have not pointed to any instances of Pinto or Wrigley "falsely claiming that Pinto's earlier billing had been truthful," because they have failed to provide any evidence that the invoices and billing were not, in fact, truthful.  Plaintiffs have failed to provide any evidence that Bernard was fraudulently induced to pay Pinto $8,000.  Moreover, Plaintiffs appear to ignore Defendants' argument that Plaintiffs retain no possessory interest in money freely given with the expectation of performance, not repayment.  As a result, they have failed to establish the first prong of a money had and received claim.  Defendants are entitled to summary judgment on this claim.

### D.    Conversion Claims

Plaintiffs' eleventh and twelfth causes of action sound in conversion.  Under New York law, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."  Colavito v. N.Y. Organ Donor Network, Inc., 8 N.Y.3d 43, 49–50 (2006).  The two elements of conversion are "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's

rights." Id. at 50 (internal citations omitted).  Money can be the subject of a conversion claim, but, "[w]here the property is money, it must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner."  Republic of Haiti v. Duvalier, 211 A.D.2d 379, 384 (1995); see also Citipostal, Inc. v. Unistar Leasing, 283 A.D.2d 916, 919 (2001) ("Although 'specific money' can be the subject of a cause of action for conversion, 'a mere claim of monies paid out by mistake based upon a contract will not support' such a cause of action." (internal citations omitted) (first quoting Meese v. Miller, 79 A.D.2d 237, 242 (1981); and then quoting Marine Midland Bank v. Russo Produce Co., 65 A.D.2d 950, 952 (1978), modified, 405 N.E.2d 205 (N.Y. 1980))).  "However, even if a plaintiff meets all of the elements of a conversion claim, the claim cannot be validly maintained where damages are merely being sought for breach of contract."  Coughlin v. Jachney, 473 F. Supp. 3d 166, 201 (E.D.N.Y. 2020) (quoting Rentrak Corp. v. Handsman, No. 12-CV-1576 (JS)(ARL), 2014 WL 1342960, at *8 (E.D.N.Y. Mar. 31, 2014)).  "Thus, 'where a conversion claim is grounded in a contractual dispute, the plaintiff must show acts that were unlawful or wrongful as opposed to mere violations of contractual rights.'"  Id. (quoting OTG Brands, LLC v. Walgreen Co., No. 13-cv-9066(ALC), 2015 WL 1499559, at *9 (S.D.N.Y. Mar. 31, 2015)).

### 1. Invoices (Plaintiffs' Eleventh Cause of Action)

Plaintiffs base their first conversion claim on "Pinto and CPI's false and inflated invoices," alleging that Defendants "exercised an unauthorized dominion over" money paid to Pinto and CPI under these invoices "by taking it and keeping it under false pretenses."  (Compl. ¶¶ 676–79.) With respect to payments other than those made for Pinto's weekly visits during the time period for which Plaintiffs have produced visitor logs, I have already determined that Plaintiffs have proffered no evidence that Pinto and CPI's invoices were "false [or] inflated."  Other than this

rejected theory, Plaintiffs set forth no other basis to suggest that Pinto and CPI acted improperly in accepting payment from Plaintiffs. Accordingly, Defendants are entitled to summary judgment on these claims.

With respect to the payments for Pinto's visits for the period for which Plaintiffs have produced the South Beach Visitor Logs, Defendants further argue that Plaintiffs' conversion claim fails because Plaintiffs have presented no evidence that they made a demand for repayment of the allegedly overbilled funds. "Where the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property." Thyroff v. Nationwide Mut. Ins. Co., 360 F. App'x. 179, 180 (2d Cir. 2010) (summary order). Plaintiffs respond[10] that no demand for repayment was necessary because Pinto "defrauded Plaintiffs into transferring money to him," and thus his possession of the funds at issue was not originally lawful. (Pls.' Opp. 28.) Having already granted summary judgment for the Defendants on each of Plaintiffs' fraud claims, I reject this argument, and accordingly grant Defendants' motion for summary judgment on Plaintiffs' eleventh cause of action.

### 2.    October 2014 Advance (Plaintiffs' Twelfth Cause of Action)

Finally, with respect to Plaintiffs' twelfth cause of action alleging conversion with respect to the $4,000 that Plaintiffs characterize as an "advance" payment for Pinto's services in October 2014, Defendants argue, inter alia, that they are entitled to summary judgment because Plaintiffs merely seek to recoup a debt and do not seek return of a "specifically identifiable [fund] . . . subject to an obligation to be returned or to be otherwise treated in a particular manner." Duvalier, 211

---

[10] Plaintiffs also argue that such a demand would have been futile because "[i]t is obvious, given Pinto's and Wrigley's actions in the last several years, that any demands would have been futile." (Pls.' Opp. 28–29.) Plaintiffs do not elaborate further or cite to any record evidence to support this claim. Plaintiffs further note that "demand is also not required if, in the interim, the recipient of the property has transferred or destroyed it . . . ." (Id. at 29.) Again, Plaintiffs do not elaborate further or cite to any record evidence suggesting that Defendants transferred or destroyed the funds at issue. These arguments are conclusory and unsupported by the record evidence, and I therefore reject them.

A.D.2d at 384. Defendants are correct. Plaintiffs present no evidence indicating that the $4,000 in question was in specific tangible funds to which Plaintiffs were "entitled to immediate possession." Ehrlich v. Howe, 848 F. Supp. 482, 492 (S.D.N.Y. 1994). Instead, Plaintiffs admit that they paid Pinto $8,000 for services to be rendered in September of 2014, subsequently instructed him to halve his rate, and demanded that he repay $4,000 when Bernard terminated Pinto's services at the end of September. (See Defs.' 56.1 ¶¶ 53–55, 57.) A conversion claim may not be used to "enforce a mere obligation to pay money." Shetel Indus. LLC v. Adin Dental Implant Sys., Inc., 493 F. Supp. 3d 64, 123 (E.D.N.Y. 2020) (quoting Fantozzi v. Axsys Techs., Inc., No. 07 Civ. 02667 (LMM), 2008 WL 4866054, at *9 (S.D.N.Y. Nov. 6, 2008)). Defendants' motion for summary judgment on Plaintiffs' twelfth cause of action is therefore granted.

## E.   Wrigley's Aiding and Abetting Liability

Finally, Plaintiffs bring a standalone cause of action against Wrigley for aiding and abetting Pinto and CPI's allegedly tortious conduct. Because I grant summary judgment in favor of Defendants on each of the underlying claims, I also grant summary judgment in favor of Defendants on Plaintiffs' cause of action for aiding and abetting. See Bigio v. Coca-Cola Co., 675 F.3d 163, 172 (2d Cir. 2012) (explaining that aiding and abetting liability requires the existence of an underlying tort).

## V.   CONCLUSION

For these reasons, Defendants' motion for summary judgment is granted in its entirety and the Clerk of Court is respectfully directed to enter judgment accordingly.

SO ORDERED.

Dated: September 21 , 2021
      Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge

40